# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Representative ERIC SWALWELL ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:21-cv-00586-APM |
| ) | |
| DONALD J. TRUMP, et al. ) | |
| Defendants, ) | |
| ) | |
| ) | |

**PLAINTIFF'S COMBINED OPPOSITION TO THE MOTIONS TO DISMISS BY
DEFENDANTS DONALD J. TRUMP,
DONALD J. TRUMP JR., AND RUDOLPH GIULIANI**

This suit seeks to hold accountable those who caused the attack on the United States

Capitol on January 6, 2021.  Defendants here conspired with each other, and with others, to

prevent the United States Congress from declaring what everyone knew to be the truth: Joseph

Biden won the 2020 Presidential Election.  Defendants launched a campaign of incitement, lying

to their supporters that their country was being stolen from them until some were so frenzied,

they attacked a fundamental institution of our democracy.  Instead of allowing this case to

proceed to discovery, where the scope and scale of their misconduct would be developed,

Defendants seek to hide behind misconstrued privileges and overstated immunities to evade

accountability for their actions.  But immunity has limits, and a conspiracy to overthrow the

government is not protected by the First Amendment.

Defendants' motions should be denied.[1]

---

[1]       As the Court is aware, there are other cases before the Court related to the attack on the Capitol on January 6, notably *Thompson v. Trump*, 21-cv-400 APM and *Blassingame v. Trump*, 21-cv-858 APM.  Each suit names Donald Trump as a defendant and *Thompson* also names Rudolph Giuliani.  Defendants in those suits have filed motions to dismiss raising largely the same arguments as in this suit.  To the extent Plaintiffs in those suits have responded to arguments that also were raised in this action, Congressman Swalwell adopts those arguments and incorporates them by reference.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................... 9

ARGUMENT ................................................................................................................. 10

I.   DONALD TRUMP'S ACTIONS TO SECURE A SECOND TERM IN OFFICE
     THROUGH A VIOLENT UPRISING ARE NOT SHIELDED BY IMMUNITY ............... 10

   A.   Presidential Immunity Does Not Protect Trump's Personal and Unofficial Acts ......... 10
   B.   The Political Question Doctrine and the Westfall Act Do Not Bar This Lawsuit. ........ 15

II.  THE COMPLAINT IS NOT BARRED BY THE FIRST AMENDMENT ...................... 17

   A.   The First Amendment Does Not Protect Speech Made to Form a Conspiracy. ............... 18
   B.   The First Amendment Does Not Protect Speech That Incites Imminent Lawless Action. 19

III. PLAINTIFF HAS STANDING TO BRING EACH OF THE CLAIMS IN THIS
     LAWSUIT ............................................................................................................ 25

   A.   Plaintiff Has Standing to Bring a Section 1985(1) Claim Because He Holds an "Office,
        Trust or "Place of Confidence Under the United States."................................................ 25
   B.   Intervening Acts Do Not to Break the Chain of Causation; They Are What Defendants
        Intended and Encouraged.................................................................................................. 29

      1.   The Complaint Amply Alleges Harm. ........................................................................ 30
      2.   The Incited Rioters Are the Weapons Defendants Chose to Attack the Capitol; They
           Are Not an Intervening Cause. .................................................................................. 31

   C.   The Impeachment Judgment Clause Does Nothing to Bar Any of Plaintiff's Claims. ..... 32
   D.   Even If Normal Principles of Res Judicata or Collateral Estoppel Applied in This Context,
        They Would Not Work to Bar Any of Plaintiff's Claims.................................................. 35

IV.  PLAINTIFF PLAUSIBLY PLEADS ALL THE CLAIMS IN THE COMPLAINT
     UNDER THE APPROPRIATE STANDARDS .............................................................. 37

## <u>TABLE OF CONTENTS</u>

A.   Plaintiff Sufficiently Pleads Civil Conspiracy under Section 1985(1). ............................ 38

B.   Plaintiff Sufficiently Pleads D.C. and Common Law Claims. ......................................... 43

    1.   Aiding and Abetting ........................................................................................... 43

    2.   Negligence ......................................................................................................... 44

    3.   Civil Action for Bias Crimes Under D.C. Code § 22-3704 ........................................... 45

    4.   Intentional Infliction of Emotional Distress ...................................................... 46

CONCLUSION ......................................................................................................................... 48

# **TABLE OF AUTHORITIES**

Page

**Cases**

*Allen v. McCurry*, 449 U.S. 90, 94 (1980) ................................................................. 33

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) ................................................. 35, 36

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) .................... 36

*Baker v. Carr*, 369 U.S. 186 (1962) ......................................................................... 14

*Bell Atlantic v. Twombly*, 550 U.S., 544, 570 (2007) .................................................. 36

*Bible Believers v. Wayne Cty.*, 805 F.3d 228, 244-46 (6th Cir. 2015) .......................... 18

*Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499 (1984) .................. 20

*Boumediene v. Bush*, 553 U.S. 723, 765 (2008) ....................................................... 15

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) .................................................. 18, 19, 22

*Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972) .............. 18

*Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) ......................................... 22

*Clark v. Clabaugh*, 20 F.3d 1290, 1296 (3d Cir. 1994) ............................................. 42

*Clinton v. City of New York,* 524 U.S. 417, 438 (1998) ............................................. 10

*Clinton v. Jones*, 520 U.S. 681, 693 (1997) ...................................................... 9, 10, 11

*Colgate v. JUUL Labs, Inc.,* 402 F. Supp. 3d 728, 762 (N.D. Cal. 2019) ................... 31

*Comm. on the Judiciary, U.S. House of Rep. v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc)) ................................................................. 24

*Connick v. Myers,* 461 U.S. 138, 147–148 (1983) .................................................... 19

*Council on American Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) ........ 15

*District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984) ............................... 43

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* 472 U.S. 749, 761 (1985) .......... 19

## <u>TABLE OF AUTHORITIES</u>

*Freeman v. United States*, No. 20-13341, 2020 WL 7383191, at *1 (D.N.J. Dec. 16, 2020) ...... 13

*Griffin v. Breckenridge,* 403 U.S. 88, 97 (1971)..................................................... 25, 26

*Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983) .................................. passim

*Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 799 (D.C. 2011)................................. 29, 43

*Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1020 (5th Cir. 1987).................................... 20

*Hess v. Indiana*, 414 U.S. 105, 108-09 (1973) ....................................................... 18, 22

*Hicks v. U.S.*, 511 F.2d 407, 420 (D.C. Cir. 1975) .................................................... 30

*In re Global Crossings, Ltd. Securities Litigation*, 314 F. Supp. 2d 172 (S.D.N.Y. 2003).......... 13

*Konigsberg v. State Bar of California*, 366 U.S. 36, 49 (1961).................................... 16

*Kravetz v. Brukenfeld,* 591 F. Supp. 1383, 1388 (E.D.N.Y. 1984)............................... 38

*Lewis v. News-Press & Gazette Co.*, 782 F. Supp. 1338, 1341–42 (W.D. Mo. 1992) ........... 26, 27

*Maloney v. Murphy*, 984 F.3d 50, 58 (D.C. Cir. 2020)..................................... 24, 28, 31

*Mills v. Alabama*, 384 U.S. 214, 218-19 (1966) .................................................. 16

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 766 & n.11 (1984)............................ 37

*N.A.A.C.P. v. Claiborne Hardware*, 458 U.S. 886, 902 (1982)..................................... 22

*New York Times v. Sullivan,* 376 U.S. 254, 284–286 (1964)....................................... 20

*Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1037 (D.C. 2015) ........................................ 45

*Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982)........................................................ passim

*Nixon v. Fitzgerald*, 457 U.S. at 755.............................................................. 11

*Park v. City of Atlanta*, 120 F.3d 1157, 1161 (11th Cir. 1997) ................................... 42

*Powell v. McCormack*, 395 U.S. 486, 512-14 (1969)................................................ 28

*R.A.V. v. St. Paul,* 505 U.S. 377, 420 (1992)...................................................... 16, 19

## TABLE OF AUTHORITIES

*Republican Nat. Comm. v. Fed. Election Comm'n*, 461 F. Supp. 570, 574 (S.D.N.Y. 1978) ...... 11

*Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 203 (7th Cir. 1985) ............................. 41

*Scales v United States*, 367 U.S. 203, 229 (1961) ........................................................ 16

*Smith v. Hope Village, Inc.*, 481 F. Supp. 2d 172, 204 (D.D.C. 2007) ......................................... 31

*Snyder v. Phelps*, 562 U.S. 443, 453–54 (2011) ........................................................... 20

*State of Mississippi v. Johnson*, 71 U.S. 475 (1866) .................................................... 13

*Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1337 (7th Cir. 1977) ......................................... 26, 27

*Tah v. Global Witness Publ., Inc.*, 991 F.3d 231 (D.C. Cir. 2021) ........................................ 45

*Tri-Corp Housing Inc. v. Bauman*, 826 F.3d 446, 450 (7th Cir. 2016) ................................. 12, 23

*Trump v. Vance*, 140 S. Ct. 2412, 2416 ............................................................... 9, 10

*United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966) ............................................... 42

*United States v. Alvarez*, 567 U.S. 709, 717 (2012) ..................................................... 17

*United States v. Capriotti*, 2021 WL 229660, at * 4 (N.D. Ill. Jan. 22, 2021) ............................ 23

*United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990) ............................................. 18

*United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970) ............................................... 18

*USAir Inc. v. U.S. Dep't of Navy*, 14 F.3d 1410, 1413 (9th Cir. 1994) ..................................... 30

*Venetian Casino Resort, L.L.C. v. N.L.R.B.,* 793 F.3d 85, 89 (D.C. Cir. 2015) ......................... 12

*Washington v. Trump*, 487 F. Supp. 3d 976, 983 (E.D. Wash. 2020) ...................................... 13

*Washington v. Trump*, 847 F.3d 1151, 1157 (9th Cir. 2017) .............................................. 13, 14

*Windsor v. The Tennessean*, 719 F.2d 155, 161 (6th Cir. 1983) ............................................ 26

*Yeager v. U.S.*, 557 U.S. 110, 119-20 (2009) ............................................................ 36

# TABLE OF AUTHORITIES

**Statutes**

3 U.S.C. § 15 ................................................................................................... 7, 26

28 U.S.C. § 1331 .............................................................................................. 7, 41

28 U.S.C. § 1367 .............................................................................................. 7, 41

29 U.S.C. § 2679 .............................................................................................. 7, 14

42 U.S.C. § 1985 ............................................................................................. passim

42 U.S.C. § 1986 .............................................................................................. 7, 40

D.C. Code § 22-1805 ........................................................................................... 41

D.C. Code § 22-3704 ........................................................................................... 43

**Treatises**

2A J. Moore & J. Lucas, *Moore's Federal Practice* ........................................ 7, 37

PROSSER, HANDBOOK OF THE LAW OF TORTS § 30 (4th ed. 1971) ...................... 42

**Restatements**

Restatement (First) of Torts § 445 ......................................................................... 30

Restatement (Second) of Torts § 448 .................................................................... 30

**Other Authorities**

"Memorandum Opinion for the Attorney General, "Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He was Impeached by the House and Acquitted by the Senate," Office of Legal Counsel August 18, 2000 ................................................ 33, 34, 36

## INTRODUCTION

As set forth in the Complaint (ECF Dk. No. 1), Defendants and others conspired to prevent the lawful certification of the election of President Biden on January 6, 2021, through a months-long campaign of lies and deceit that culminated in violence-laced calls to save a country they claimed was being stolen.  They did so knowing the propensity of some of Donald Trump's followers to engage in political violence.  They did so knowing that Trump previously had approved of such violence.  They did so knowing that Trump had pressured state officials to tamper with election results and was publicly pressuring Vice President Mike Pence to do the same.  And they did so knowing that the crowd at the January 6 rally had been gathered for the express purpose of marching on the Capitol at the moment of certification.  Defendants, knowing all of *that*, exhorted the crowd to respond to the claimed theft of their country by "taking names and kicking ass," sacrificing their "blood," engaging in "trial by combat," "fight[ing] like hell," and playing by "different rules."  And when hordes of Trump's supporters did just that, Donald Trump reportedly was happy with the result, could not understand why others were not, and told a member of his own party who was under attack at the Capitol that the member simply was not as upset about the election as the rioters Defendants had inspired to violence.

After Senate Minority Leader Mitch McConnell invited this lawsuit, the Trump Defendants and Defendant Giuliani seek to have it dismissed.  They do so by lobbing a kitchen sink's worth of barely developed arguments that misconstrue presidential immunity, overstate the protections of the First Amendment, ignore the well-pled allegations in the Complaint, offer an interpretation of a key Reconstruction Era Civil Rights law that would weaken it beyond recognition, wildly distort the effect of an impeachment trial, and push standing doctrines never

before recognized in law.  They do so in an effort to escape the consequences of their months-long actions.  The Court should reject these overtures.

## ARGUMENT

**I.   DONALD TRUMP'S ACTIONS TO SECURE A SECOND TERM IN OFFICE THROUGH A VIOLENT UPRISING ARE NOT SHIELDED BY IMMUNITY**

At bottom, this lawsuit is about Donald Trump's desperate measures to hold on to the office he fairly lost to President Biden.  As part of his ongoing efforts to avoid accountability for what happened, Trump asks this Court to find that he enjoys special immunity from suit for his outrageous conduct simply because he happened to occupy the Office of the President at the time.  If this were the rule, any president could grab the federal government's sweeping powers and use them to stay in office, perhaps indefinitely, immune from suit or challenge if Congress lacked the political inclination to remove him.  But this cannot be so.  The president is not a king, and this Court should forcefully reject Trump's sweeping assertions of immunity.

### A.   Presidential Immunity Does Not Protect Trump's Personal and Unofficial Acts.

It is true that the President of the United States enjoys "absolute immunity from damages liability predicated on his official acts."  *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).  The purpose of this immunity doctrine is to ensure presidents can perform their official duties "effectively without fear that a particular decision may give rise to personal liability."  *Clinton v. Jones*, 520 U.S. 681, 693 (1997).  Thus, presidential immunity extends even to those acts falling "within the outer perimeter" of a president's "official responsibility."  *Nixon v. Fitzgerald*, 457 U.S. at 756.

Presidential immunity is not without limits, however, as it extends only as far as necessary to prevent "distortion of the Executive's 'decision-making process.'"  *Trump v. Vance*, 140 S. Ct. 2412, 2416 (*quoting Clinton v. Jones*, 520 U.S. at 694, n.19).  "[T]he sphere of

protected action" must still "be related closely to the immunity's justifying purposes" – here, the protection of "acts in performance of particular functions" of the presidency. *Id.* at 755. Thus, presidential immunity cannot be invoked as protection against the mere "distraction[s]" of civil litigation involving private conduct (*Clinton v. Jones, supra*) or the inconvenience and incursions of federal or state subpoenas (*see U.S. v. Nixon*, 418 U.S. 683, 702 (1974) (federal)), *Trump v. Vance, supra* (state)). It does not insulate a president against actions for equitable relief even with respect to official duties (*see Clinton v. City of New York,* 524 U.S. 417, 438 (1998)). And it unequivocally does not protect "unofficial conduct" with no relation to a president's official responsibilities. *Clinton v. Jones*, 520 U.S. at 693.

The question, then, is whether former President Trump's false claims about the integrity of the election and his incitement of others to attack the Capitol – conduct the Complaint alleges he undertook in his personal capacity as a losing candidate – are "particular functions" of the president entitled to immunity. The answer is, of course, no.

Trump does not actually identify a "particular function" he allegedly performed for which he seeks immunity. Instead, he claims protection for the mere fact that he was speaking to his supporters – before and during the January 6 rally – arguing that nothing could be "cloaked with more constitutional protection" than words uttered by a president. Trump Mot. 23.[2] According to Trump, these words lie "not at the 'outer perimeter' of his duties," but rather "at the dead center." Trump Mot. 9. But Trump conflates his role as a candidate with his role as President. It is true that Trump's words were at the "dead center" of his failed effort to stay in power

---

[2]      "Trump Mot. [page number]" refers to Donald J. Trump and Donald J. Trump Jr.'s Motion to Dismiss (ECF Dk. No. 14). "Giuliani Mot. [page number]" refers to Rudolph Giuliani's Motion to Dismiss Plaintiff's Original Complaint (ECF Dk. No. 13).

against the will of the American people, but that does not transform those words and actions into conduct relating to his official duties.

Trump's wildly overbroad position that merely uttering words constitutes an "act[] in performance of particular functions of" the presidency, *Nixon v. Fitzgerald*, 457 U.S. at 755, is inconsistent with the case law. The courts determine whether a presidential act is "official" or not based on "the nature of the function" at issue. *Clinton v. Jones*, 520 U.S. at 693. If all words uttered by a president were automatically protected simply because the president spoke them, the Supreme Court's requirement that courts look into the "nature of the function" would be irrelevant. But this is not the law.

More fundamentally, the act of speaking is not a function unique to the presidency, and construing it is as such would not ensure that the "sphere of protected action [is] related closely to the immunity's justifying purposes." *Nixon v. Fitzgerald*, 457 U.S. at 755. Indeed, conferring presidential immunity for something a president can freely do as a private citizen would completely undermine the immunity's purpose of safeguarding only the president's exercise of his *official* duties. Even purportedly narrower categories of "political speech by the President," Trump Mot. 9, or "rousing and controversial speech," *id.* 10, suffer the same problems. Although Trump does not try to define these terms in his motion, nearly everything a president says or does fairly could be labeled "political" or "rousing and controversial" simply because presidents tend to create headlines as a matter of course. *Cf. Republican Nat. Comm. v. Fed. Election Comm'n*, 461 F. Supp. 570, 574 (S.D.N.Y. 1978) ("Incumbent presidents have the advantage of free publicity; virtually all of their activities are inherently newsworthy.")

However, without a connection to an official function, speech on its own – even when "political" or "rousing and controversial" – cannot be protected by presidential immunity

because *a fortiori* it would not "relate closely to the immunity's justifying purpose" of protecting a president's official functions. *Nixon v. Fitzgerald*, 457 U.S. at 755. To hold differently would produce absurd results. Much action is undertaken through speech. If all speech by a president is privileged regardless of subject matter, there would be no principled distinction between a president's statements at a news conference about an important political summit or piece of legislation, and an order to a henchman to shoot someone on Fifth Avenue. The critical nexus to official functions of the presidency must exist.

Trump's efforts to reimagine his conduct as "petitioning the government for redress" of a problem (Trump Mot. 25) similarly fail.[3] First, the Complaint does not seek to hold Trump accountable for encouraging Congress to do anything; instead, it alleges that he unleashed a violent mob at the Capitol to *prevent* Congress from carrying out its constitutional duties. The remarks that are the basis of this suit were directed at the attendees at the rally, not Congress. To the extent Trump did address Congress directly, he demanded that Vice President Pence and individual members remedy false allegations of widespread voter fraud by throwing out the results of the voting in the Electoral College in furtherance of his purely personal agenda as a

---

[3]     To the extent Trump's argument is less that he enjoys presidential immunity and more that his conduct is protected by the First Amendment's Petition Clause, *see* Trump Mot. 25 (citing cases), that Clause protects only "good faith" efforts to petition the government. *Venetian Casino Resort, L.L.C. v. N.L.R.B.,* 793 F.3d 85, 89 (D.C. Cir. 2015). Trump's efforts here were unambiguously not in good faith. Ironically, the *Tri-Corp Housing* decision Trump cites upholds this very proposition, finding that a public official does *not* enjoy First Amendment protection when making "sham" attempts to "influence government activity," *Tri-Corp Housing Inc. v. Bauman*, 826 F.3d 446, 450 (7th Cir. 2016) – a distinction Trump conveniently omits from his brief. The D.C. Circuit in *Venetian Casino Resort* held the same, concluding that "while genuine petitioning is immune from [sanctions], sham petitioning is not," *id.* at 92 – a sham petition being one that is "objectively baseless" and "brought with the specific intent to further wrongful conduct through the use of governmental process." *Id.* (internal quotations and citations omitted).

political candidate, and not in the discharge of his duties as President.  Calling all of this "petitioning" would distort the term beyond recognition.[4]

Not surprisingly, no court has found that mere speech by a president in and of itself constitutes an official act subject to presidential immunity.  To the contrary, the cases are grounded in obvious examples of executive-level functions unique to the presidency – that is, duties one must actually be the president to discharge.  This includes, among others, making personnel decisions (*see Nixon v. Fitzgerald, supra*); determining contract awards (*see In re Global Crossings, Ltd. Securities Litigation*, 314 F. Supp. 2d 172 (S.D.N.Y. 2003))*; enacting federal legislation (*see State of Mississippi v. Johnson*, 71 U.S. 475 (1866)); and managing the logistics of a national emergency (*see Freeman v. United States*, No. 20-13341, 2020 WL 7383191, at *1 (D.N.J. Dec. 16, 2020)).[5]

It takes no imagination to see how the case here is different.  The Complaint alleges that Trump intentionally undermined public confidence in a national election he clearly lost; filed frivolous lawsuits to perpetuate this fiction; conspired with Defendants and others to unlawfully interfere with members of Congress as they performed their constitutional obligation to certify the winner of the election; and encouraged and incited his supporters to march to the Capitol to

---

[4]     This is not the first time Trump's words have come under scrutiny, and in other contexts courts appropriately have construed Trump's words against him in ruling against even otherwise legitimate executive functions.  *See, e.g., Washington v. Trump*, 487 F. Supp. 3d 976, 983 (E.D. Wash. 2020) (enjoining the U.S. Postal Service from implementing policy changes with negative impact on voting, citing Trump's "highly partisan words and tweets" as relevant evidence); *Washington v. Trump*, 847 F.3d 1151, 1157 (9th Cir. 2017) (enjoining Trump's first travel ban, which Trump publicly referred to as a "Muslim ban").

[5]     Indeed, the reason immunity still applies even when a president allegedly performs official acts "[in excess of] his legal authority," Trump Mot. 8, is because the *underlying acts,* notwithstanding the allegations of wrongdoing, are integral to the president's job description, and are, therefore, not purely personal or unofficial.  *See In re Global Crossings, Ltd.*, 314 F. Supp. 2d at 175.

disrupt the peaceful transition of power.  Compl. ¶¶ 1-5.  The Complaint further alleges that

Trump did these things in his personal capacity as a candidate with no connection to his job as

president.  *Id.* ¶ 15.  It is not even essential to these allegations that Trump was president; he

could have done exactly the same things if he were merely a non-incumbent candidate who lost.

Treating these and the other allegations as true, as the Court must, the Complaint sufficiently

establishes personal, unofficial conduct for which Trump is not entitled to immunity.

### B.  <u>The Political Question Doctrine and the Westfall Act Do Not Bar This Lawsuit.</u>

Trump's remaining arguments for immunity are equally unavailing.  *See* Trump Mot. 11

(asserting protection by the political question doctrine and the Westfall Act).  Neither legal

principle operates a bar to this lawsuit.

The political question doctrine is a narrow exception that removes from federal-court

jurisdiction a case or controversy that clearly is within the purview of a coordinate branch of

government, and for which the courts have no cognizable role in resolving.  *See generally Baker

v. Carr*, 369 U.S. 186 (1962).  However, "[i]t is settled law that the separation-of-powers

doctrine does not bar every exercise of jurisdiction over the President of the United States," and

courts "must balance the constitutional weight of the interest to be served against the intrusion on

the authority and functions of the Executive Branch."  *Nixon v. Fitzgerald*, 457 U.S. at 753-54;

*see also U.S. v. Nixon*, 418 U.S. at 693 ("[C]ourts must look behind names that symbolize the

parties to determine whether a justiciable case or controversy is presented.") (internal quotations

and citation omitted).  Where, as here, the constitutionality of a particular act of another branch

is at issue, resolution of the question is firmly committed to the courts.  *See Washington v.

Trump*, 847 F.3d at 1164 ("[I]t is beyond question that the federal judiciary retains the authority

to adjudicate constitutional challenges to executive action."); *Boumediene v. Bush*, 553 U.S. 723, 765 (2008) ("political branches" lack "the power to switch the Constitution on or off at will").

Likewise, courts determine whether conduct is covered by the Westfall Act because the Act immunizes a government employee from tortious conduct only if they were "acting within the scope of [their] office or employment."  29 U.S.C. § 2679(b)(1).  In each case, the courts are charged with applying relevant principles of agency law to make the threshold determination of whether the alleged conduct in fact was within the particular scope of employment.  *E.g., Council on American Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006).[6]

The Court clearly is empowered to decide whether, as the Complaint alleges, Trump engaged in conduct that was not part of his official duties and that was outside the scope of his employment, not to mention the serious implications of this conduct.

While the "bully pulpit" (Trump Mot. 10) might be the "dead center" of Trump's universe, the mere fact that a president speaks – even rousingly or controversially – does not by itself trigger presidential immunity.  This immunity exists to protect presidents in the exercise of the official functions of their office, not to protect their personal and unofficial acts – least of all the personal and unofficial acts of a losing candidate desperate for power by any means necessary.  Nor does it invoke the narrow protections of the political question doctrine or the Westfall Act.  The Complaint alleges that Trump spoke and acted in his personal capacity as a

---

[6]     To the extent Trump's reference to the Westfall Act in a single footnote (*see* Trump Mot. 11, n.6) constitutes a serious argument that the Act applies here, this defense fails for the same reasons Trump is not entitled to presidential immunity.  As we have noted, the Complaint alleges that Trump acted in his personal capacity as a candidate and not in an official capacity as President.  And, in any event, the Complaint alleges conduct by Trump that is so outrageous that it would fall outside the scope of any reasonable employment.

political candidate, and as such his words and actions fall outside the scope of any special immunity or protection.

## II.   THE COMPLAINT IS NOT BARRED BY THE FIRST AMENDMENT

Defendants next assert a complete defense to each count in the Complaint under the First Amendment.  To be sure, this lawsuit is not about "disapproval of the ideas expressed" or improper "content-based regulations."  Trump Mot. 21.  It is about accountability for dangerous and unprotected speech that directly caused substantial and lasting harm to Plaintiff and many others.

While it is true that one of the major purposes of the First Amendment is to "protect the free discussion of governmental affairs" that  "includes . . . all such matters relating to political processes," *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966), the First Amendment is not without limits.  One of those limits is speech used to create an illegal conspiracy, which enjoys no First Amendment protection whatever.  *See Scales v United States*, 367 U.S. 203, 229 (1961).  Moreover, the First Amendment draws a "line between permissible advocacy and impermissible incitation to crime or violence."  *R.A.V. v. St. Paul,* 505 U.S. 377, 420 (1992).  Thus, "[f]reedom of speech is not an absolute."  *Konigsberg v. State Bar of California*, 366 U.S. 36, 49 (1961).  Here, Defendants' behavior far exceeds any boundaries recognized by the First Amendment.

For months prior to January 6, Defendants lied about the election results and encouraged supporters to gather in D.C. on January 6 – the day Congress was to certify Biden as the winner of the election – and specifically encouraged them to "Stop the Fraud" (Compl. ¶ 32), "Stop the Steal" (Compl. ¶ 84), to "Be Brave" and "Do Something" (Compl. ¶ 74), or otherwise endorsed Trump's false claims of election-rigging and theft (*e.g.,* Compl. ¶ 63).  At the January 6 rally, Defendants threw gas on the fire by calling for "trial by combat"; by imploring the crowd to start

"taking down names and kicking ass," and suggesting the cause that day was worth the sacrifice of human life as in times past in America's history; by warning Trump's political opponents that "we're coming for you"; and by telling the rally attendees that "we're going down to the Capitol" and that "you'll never take back our country with weakness."  Compl. ¶¶ 108, 114, 119, 128. This was not advocacy for a particular political position or mere speech; it was a call to arms by a losing candidate – *after* an election he had lost – in support of an illegitimate power-grab.  At a bare minimum, these allegations cannot be rejected as a matter of law.

The point of the disinformation Defendants spread and their speeches at the rally is important: Defendants were not soliciting signatures for a petition or promoting a PAC to target politicians who steal elections; nor were they making anodyne remarks to supporters at a bake sale or picnic.  Defendants put into motion a combined effort to disrupt the peaceful transition of power for the sole purpose of preventing Congress from certifying the election that Donald Trump lost.  They fomented anger, distrust, and fear, and then set that all ablaze at the rally, which put in motion precisely the likely and foreseeable events that unfolded – just as Defendants intended.  Such conduct finds no shelter in the First Amendment.

A. **The First Amendment Does Not Protect Speech Made to Form a Conspiracy.**

The first claim in the Complaint is that Defendants conspired with others to interfere with Congress' certification of the Electoral College votes.  Compl. ¶¶ 166-184.  Defendants' position that such unlawful conduct is entitled to the utmost protection fails out of the gate.  In fact, there is no First Amendment protection for speech that establishes a conspiracy because the First Amendment does not protect "speech integral to criminal conduct."  *United States v. Alvarez*, 567 U.S. 709, 717 (2012).  Nor does it protect speech made to violate other provisions of law; as the Supreme Court has held, "First Amendment rights are not immunized from regulation when

they are used as an integral part of conduct which violates a valid statute." *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972).  Indeed, courts have expressly rejected the First Amendment defense to conspiracy charges in criminal cases.  *See United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970); *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990) ("Appellants were convicted of the act of conspiracy …. Their conduct was not protected by the First Amendment merely because, in part, it may have involved the use of language.").

Here, the Complaint alleges that Defendants "all conspired with … each other, and others to subvert the will of the people in the 2020 election [in violation of Section 1985(1)]," which efforts "culminated with the attack on January 6 [but] began long before then."  As we discuss, *infra*, these and other allegations, taken as true (as they must be), clearly plead Defendants' civil conspiracy and thus put Defendants' alleged conduct out of reach of the First Amendment.

In short, as to the Section 1985(1) claim, Defendants' First Amendment arguments simply do not apply.

**B.  The First Amendment Does Not Protect Speech That Incites Imminent Lawless Action.**

Nor does the First Amendment tolerate speech that directly incites lawlessness, as Defendants' speech did here.  The Supreme Court held in *Brandenburg v. Ohio*, 395 U.S. 444 (1969), that speech "directed to inciting or producing imminent lawless action and is likely to incite or produce such action" is not protected by the First Amendment.  *Id.* at 447.  To satisfy *Brandenburg* and fall outside the protection of the First Amendment, speech (i) must be directed at specific individuals, *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973) (per curiam); (ii) must "specifically advocate for listeners to take … action," *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 244-46 (6th Cir. 2015) (quoting *Hess*, 414 U.S. at 109), *cert. denied*, 136 S. Ct. 2013

19

(2016); and (iii) must be uttered with the specific intent "to produce … imminent disorder,"
*Hess*, 414 U.S. at 109.  All three factors resolve easily for Plaintiff here.

*First*, Defendants' speeches at the rally were "directed at specific individuals" – namely,
the thousands of people at the rally, whom Defendants had summoned to D.C. to be within
walking distance of the Capitol on the very day the certification vote took place.  The Complaint
alleges that Defendants "promoted, supported, and endorsed [the] rally near the White House,"
the purpose of which was "to gather a crowd in an effort to incite them to disrupt the certification
of the Electoral College votes by Congress, including the Plaintiff, and to deny President Biden
and Vice President Harris their respective offices."  Compl. ¶¶ 175-176.  These allegations,
which must be taken as true, are more than enough to satisfy the first requirement of the
*Brandenburg* test.

*Second*, Defendants "specifically advocate[d] for listeners to take … action."  As an
initial consideration, not only the words themselves, but also the context in which they are
uttered, must be assessed in determining whether speech constitutes unlawful incitement.  *See
Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* 472 U.S. 749*, 761 (1985) (quoting *Connick
v. Myers,* 461 U.S. 138, 147–148 (1983)) ("Deciding whether speech is of public or private
concern requires us to examine the "'content, form, and context' " of that speech, " 'as revealed
by the whole record.'"); *R.A.V. v. St. Paul,* 505 U.S. at 420 (whether speech is protected or not
"depends, not merely on the setting in which the speech occurs, but also on exactly what the
speaker had to say."); *cf. United States v. Stagno*, 839 Fed. Appx. 112, 115 (9th Cir. 2020)
(finding that "racial epithets alone, *in some contexts*, *can* be language that inflicts injury *or
incites a breach of the peace*") (emphasis added except for the original "can").

As in other First Amendment cases, the court is obligated "'to make an independent examination of the whole record.'" *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499 (1984) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 284–286 (1964)). "In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, *including what was said, where it was said, and how it was said.*" *Snyder v. Phelps*, 562 U.S. 443, 453–54 (2011) (emphasis added); *cf. Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1020 (5th Cir. 1987) ("The extent of the danger created by a publication … is not immaterial in determining the state's power to penalize that publication for harm that ensues").

To begin with, Defendants' words alleged in the Complaint are damning enough on their face:

- Giuliani:  After repeating Trump's baseless claims of fraud and theft, Giuliani promised to "fight to the very end to make sure" the election was not stolen and then exhorted "Let's have trial by combat."  Compl. ¶ 180.

- Brooks:  After falsely telling the crowd that "America is at risk unlike it has been in decades, and perhaps centuries," he implored everyone there to start "taking down names and kicking ass" and spoke reverently about how "our ancestors sacrificed their blood, sweat, their tears, their fortunes, *and sometimes their lives,*" before shouting "Are you willing to do the same?!"  Compl. ¶ 179.

- Trump Jr.:  After declaring that the Republican party was now "Donald Trump's Republican party" and it was "not just going to roll over and die," Trump Jr. then said "if you're gonna be the zero, and not the hero, we're coming for you, and we're gonna have a good time doing it."  Compl. ¶ 178.

- Trump:  After reminding the gathered crowd that the Democrats "rigged an election … [t]hey rigged it like they've never rigged an election before," he stated "We will never concede, it doesn't happen.  You don't concede when there's theft involved.  Our country has had enough.  We will not take it anymore and that's what this is all about."  Compl. ¶ 181.  He advised the crowd that "[w]hen you catch somebody in a fraud, you're allowed to go by very different rules."  Compl. ¶ 126.  And then he told the crowd that "we're going to the Capitol" and admonished that "You'll never take back our country with weakness.  You have to show strength, and you have to be strong."  Compl. ¶¶ 128, 181.

21

However, the objective and subjective meaning of these words – both express and implied – comes into even greater relief in context.  Putting aside Defendants' good-faith belief, or not, in the validity of their (utterly baseless) claims of election fraud, these claims in fact sounded a very real alarm about an unprecedented assault on one of this country's most sacred institutions.  By telling Trump's supporters for months that the election had been rigged and stolen, Defendants were, by all accounts, alleging a crisis usually perpetrated by dictators and strongmen – and on a scale not seen in this county since perhaps the Civil War and the Revolution – that in many instances can only be quelled with a violent response.  Indeed, if the country literally was being stolen, if a coup actually was underway, they asserted, violence would be acceptable – maybe even necessary.

The seriousness of Defendants' claims cannot be overstated in discerning the intended impact of their words.  Defendants were – and still are – telling nearly half the country, including all of those at the rally, that an election had been hijacked by the incoming president who had illegally usurped power and directly undermined the will of the people.  This is precisely the danger Thomas Jefferson warned about when he wrote in the Declaration of Independence "when a long train of abuses and usurpations … evinces a design to reduce [the people] under absolute Despotism, it is their right, it is their duty, to throw off such Government, and to provide new Guards for their future security."  Defendants here were calling for nothing less than an uprising to "throw off" a despotic government – and each of them made clear that those at the rally were uniquely situated and, indeed, duty-bound as "new Guards," to see it through.

The grave implications of Defendants' election-fraud claims made it at least likely, if not certain, that some or all of the rally attendees would heed their call stop a tyrannical government from rising to power and would go to the furthest lengths necessary to carry out the mission

Defendants had entrusted to them, including resorting to violence and other unlawful behavior. For these reasons, Defendants' words, particularly in context, readily satisfy the second prong in the *Brandenburg* analysis.

*Third*, Defendants specifically intended "to produce … imminent disorder." There were no calls for future harm or vague threats of distant action. The point of having a rally in the vicinity of Congress on the same day it was to certify Biden as the winner is self-evident. Defendants' call to action was explicitly limited to January 6 – indeed, to the *hours* immediately following the rally that day – because that was the only day when Congress would be voting to certify Biden's victory; it was Defendants' only chance to turn Trump's supporters into soldiers. In this regard, Defendants' speeches are akin to "fighting words" that provoke an immediate violent response, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942), which also enjoy no First Amendment protection.

The facts here starkly contrast those in cases where the Supreme Court has found the threat of lawless conduct to be too remote in time. For example, in *Brandenburg* itself, the court found dispositive the petitioner's statement "there might have to be some revengence [sic]" at some future time in concluding that this third prong was not satisfied. In *N.A.A.C.P. v. Claiborne Hardware*, 458 U.S. 886, 902 (1982), the court likewise concluded that a threat of future "discipline" for violators of a boycott was not likely to produce *imminent* disorder. And in *Hess, supra*, the Court found that a protestor's promise that "We'll take the fucking street later," or "We'll take the fucking street again" was not immediate enough to pass muster under *Brandenburg*. *Id.* at 107.

Rather than grapple with these undeniable truths, the Trump Defendants in particular try to duck the facts altogether by suggesting that public officials can *never* run afoul of the First

Amendment as a matter of law.  *See* Trump Mot. 10.  This familiar refrain that Trump and his

circle are above the law is as untenable as it is wrong.  There is no "public-official exception" to

the *Brandenburg* doctrine, nor would such an exception serve any legitimate public interest.  *See*

*Tri-Corp Housing, supra* (public officials have "every right" to urge action from constituents and

other officials "*as long as they refrain from making the kind of threats that the Supreme Court*

*treats as subject to control under the approach of* Brandenburg v. Ohio.").  *Id.* at 449 (emphasis

added).  More to the point, as we discuss *supra*, the Complaint alleges that Trump was acting in

an *unofficial*, purely personal capacity, so even if such a carve-out did exist it would not apply

here.

The little attention Defendants ultimately give to their actual words at issue in the

Complaint amount to "denials by counter-assertion" that are not appropriate at the motion-to-

dismiss stage.  *See* Giuliani Mot. 18 ("There is no plausible way to construe [the speeches at the

rally as] inciting a clear and present danger of mob action."); Trump Mot. 33 (asserting other

words that "unambiguously contradict[] any premise that Defendants sought anything other than

peaceful protests.").  They argue their words could not cause violence and ask the Court to

ignore the dangerous mob that followed their words.  *Cf. United States v. Capriotti*, 2021 WL

229660, at * 4 (N.D. Ill. Jan. 22, 2021) ("The events of January 6, 2021 stand as an abject

demonstration of the harm that can be done, not just to individuals, but to the institutions of U.S.

democracy when incitements to violence transform into actual violence").  As we discuss, *infra,*

the Complaint more than sufficiently alleges words and conduct that plausibly make out the

elements of incitement and Plaintiff's other claims.

III.    **PLAINTIFF HAS STANDING TO BRING EACH OF THE CLAIMS IN THIS LAWSUIT**

Defendants also assert that Congressman Swalwell lacks standing to bring this lawsuit. As we discuss, he plainly does.  In assessing whether a plaintiff has standing to assert a claim, this Court must "accept as true [his] material factual allegations."  *Maloney v. Murphy*, 984 F.3d 50, 58 (D.C. Cir. 2020).  It must also "assume that [he] would prevail on the merits of [his] lawsuit" to "the extent that it bears on the standing inquiry."  *Id.* (citing *Comm. on the Judiciary, U.S. House of Rep. v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc)).

Defendants float several threadbare arguments as to why Plaintiff purportedly lacks standing to bring some or all of his claims against them.  Those arguments fail, often in straightforward ways.

### A.    Plaintiff Has Standing to Bring a Section 1985(1) Claim Because He Holds an "Office, Trust or "Place of Confidence Under the United States."

The lead claim in the Complaint alleges a violation of Section 1985(1), which prohibits exactly what happened on January 6: a concerted effort by a group of people to keep officials of a governmental unit of the United States from "discharging any duties" of the particular unit.  42 U.S.C. § 1985(1).  The "officials" within the scope of Section 1985(1)'s protection are "any person" who holds "any office, trust, or place of confidence under the United States."  *Id.*  When such a person has been "injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States," he or she "may have an action for the recovery of damages occasioned by such injury or deprivation."  *Id.* § 1985(3).  The plain language of Section 1985(1) therefore applies to Plaintiff and prohibits Defendants' conspiracy that culminated in the January 6 attack.

25

Defendants try to artificially narrow the application of Section 1985(1) by reading it through the lens of remote-in-time texts and wholly separate common-law terms of art. *See* Trump Mot. 19-21. Their arguments are unavailing and conflict with the Supreme Court's holding that Section 1985 be accorded "a sweep as broad as [its] language." *Griffin v. Breckenridge,* 403 U.S. 88, 97 (1971).

Defendants first argue that since the Constitution bars members of Congress from "holding any office under the United States," *see* U.S. Const. art. I, § 6, cl 2, the phrase "office … under the United States" in Section 1985(1) should be read to exclude members of Congress. Trump Mot. 19. They offer no reason to believe the Congress that passed Section 1985 in 1871 had that understanding in mind. The clear import of that constitutional language is to bar a member of Congress from holding another position in the federal government while serving in Congress. It does not mean that a member of Congress does not hold an office under the United States.

But even if Defendants were right about what it means to hold an "office under the United States," Section 1985 protects more than just office holders; it protects those holding any "trust" or "place of confidence under the United States" as well. Members of Congress fall within the plain meaning of those terms if nothing else.

Defendants' sole argument to the contrary relies on a wholly separate term of art: that of holding "an office of trust or profit." The Constitution and the common law, they argue, use that term to refer to those in the employ of the executive, the judiciary, or the church, not the legislature. Trump Mot. 20. As before, Defendants offer no reason to believe that the Congress that passed Section 1985 equated holding "an office of trust or profit" with "holding any . . . trust

. . . under the United States."  If anything, the decision *not* to use that same term of art suggests a difference in meaning, not a reproduction of it.

Defendants, in any event, offer no reason at all – literally none – as to why members of Congress do not hold a "place of confidence" despite satisfying the plain meaning of that term. The cases interpreting Section 1985(1) show precisely that they do.  As noted above, the statute is to be accorded "a sweep as broad as [its] language."  *Griffin,* 403 U.S. at 97.  It is "a statute cast in general language of broad applicability," *Lewis v. News-Press & Gazette Co.*, 782 F. Supp. 1338, 1341–42 (W.D. Mo. 1992), the purpose of which is to protect the "federal interest in the carrying out of federal functions," *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1337 (7th Cir. 1977).  Courts have repeatedly interpreted it as such.  They have done so with regard to the kinds of attacks on person or property that can trigger application of the statute.  *See, e.g.*, *Windsor v. The Tennessean*, 719 F.2d 155, 161 (6th Cir. 1983) (finding that defamation, not just physical violence, can trigger application of the statute).  And they have done so with respect to the kinds of officials who qualify as holding "any office, trust, or place of confidence under the United States."

In *Lewis v. News-Press & Gazette Co.*, for example, a trial court in another district concluded that *state* court judges qualify as persons holding "any office, trust or place of confidence under the United States" and therefore have standing to raise claims under Section 1985(1).  *Lewis*, 782 F. Supp. at 1342.  It did so for reasons that apply equally here, if not more so.  State court judges, it noted, hold "a unique position of mixed state and federal authority and responsibility."  *Id.* at 1341.  They "decid[e] issues of federal constitutional dimension on a regular basis."  *Id.* at 1342.  The Constitution "explicitly recognizes the trust and confidence placed in state judges" in that they "are bound by the United States Constitution, *see* U.S. Const.

art. VI, cl. 2," and must "take an 'Oath or Affirmation, to support this Constitution.'  U.S. Const. art. VI, cl. 3."  *Id.*  They in turn are "bound by the decisions of the United States Supreme Court."  *Id.*  And – in the particular case before that court – "the specific dispute at issue" stemmed from the judge's "decision on a federal constitutional question."  *Id.*  "Each of these factors," the court held, "underscore the 'trust' and 'confidence' placed in a state judge to decide federal constitutional issues" and meant that the plaintiff there held, "for purposes of this case, an 'office, trust, or place of confidence under the United States.'"  *Id.*

Those factors suffice all the more to establish that *federal* legislators hold "an office, trust, or place of confidence under the United States," particularly in a case like this one. Congressman Swalwell holds not merely a "position of mixed state and federal authority and responsibility," *id.* at 1341, but a position solely of federal authority and responsibility.  He is involved in issues of federal law not just "on a regular basis," *id.* at 1342, but every single day. The Constitution "explicitly recognizes the trust and confidence placed in" him by likewise requiring him to "take an 'Oath or Affirmation, to support this Constitution.'  U.S. Const. art. VI, cl. 3."  *Id.*  He, too, is "bound by the decisions of the United States Supreme Court."  *Id.*  And "the specific dispute at issue" here, *id.*, relates directly to his "carrying out of federal functions," *Stern*, 547 F.2d at 1337 – specifically, his responsibilities under the Electoral Count Act.  *See* 3 U.S.C. § 15.

As such, Section 1985(1) creates a statutory injury for a certain kind of conspiracy that allows a plaintiff to bring suit if he is a "party so injured or deprived."  By limiting suit to individuals who suffer injury, the statute defines an injury that is personal to the member as opposed to one that attaches to the institution.  It is irrelevant to the standing inquiry that every member of Congress so injured has a right to bring suit; a right shared by all members is not

thereby a right of the institution as opposed to a personal right.  Every member of Congress has a

right to a congressional salary – and only has that right by virtue of their office – but that does

not make it an institutional right; it remains a right personal to each member, the wrongful

deprivation of which affords them standing to sue.  *Powell v. McCormack*, 395 U.S. 486, 512-14

(1969); *Maloney*, 984 F.3d at 66 ("The injury was to Powell's own performance of his legislative

job, and so ran to and with the person, not the institution.").

The Complaint shows that the injuries at the center of this suit are personal to Plaintiff

and others in the subset of members who were threatened by Defendants, and in the subset of

members who were injured by the conspiracy.  As the Complaint details, the former president

and his co-conspirators repeatedly singled out "RINOs" (Republicans in Name Only) and

"socialist Democrats" as the targets of their attacks.  Compl. ¶¶ 58, 84, 107.  As multiple Trump-

loyalist members have since admitted, *they* did not feel threatened by the violent mob that

invaded the Capitol.  Senator Ron Johnson, for instance, stated openly that he "never felt

threatened" on January 6, but might have if the protesters had different political motivations.[7]

The complaint sufficiently alleges that Plaintiff suffered the injury created by Section

1985(1).  He, therefore, has standing to bring a claim under that section.

**B.   Intervening Acts Do Nothing to Break the Chain of Causation; They Are What Defendants Intended and Encouraged.**

Defendants also argue that Plaintiff lacks standing more generally because he makes only

"conclusory allegations of unknown emotional harm" and because the "intervening acts of third-

---

[7]      Tal Axelrod, "GOP senator says he may have felt unsafe if BLM, antifa had stormed Capitol," *The Hill* (Mar. 13, 2021) *available at* https://thehill.com/homenews/senate/543050-gop-senator-says-he-didnt-feel-unsafe-during-riot-but-would-have-if-blm.

party rioters" are what actually caused him harm.  *See* Trump Mot. 15-17.  Neither is true, and manifestly so.

> ### 1.      The Complaint Amply Alleges Harm.

As to the first, the Complaint very clearly explains – in paragraphs Defendants' motions simply ignore – how Plaintiff legitimately came to fear for his life that day.  He and other members of Congress "were trapped in the House chamber as plainclothes officers barricaded doors" and literally "held off the mob at gunpoint."  Compl. ¶ 6.  "Fearing for their lives," Plaintiff and others actually "masked their identities as members of Congress" and "took shelter throughout the Capitol complex."  *Id.*  As they were in "mortal danger," *id.* ¶ 7, Plaintiff "texted with his wife in what he felt could be his last moments, telling her, 'I love you very much.  And our babies,'" *id.* ¶ 225.  From all of that, Plaintiff understandably has suffered "severe emotional distress."  *Id.* ¶ 226.

Defendants' motions offer nothing – not a single reason or a single case cite – suggesting why it is not plausible that a mob that indisputably broke into a secure federal building – the *U.S. Capitol* no less – and had to be held back by barricaded doors and drawn guns would not cause one of its intended targets to suffer severe emotional distress.  Just being "in close proximity to gunshots that killed" someone suffices to state a claim for *negligent* infliction of emotional distress."  *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 799 (D.C. 2011).  Plaintiff here was in proximity to so much more.

A complaint is not required to detail the full extent of a plaintiff's injuries; less still is that relevant to the standing inquiry.  Standing requires merely the existence of concrete harm.  The Complaint amply alleges that.

2.      **The Incited Rioters Are Not an Intervening Cause; They Are the Weapons Defendants Chose to Attack the Capitol.**

Defendants' second argument is that "it was the independent and intervening acts of third-party rioters" that harmed Plaintiff, not Defendants.  Trump Mot. 16; *see also* Giuliani Mot. 12-13.  Defendants again offer no argument, nor cite to a single case, explaining why that is so.

First, as to the Section 1985(1) claim, the rioters are not intervening actors; they are co-conspirators whose actions do not break the chain of causation.  *See, e.g.*, Comp. ¶¶ 6, 59.  Their acts are in fact *part of* the chain of causation as they are attributed to each of the other co-conspirators, including Defendants.  *See, e.g.*, *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983) ("A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable.").

Even if the Complaint did not allege that Defendants conspired with the rioters, Defendants' argument would still fail because "[a] superseding cause must be something more than a subsequent act in a chain of causation; it must be an act that was not reasonably foreseeable[.]"  *USAir Inc. v. U.S. Dep't of Navy*, 14 F.3d 1410, 1413 (9th Cir. 1994) (internal citation omitted); *cf. Hicks v. U.S.*, 511 F.2d 407, 420 (D.C. Cir. 1975) ("if injury be caused by the concurring negligence of the defendant and a third person, the defendant is liable to the same extent as though it had been caused by his negligence alone") (internal quotation marks and citation omitted).  When a negligent actor "realize[s] or should have realized the likelihood" that his negligence would "create[d] a situation which afforded an opportunity" for a third party to commit an intentional crime or tort, the intentional crime or tort is not a superseding cause of the resulting harm:

> The act of a third person in committing an intentional tort or crime is a
> superseding cause of harm to another resulting therefrom, although the actor's
> negligent conduct created a situation which afforded an opportunity to the third

person to commit such a tort or crime, **unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.**

Restatement (Second) of Torts § 448 (emphasis added); *see Smith v. Hope Village, Inc.*, 481 F. Supp. 2d 172, 204 (D.D.C. 2007) (relying on Restatement (Second) of Torts § 443 for related principle). That is precisely what the Complaint alleges – that Defendants, knowing the propensity of some of President Trump's followers to engage in political violence, negligently (if not recklessly or intentionally) told them things they knew to be false, but which, if true, might indeed justify political violence. Compl. ¶¶ 163, 173, 174, 196, 197; *see Colgate v. JUUL Labs, Inc.,* 402 F. Supp. 3d 728, 762 (N.D. Cal. 2019) ("Plaintiffs' allegations, if proven, are sufficient to show that JUUL had reason to know that its conduct would encourage illegal use and trade of its products; thus, the allegedly illegal activity was foreseeable and not an intervening cause."). Allegations of incitement so clearly satisfy that standard that the first Restatement of Torts used incitement to riot as an example to illustrate the principle. *See* Restatement (First) of Torts § 445, ill. 2. And for purposes of standing, it must be assumed that Plaintiff will prevail on the merits of his incitement claims. *Maloney*, 984 F.3d at 58.

In short, Defendants' causation arguments are without merit.

**C.  The Impeachment Judgment Clause Does Nothing to Bar Any of Plaintiff's Claims.**

Next, Defendants half-heartedly maintain that Donald Trump's impeachment and acquittal bar this lawsuit under the Impeachment Judgment Clause (Trump Mot. 12-14.[8]). *See* U.S. Const. art. I, § 3, cl. 7. This position is demonstrably wrong because the drafters of the

---

[8]       Even if this argument were valid (it is not, for the reasons that follow), it would only apply to President Trump, the only defendant to have been impeached.

Impeachment Judgment Clause envisioned subsequent civil, and even criminal, liability for acquitted officials.

Defendants first maintain that the Constitution's Impeachment Judgment Clause bars re-litigation of any claim of which a federal official has been impeached but acquitted.  Their sole argument is that the second half of the clause states that a "Party convicted shall nevertheless be liable and subject to . . . Judgment," and that under the principle of *expressio unius exclusio alterius* this language must mean that *only* a "Party convicted" may be subject to further "Judgment."  Trump Mot. 13.  Defendants lifted that argument from the Office of Legal Counsel opinion they cite on pages 13 and 14 of their motion, right down to the case they cite for the *expressio unius* principle.  *See* Memorandum Opinion for the Attorney General, "Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He was Impeached by the House and Acquitted by the Senate," August 18, 2000 ("Opp. O.L.C.") at 114-19[9] (formulating argument why clause might be read to bar subsequent criminal prosecution).

What Defendants fail to disclose are the 35 pages of analysis that follow, in which OLC (1) notes that *expressio unius* is "regularly rejected" as an interpretive aid, *id.* at 119 (collecting cases), and then (2) rejects the principle – and Defendants' entire argument here – based on the full text of the clause, constitutional structure, its drafting history, and the historical backdrop of impeachment in the United Kingdom.  *See id.* at 119-155.

The full text of the clause reads as follows:

> Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

---

[9]     Available at https://www.justice.gov/file/19386/download.

U.S. Const. art. 1, § 3, cl. 7.  As the OLC opinion explains, limiting judgments to removal from office and disqualification from future office was an American innovation; the House of Lords retained authority on impeachment to impose the full range of criminal sanctions, including death.  Op. O.L.C. at 120.  Against that backdrop, expressly stating that those convicted were "nevertheless" liable to future judgment was not an affirmative statement that only such officials could be subjected to future liability, but simply an acknowledgement that limited American-style impeachment did not immunize a convicted official from the full range of sanctions he would be subject to under British-style impeachment.

The historical record amply bears that out.  Not a single person involved in framing or ratifying the Constitution appears to have stated that only those convicted by the Senate may be subject to future liability – an extremely odd silence if that were the purposes of the clause.  *Id.* at 124.  Two influential participants, by contrast, *did* state that the clause did *not* exempt those acquitted by the Senate from future judgments.[10]  Not surprisingly, the historical evidence likewise indicates "that the framers and ratifiers believed that an impeachment trial where only removal and disqualification were at stake did not constitute an instance of jeopardy."  *Id.* at 129.  And as a structural matter, the possibility of prosecution after acquittal makes sense because acquittal on impeachment may permissibly stem from legal or jurisdictional doubts about the propriety of impeachment, not a view on the merits of the charged conduct.  *Id.* at 131.[11]

---

[10]     James Wilson, "a leading figure at the Constitutional Convention," a "member of the Committee of Detail, *which drafted the Impeachment Judgment Clause*," and later "an Associate Justice of the Supreme Court," stated during the Pennsylvania ratifying convention that those acquitted on impeachment nevertheless "may be tried by their country, and if their criminality is established, the law will punish."  Op. O.L.C. at 124 (emphasis added).  And Edmund Pendleton, "the President of the Virginia Supreme Court and of the Virginia Ratifying Convention," interpreted it the same way.  *Id.* at 124-25.

[11]     As explained below, that was precisely the case in President Trump's acquittal on the impeachment at issue here.

For those reasons and more, the OLC opinion from which Defendants draw their argument thoroughly rejects it.  The text, historical context, and legislative history of the clause all converge on the same conclusion: Because of its limited remedies, the Impeachment Judgment Clause does not bar future litigation against an acquitted federal official.

**D.  Even If Normal Principles of Res Judicata or Collateral Estoppel Applied in This Context, They Would Not Work to Bar Any of Plaintiff's Claims.**

The fact that the Impeachment Judgement Clause was intended to allow for subsequent liability by impeached-but-acquitted officials ends the inquiry into whether such subsequent proceedings are permitted.  But even if the question were to be decided by application of the normal principles of res judicata and collateral estoppel, *see* Trump Mot. 14-15, the result would be the same.

Res judicata manifestly does not apply.  "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  The parties here clearly are not the same as they were in the impeachment proceeding, and Defendants fail to argue, at all, why Plaintiff is in privity with the House.

Collateral estoppel does not bar any claims here either.  "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude re-litigation of the issue in a suit on a different cause of action involving a party to the first case." *Id.* (emphasis added).  But it is impossible to discern any fact that was "necessary" to the Senate's judgment in acquitting former President Trump.  The impeachment verdict was accompanied by no statement of reasons nor suggested in any other way the basis on which the verdict was rendered.  Nothing about the verdict suggests it was based on the merits of the claims prosecuted by the House.  As noted above, precisely what makes the Senate *qua* impeaching

35

court different from an Article III court is that the impeachment "jury" might permissibly acquit

based on legal or jurisdictional considerations.  Op. O.L.C. at 131.  And that is exactly what the

public record reveals about the vote here based on the post-trial comments of a number of

senators:

- <u>Sen. Mitch McConnell</u>: "Others, such as Minority Leader Mitch McConnell of Kentucky, said they based their voted on procedural grounds—that the Senate did not have jurisdiction to convict a president who was no longer in officer—and not as a judgment of Trump's behavior."[12]

- <u>Sen. Marco Rubio</u>: "Impeachment is not a way of sending a message or taking symbolic action. . . . I voted to acquit former President Trump because I will not allow my anger over the criminal attack of January 6th nor the political intimidation from the left to lead me into supporting a dangerous constitutional precedent."[13]

- <u>Sen. Roger Wicker</u>: "I am convinced that impeachment was intended only as a means of removing presidents and other officials from office. On two occasions during this trial, I had already voted not to proceed to trial based on this jurisdictional issue. My vote for acquittal today was consistent with those previous votes."[14]

- <u>Sen. Richard Shelby</u>: "The Constitution speaks of removing a sitting president, not a private citizen.  I recently voted to dismiss this case based on its questionable constitutionality."[15]

---

[12]     Todd Ruger, "Senate voted to acquit Trump for incitement of Jan. 6 insurrection," *Roll Call* (Feb. 13, 2021), *available at* https://www.rollcall.com/2021/02/13/trump-acquitted/

[13]     Sen. Marco Rubio (R-FL), Press Release, "Rubio Statement on Impeachment," (Feb. 13, 2021) *available at* https://www.rubio.senate.gov/public/index.cfm/2021/2/rubio-statement-on-impeachment.

[14]     Sen. Roger Wicker (R-Miss), Press Release, "Wicker Votes to Acquit President Trump," (Feb. 13, 2021) *available at* https://www.wicker.senate.gov/public/index.cfm/2021/2/wicker-votes-to-acquit-president-trump

[15]     Sen. Richard Shelby (R-Ala.), Press Release, "Shelby Statement on Conclusion of Impeachment Trial," (Feb. 13, 2021) *available at* https://www.shelby.senate.gov/public/index.cfm/2021/2/shelby-statement-on-conclusion-of-impeachment-trial

- <u>Sen. John Boozman</u>: "'I believe that impeachment is reserved primarily for removing people from office. The president's removed.'"[16]

The Senate did not "necessarily decide," by acquitting Donald Trump, that he was factually innocent of the conduct alleged.  And that is enough to defeat collateral estoppel.  *See Yeager v. U.S.*, 557 U.S. 110, 119-20 (2009) (if "a rational jury *could have* grounded its verdict upon an issue *other than that which the defendant seeks to foreclose from consideration*," collateral estoppel does not apply) (internal quotation marks omitted, emphasis added).

Neither res judicata nor collateral estoppel bar Congressman Swalwell's claims against Trump or any of the other Defendants.

## IV.    PLAINTIFF PLAUSIBLY PLEADS ALL THE CLAIMS IN THE COMPLAINT UNDER THE APPROPRIATE STANDARDS

Defendants' remaining arguments are unsuccessful attacks on the sufficiency of the allegations that are easily defeated.  Under Rule 8 of the Federal Rules of Civil Procedure, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible when the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  This standard merely "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Plausibility is a lower standard than probability; a given set of facts may well be subject to diverging interpretations, each of which is plausible.  *See Anderson v. Bessemer City*, 470 U.S.

---

[16]    Frank Lockwood, "Boozman, Cotton vote to acquit," *Arkansas Democrat Gazette* (Feb. 14, 2021) *available at* https://www.arkansasonline.com/news/2021/feb/14/boozman-cotton-vote-to-acquit/

564, 575 (1985) ("two or more witnesses" may tell mutually inconsistent but "coherent and facially plausible stor[ies]"); *accord Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012).  If there are two plausible scenarios, then a motion to dismiss should not be granted; instead, the issue should go to the fact finder.  *See id.*; *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 766 & n.11 (1984) (the meaning of documents that are "subject to" divergent "reasonable . . . interpret[ations]" either as "referring to an agreement or understanding that distributors and retailers would maintain prices" or instead as referring to unilateral and independent actions, is "properly . . . left to the jury"); *id.* at 767 n.12 ("The choice between two reasonable interpretations of . . . testimony properly [i]s left for the jury.").

   A. **Plaintiff Sufficiently Pleads Civil Conspiracy under Section 1985(1).**

   A Section 1985(1) claim requires the plaintiff to allege the elements of civil conspiracy, specifically "(1) an agreement between two or more defendants, (2) to participate in an unlawful act, (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement, and (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam*, 705 F.2d at 477.  The complaint amply pleads each of these things.

   The conspiracy here was not some far-fetched scheme held together by loose threads, and Defendants' intent to join it is anything but speculative.  There was a clear and straightforward plan with a precise purpose – to interfere with Congress' certification vote on January 6 – and Defendants manifested their intent to join it through consistent and public lockstep efforts to spread identical false claims of election fraud to the same target audience.  On these two initial points, the Complaint provides far-reaching evidence of an implicit agreement among Defendants, and between them and the rioters, to unlawfully disrupt certification of President

Biden's victory on January 6 – certainly evidence that is more than sufficient at this stage in the case.

To the extent the unlawful agreement must be inferred through other facts, it is long accepted that "[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement" for purposes of civil conspiracy. *Halberstam*, 705 F.2d at 477.  This is because conspirators rarely discuss their plans in the open, much less in ways that can be discovered and used as evidence; "in most cases," therefore, "the court will have to infer a conspiracy from indirect evidence." *Id.* at 481; *cf. Kravetz v. Brukenfeld,* 591 F. Supp. 1383, 1388 (E.D.N.Y. 1984) (citing 2A J. Moore & J. Lucas, *Moore's Federal Practice* para. 8.17[5] at 8-180-8-183 (1984)) ("great leeway should be allowed" for conspiracy pleadings because "details may not be readily known at the time").  "Most commonly, courts have relied on evidence of assistance to the main tortfeasor to infer an agreement, and then attached the label 'civil conspiracy' to the resultant amalgam." *Halberstam*, 705 F.2d at 478.  In doing so, courts "must initially look to see if the alleged joint tortfeasors are pursuing the same goal – although performing different functions – and are in contact with one another." *Id.* at 481.  "Factors like the relationship between the parties' acts, the time and place of their execution, and the duration of the joint activity" bear on this analysis. *Id.* at 486.

That is precisely what the Complaint here alleges.  Defendants spent months telling Trump's supporters, and hearing each other tell his supporters, that the election literally was being stolen from them, despite knowing that was not true and having no credible evidence to prove it.  Compl. ¶¶ 173-182.  Trump told some of his most violent supporters – the Proud Boys – to "stand back and stand by." *Id.* ¶ 87.  Trump tweeted that January 6th – a day reserved for a purely ministerial act of Congress to certify the election of the incoming president – would be

"wild." *Id.* ¶ 86.  Defendants each sowed their lies and encouraged violence knowing the propensity of some of Trump's supporters to engage in political violence.  *Id.* ¶¶ 196, 227.  They continued to do so until just hours before the certification vote on January 6, within a stone's throw from the Capitol, knowing that Trump had called his supporters to the District that day with the express intent of marching to the Capitol as Congress was performing this final, necessary step to cement Biden's victory – the very thing Defendants decried as illegitimate and stolen.  *Id.* ¶¶ 175-176.  And on that day, Defendants spoke at the rally, *after* Trump had tweeted that Vice President Pence should unilaterally and illegally block certification, *id.* ¶ 98 – which Pence himself publicly acknowledged he had no authority to do.[17]  They then told the crowd, again, that the election and indeed their country was being stolen from them *literally at that moment* and repeatedly used images of violence to describe how the crowd should react – and did so ***knowing*** that at the conclusion of their speeches Trump would send the crowd to the Capitol where he had called on Vice President Pence to illegally keep him in power.  *Id.* ¶¶ 176-177.  And they did all of that for the singular purpose of causing the precise lawlessness that took place.

As to Trump himself, the evidence in the Complaint extends even further.  It recounts what is now common knowledge: (1) that after his supporters breached the Capitol, Trump was reported to be happy with the development and could not understand why others did not share his joy, Compl. ¶ 7; (2) that after his supporters breached the Capitol, he tweeted that Vice President Pence had failed to take the illegal step Trump had been pressuring him to take, *id.* ¶ 138, which almost immediately caused the rioters to threaten to hang Pence, as well as others, Compl. ¶ 5;

---

[17]     https://www.indystar.com/story/news/politics/2021/06/25/mike-pence-speech-statement-delivers-strongest-message-yet-election-results-mike-pense/5342828001/

(3) that he chastised Congressman Kevin McCarthy for not being "as upset as" the rioters at the result of the election, *id.* ¶ 142; and (4) that he waited hours to do anything to calm the situation, and eventually did so only with half-hearted measures, *id.* ¶¶ 147, 150.[18]  As to President Trump, in other words, there is evidence both before *and after* the riot that the lawlessness was neither unexpected nor unwelcomed by him, just as he had approved of his supporters' prior acts of political violence.  *Id.* ¶¶ 13, 196, 222, 227, 232.  This is further evidence of an implicit conspiracy between him and the rioters, an understanding which many of them in fact openly acknowledged.  *Id.* ¶ 151.

The Complaint shows that Defendants ably gave "assistance to the main tortfeasor" and undoubtedly were "pursuing the same goal."  *Halberstam*, 705 F.2d at 478, 481.  This is more than enough to establish the conspiracy claim at this point.  The Complaint therefore amply pleads the first two elements of civil conspiracy.

The Complaint also obviously alleges that "an injury caused by an unlawful overt act performed by one of the parties to the agreement" occurred on January 6.  *See Halberstam*, 705 F.2d at 477.  The injury here was the "mortal danger" experienced by many members, including Congressman Swalwell, "as the seat of the American Democracy was desecrated by the insurgent mob."  Compl. ¶ 7.  The overt acts were Defendants' words over the course of months, culminating in their speeches at the rally, and the violent acts of the mob they whipped up.  *See, e.g.*, Compl. ¶¶ 14, 138-39 (Trump's January 6th tweet understood by rioters to be

---

[18]    Trump said in a tweet after the riot had been quelled that "[t]hese are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long."  Compl. ¶ 150.

encouragement of further violence.) *id.* ¶¶ 105-109 (Brooks's statements); 111-115 (Giuliani's statements); 116-119 (Trump Jr.'s statements).

Lastly, the Complaint alleges that "the overt act was done pursuant to and in furtherance of the common scheme." *See Halberstam*, 705 F.2d at 477. The common scheme was to denounce the results of the 2020 election by "interfer[ence] with the Joint Session's solemn constitutional duty to certify the results of the 2020 Presidential election." Compl. ¶ 159. The Complaint specifically alleges for which acts each Defendant was responsible in connection with the events on January 6. Thus, the motion to dismiss the Section 1985(1) claim should be denied.

Finally, Defendants incorrectly assert that the Section 1986 claim (*see* Compl. ¶¶ 185-191) must fail with the Section 1985(1) claim. Defendants incorrectly allege "there is not a single factual allegation in the Complaint that Mr. Trump and Donald Trump Jr. were aware of any actual plans to riot at the U.S. Capitol." Trump Mot. 32. This is incorrect; all Defendants had "actual knowledge" of the riot on January 6. Compl. ¶¶ 3, 14 (Trump encouraged the rioters to go to the Capitol and "fight like hell"); Compl. ¶ 67 (Giuliani told the rioters that it was time for "trial by combat"), ¶¶ 86-96 (Trump's supporters understood Trump and Trump Jr.'s actions prior to January 6 to mean "a call to violence"); Compl. ¶ 97 (the rally on January 6 was organized and funded by Trump's campaign); Compl. ¶¶ 105-108 (Brooks' actions on January 6). These allegations sufficiently establish knowledge, and therefore Defendants' duty to prevent the ensuing harm.

Although "Section 1986 liability is derivative of Section 1985 liability . . . [d]efendants need not be participants in conspiracy under [Section] 1985(3) for liability to attach under [Section] 1986." *Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 203 (7th Cir. 1985):

*Park v. City of Atlanta*, 120 F.3d 1157, 1161 (11th Cir. 1997). Additionally, if Defendants "knew of a § 1985(3) conspiracy, were in a position to prevent the implementation of that conspiracy, and neglected or refused to prevent it, they are liable under § 1986." *Park*, 120 F.3d at 1162. For liability to attach, Plaintiff need only show Defendants had actual knowledge of the conspiratorial plan. *Clark v. Clabaugh*, 20 F.3d 1290, 1296 (3d Cir. 1994). The Complaint adequately alleges that they did.

The conspiracy claims are well-pled and sufficient to overcome Defendants' motions.

**B.  Plaintiff Sufficiently Pleads D.C. and Common Law Claims**.

Plaintiff also has pled claims under D.C. law, which this Court has jurisdiction to hear because they arise from the same case or controversy as the federal claims. *See* 28 U.S.C. §§ 1331, 1367. The claims for aiding and abetting, negligence, and intentional infliction of emotional dress all arise from the same "common nucleus of operative facts," *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966) – that is, Defendants' words and actions relating to the 2020 election, culminating in the riot on January 6.

**1.  Aiding and Abetting**

In a footnote, Defendants seek dismissal of Plaintiff's aiding and abetting claim with no reasoning beyond a blanket statement that Plaintiff "has failed to allege Defendants aided and abetted rioters." Trump Mot. 29, n.13. However, the Complaint alleges that all Defendants were responsible for inciting the violence that occurred at the Capitol due to their tweets and other public statements. Under D.C. Code § 22-1805, "inciting . . . aiding or abetting the principal offender" of any criminal offense makes one criminally liable as if they were the principal offender. Count 5 of the complaint outlines the actions of Trump and Trump Jr. showing that they incited and aided and abetted the crowd into rioting at the Capitol. In addition, ¶¶ 25-58,

74, 76-77, and 108 provide the actions of all Defendants in connection with inciting and aiding and abetting the crowd on and before January 6.

Accordingly, the Complaint sufficiently alleges that Defendants aided and abetted the rioters.

### 2.  Negligence

A claim for negligence must show: "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Hedgepeth*, 22 A.3d at 793  (citing *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984); PROSSER, HANDBOOK OF THE LAW OF TORTS § 30 (4th ed. 1971).

Defendants erroneously argue Plaintiff failed to plead any of the elements of negligence, focusing primarily on what they describe as "language unambiguously contradicting any premise that Defendants sought anything other than peaceful protests."  Trump Mot. 33.  Regardless of whether Defendants made other statements on and before January 6 relating to peaceful protests, Defendants' encouragement of violence won out, and those words and actions harmed Plaintiff. A defendant owes a plaintiff a duty if "the risk to the [plaintiff] was reasonably foreseeably to the defendant."  *Hedgepeth*, 22 A.3d at 793.  The Complaint sufficiently alleges it was reasonably foreseeable that Defendants' actions would result in harm to Plaintiff and others at the Capitol on January 6.

First, the Complaint alleges that by "directing a crowd of thousands to march on the Capitol, the Defendants owed a duty of care to the Plaintiff and everyone in the Capitol," and that "it was reasonably foreseeable to the Defendants that members of a crowd might act violently if sufficiently inflamed and insufficiently instructed to remain peaceful and law-abiding."  Compl. ¶¶ 255-56.  Defendants breached this duty by repeating their false claims

about the 2020 election, blaming those claims on Plaintiff and other Democrats, and sending the rioters into the Capitol by inciting them with terms such as "fight like hell," "start taking down names and kicking ass," "trial by combat," and "to play by different rules" to "save the republic."  Compl. ¶ 257.

Defendants' recasting of Plaintiff's negligence claim as attempting to hold Defendants "vicariously liable for the acts of the speakers," Trump Mot. 34, misses the point.  The allegations in the Complaint demonstrate that due to Defendants' denial of the election prior to January 6 and their actions on January 6, the riot at the Capitol was foreseeable.  It is the actions of Defendants – not their "listeners" – that is negligent, and for which they are liable.  The Complaint also pleads a causal connection between Defendants' behavior and Plaintiff's emotional and physical wellbeing, as the riot caused Plaintiff to fear for his life.  Compl. ¶¶ 226-27.  Since Plaintiff feared for his life and suffered harm as a result of Defendants' actions, Plaintiff's injury was proximately caused by Defendants.  *See Hedgepeth*, 22 A.3d at 795-96 (claims for mental distress are based on an examination of whether the defendant owed a duty instead of proximately caused the damages).  The Complaint therefore adequately pleads a claim for negligence.

### 3.   Civil Action for Bias Crimes Under D.C. Code § 22-3704

D.C. Code § 22-3704 provides a cause of action for intentional acts motivated by prejudice.  The Complaint alleges that Defendants, among other things, incited violence, intentionally inflicted emotional distress, and aided and abetted the same motivated by animus toward the political affiliation of Plaintiff and others.  Compl. ¶¶ 208-220.  Defendants incorrectly assert that Plaintiff can only recover under this claim if he suffered an actual injury to his person or property.  Trump Mot. 35.  The D.C. Code specifically provides for recovery of

45

"actual or nominal damages for economic or non-economic loss, including damages for emotional distress." D.C. Code § 22-3704(a)(2). Plaintiff amply pleads such injury here. As we have discussed in this motion, Plaintiff otherwise sufficiently alleges the conduct underlying his bias-crimes claim.

### 4.   Intentional Infliction of Emotional Distress

To succeed on a claim for intentional infliction of emotional distress, "the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1037 (D.C. 2015) (citations omitted). Moreover, when a public official such as Congressman Swalwell alleges emotional harm from a false statement, he must show the statement "was made with 'actual malice,' i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true," *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988).[19]

The allegations in the complaint inarguably allege that Defendants' behavior went beyond what would be accepted in civilized society and that their words were made with actual malice. Defendants repeatedly peddled manufactured claims of election fraud for weeks following an election Trump indisputably lost, and openly planned to disrupt the joint session of Congress on January 6 to prevent Joe Biden from assuming office, which caused fear and severe emotional distress for those trapped inside the Capitol. Compl. ¶¶ 5, 13, 25, 159, 222. These

---

[19]   Defendants erroneously contend that Plaintiff is required to plead actual malice as to all of the D.C. and common law claims. Trump Mot. 40; Giuliani Mot. 14-15. However, Plaintiff is only required to plead actual malice standard for intentional infliction of emotional distress claim. *See Tah v. Global Witness Publ., Inc.*, 991 F.3d 231 (D.C. Cir. 2021); *Falwell*, 485 U.S. at 56 (1988).

actions also reverberated around the world, causing legitimate fear that America's hold on democracy was slipping.  They were outrageous to say the least.

Defendants' claims of election fraud were also willfully untrue.  Trump's own federal agencies and almost every objective news source on the planet established conclusively that no such widespread fraud had occurred.  Compl. ¶ 56.  These claims continue to be universally rebuked to this day.  Defendants unquestionably had knowledge that Trump had lost the election, and yet persisted with their baseless claims of fraud to undermine public confidence in pursuit of their illiberal personal objectives.  Their actions meet the actual malice standard, and then some.  The Complaint therefore sufficiently pleads the claim of intentional infliction of emotional distress.

Accordingly, Defendants' sufficiency objections should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that Defendants' motions to dismiss be denied.

Dated: July 8, 2021

Respectfully submitted,

_____/s/ Philip Andonian_____
CALEBANDONIAN PLLC
Philip Andonian (D.C. Bar No. 490792)
Joseph Caleb (D.C. Bar No. 495383)
1100 H Street, N.W., Ste. 315
Washington, D.C. 20005
Tel: (202) 953-9850
Email: phil@calebandonian.com
          joe@calebandonian.com

_____/s/ Matthew Kaiser_____
KAISERDILLON PLLC
Matthew Kaiser (D.C. Bar No. 486272)
Sarah Fink (D.C. Bar No. 166663)
1099 Fourteenth Street, N.W., 8th Fl.
Washington, D.C. 20005
Tel: (202) 640-2850
Email: mkaiser@kaiserdillon.com
          sfink@kaiserdillon.com

_____/s/ Barry Coburn_____
COBURN & GREENBAUM PLLC
Barry Coburn (D.C. Bar No. 358020)
Marc Eisenstein (D.C. Bar No. 1007208)
1710 Rhode Island Avenue, N.W., 2nd Fl.
Washington, D.C. 20036
Tel: (202) 643-9472
Email: barry@coburngreenbaum.com
          marc@coburngreenbaum.com

*Attorneys for Plaintiff Eric Swalwell*

**<u>Certificate of Service</u>**

I hereby certify that on this 8th day of July, 2021, the foregoing Opposition to Defendants' Motions to Dismiss was served upon all parties of record by the Court's CM/ECF system.

_/s/ Philip Andonian_
Philip Andonian
