**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ERIC SWALWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-cv-586-APM |
| | ) | |
| DONALD J. TRUMP, DONALD J. TRUMP JR., MO BROOKS, RUDOLPH GIULIANI, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THE UNITED STATES' RESPONSE
TO DEFENDANT MO BROOKS'S PETITION TO CERTIFY
HE WAS ACTING WITHIN THE SCOPE OF HIS OFFICE OR EMPLOYMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ i

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 3

    I.    Factual and procedural background. ................................................................................ 3

    II.    Legal background. ............................................................................................................ 5

        A.    The Westfall Act. ..................................................................................................... 5

        B.    District of Columbia scope-of-employment law. ..................................................... 6

ARGUMENT .............................................................................................................................. 7

    I.    Brooks's participation at a campaign event was not within the scope of the office or employment of a Member of Congress. ........................................................................... 8

        A.    Brooks's participation at the January 6 rally was presumptively outside the scope of his official employment. ................................................................................... 9

        B.    Brooks has not shown how his participation at the rally would otherwise be within scope. ..................................................................................................................... 16

    II.    Instigating an attack on the United States Capitol would not be within the scope of a Member of Congress's employment. ......................................................................... 19

    III.    The Court should deny the petition as to Counts 1 and 2 because those claims are not covered by the Westfall Act. ..................................................................................... 22

CONCLUSION ......................................................................................................................... 22

# TABLE OF AUTHORITIES

Cases

*Allaithi v. Rumsfeld*,
    753 F.3d 1327 (D.C. Cir. 2014) ................................................................. 6
*Anderson v. City of Inkster*,
    2014 WL 3747545 (Mich Ct. App. July 29, 2014) ................................. 13
*Common Cause v. Bolger*,
    574 F. Supp. 672 (D.D.C. 1982) ............................................................. 9
*Council on Am. Islamic Relations v. Ballenger*,
    444 F.3d 659 (D.C. Cir. 2006) ................................................. 7, 18, 20
*Dean v. American Fed'n of Gov't Emps., Loc. 476*,
    509 F. Supp. 2d 39 (D.D.C. 2007) ......................................................... 12
*Does 1-10 v. Haaland*,
    973 F.3d 591 (6th Cir. 2020) ................................................................. 18
*Ennis v. Crenca*,
    587 A.2d 485 (Md. 1991) ....................................................................... 12
*Gallant v. NLRB*,
    26 F.3d 168 (D.C. Cir. 1994) ................................................................. 12
*Glacken v. Incorporated Vill. of Freeport*,
    2014 WL 1836143 (E.D.N.Y. May 8, 2014) ................................... 12, 17
*Green v. Hall*,
    8 F.3d 695 (9th Cir. 1993) ....................................................................... 6
*Lyons v. Brown*,
    158 F.3d 605 (1st Cir. 1998) ................................................................... 6
*Mailhiot v. Liberty Bank & Tr. Co.*,
    510 N.E.2d 773 (Mass. App. Ct. 1987) ................................................. 20
*Majano v. United States*,
    469 F.3d 138 (D.C. Cir. 2006) ................................................................. 6
*Mehau v. Reed*,
    869 P.2d 1320 (Haw. 1994) ............................................................ 12, 17
*Nevada Comm'n on Ethics v. Carrigan*,
    564 U.S. 117 (2011) ............................................................................... 18
*Operation Rescue Nat'l v. United States*,
    975 F. Supp. 92 (D. Mass. 1997) *aff'd*, 147 F.3d 68 (1st Cir. 1998) ............... 14, 19
*Osborn v. Haley*,
    549 U.S. 225 (2007) ............................................................................... 22
*Penn Cent. Transp. Co. v. Reddick*,
    398 A.2d 27 (D.C. 1979) ....................................................................... 18
*Rasul v. Myers*,
    512 F.3d 644 (D.C. Cir. 2008) ............................................................... 20
*S.J. & W. Ranch, Inc. v. Lehtinen*,
    913 F.2d 1538 (11th Cir. 1990), *amended*, 924 F.2d 1555 (11th Cir. 1991) ............... 6
*Saleh v. Bush*,
    848 F.3d 880 (9th Cir. 2017) ................................................................... 6

*Smith v. Clinton*,
   886 F.3d 122 (D.C. Cir. 2018) ................................................................................. 11, 20
*Stokes v. Cross*,
   327 F.3d 1210 (D.C. Cir. 2003) ............................................................................... 19, 20
*United States v. Brewster*,
   408 U.S. 501 (1972) .......................................................................................................... 13
*Weinberg v. Johnson*,
   518 A.2d 985 (D.C. 1986) ................................................................................................ 20
*Williams v. Gorton*,
   529 F.2d 668 (9th Cir. 1976) ........................................................................................... 12
*Williams v. United States*,
   71 F.3d 502 (5th Cir. 1995) ............................................................................................. 19
*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) ................................................................................. 6, 7, 20
*Wuterich v. Murtha*,
   562 F.3d 375 (D.C. Cir. 2009) ......................................................................................... 19

Statutes

3 U.S.C. § 15 .................................................................................................................. 17, 18
28 U.S.C. § 1346(b)(1) ........................................................................................................ 6
28 U.S.C. § 2679(b)(2)(B) ........................................................................................... 3, 6, 22
28 U.S.C. § 2679(d) .............................................................................................................. 1
28 U.S.C. § 2679(d)(3) ..................................................................................................... 2, 6
42 U.S.C. § 1986 .................................................................................................................. 3
42 U.S.C. § 1985 .................................................................................................................. 3
42 U.S.C. § 1985(1) .............................................................................................................. 3
U.S. Const. amend. XII ...................................................................................................... 17

Regulations

28 C.F.R. § 15.3 .................................................................................................................... 4

Restatements

Restatement (Second) of Agency § 228 .............................................................................. 7
Restatement (Second) of Agency § 228(1) .......................................................................... 7
Restatement (Second) of Agency § 228(1)(a) ............................................................. 2, 8, 14
Restatement (Second) of Agency § 228(1)(b) ............................................................. 2, 8, 14
Restatement (Second) of Agency § 228(1)(c) ............................................................... 3, 8

Secondary Sources

*House Ethics Manual*,
Committee on Standards of Official Conduct, 110th Cong., 2d Sess. (2008) .............................. 10
H. Comm. on Ethics, *General Prohibition Against Using Official Resources for Campaign or Political Purposes*,

https://ethics.house.gov/campaign/general-prohibition-against-using-official-resources-campaign-or-political-purposes ....................................................................................10

Members' Congressional Handbook, 116th Cong. (Nov. 6, 2020) ................................................11

House Comm. on Ethics,
*In the Matter of Allegations Relating To Representative Cathy McMorris Rodgers*
(Dec. 19, 2019) ........................................................................................................................11, 13, 16

*Payment of Expenses Associated with Travel by the President and Vice President*,
6 Op. O.L.C. 4 (1984)........................................................................................................................11, 13

C-SPAN, Rally on Electoral College Vote Certification,
https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification ...................14

**INTRODUCTION**

This case arises out of the violent attack at the U.S. Capitol on January 6, 2021.  Plaintiff Eric Swalwell filed suit against Defendant Morris "Mo" Brooks Jr., in his personal capacity, asserting two statutory claims and seven tort claims based on Brooks's conduct at the rally at the Ellipse south of the White House that morning and Brooks's alleged participation in a conspiracy to instigate the attack on the Capitol that followed.  In response to Plaintiff's suit, Brooks submitted a request to the Department of Justice ("Department") for certification under the Westfall Act that he was acting within the scope of his office or employment as a Member of Congress at the time of the conduct alleged in the Complaint.  Brooks later petitioned this Court for a scope-of-employment certification, and the Court called for the United States to respond by July 27, 2021.

When a federal employee is sued for tortious conduct, the Westfall Act authorizes the Department to determine whether the employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose.  28 U.S.C. § 2679(d).  If the Department certifies that the employee was acting within scope, the employee is dismissed and the action proceeds against the United States; if the Department declines to issue a certification, the case proceeds against the individual defendant in his personal capacity.  *Id.*

In response to the Court's order, the United States hereby reports that the Department has declined to issue a certification because it cannot conclude that Brooks was acting within the scope of his office or employment as a Member of Congress at the time of the incident out of which the claims in this case arose.  In light of the Department's declination, the United States should not be substituted as a defendant in this action.

1

The Westfall Act permits Brooks to petition this Court for a judicial determination of scope, as Brooks has done.  28 U.S.C. § 2679(d)(3).  The United States respectfully submits that the Court should deny Brooks's petition.  Because the Department has declined to certify, Brooks bears the burden of showing that his actions were within the scope of his office or employment as a Member of Congress.  And, as explained below, Brooks has not carried that burden.

The record indicates that Brooks's appearance at the January 6 rally was campaign activity, and it is no part of the business of the United States to pick sides among candidates in federal elections.  Members of Congress are subject to a host of restrictions that carefully distinguish between their official functions, on the one hand, and campaign functions, on the other.  The conduct at issue here thus is not the kind a Member of Congress holds office to perform, or substantially within the authorized time and space limits, as required by governing law.  *See* Restatement (Second) of Agency § 228(1)(a), (b).  Indeed, although the scope of employment related to the duties of a Member of Congress is undoubtedly broad and there are some activities that cannot be neatly cleaved into official and personal categories, Brooks's request for certification and substitution of the United States for campaign-related conduct appears to be unprecedented.  And in a variety of contexts involving state and local elected officials, courts have routinely rejected claims that campaigning and electioneering activities fall within the scope of official employment.  Brooks thus has not sustained his burden of demonstrating that his conduct at the January 6 rally was undertaken in his official capacity.

In addition, the Complaint alleges that Brooks engaged in conduct that, if proven, would plainly fall outside the scope of employment for an officer or employee of the United States: conspiring to prevent the lawful certification of the 2020 election and to injure Members of

Congress and inciting the riot at the Capitol.  Alleged action to attack Congress and disrupt its official functions is not conduct a Member of Congress is employed to perform and is not "actuated . . . by a purpose to serve" the employer, as required by District of Columbia law to fall within the scope of employment.  Restatement (Second) of Agency § 228(1)(c).  Thus, if the Court were to reject our argument that the campaign nature of the January 6 rally resolves the certification question, the Court should not certify that Brooks was acting within the scope of his office or employment unless it concludes that he did not engage in the conspiracy and incitement alleged in the Complaint.

Finally, the Court should deny the petition as to Counts 1 and 2 of the Complaint because they are not subject to the Westfall Act at all.  Those claims seek to recover for alleged violations of 42 U.S.C. §§ 1985 and 1986, and the Westfall Act does not reach claims based on "a violation of a statute of the United States."  28 U.S.C. § 2679(b)(2)(B).

## BACKGROUND

### I.     Factual and procedural background.

On March 5, 2021, Swalwell filed this nine-count Complaint against Brooks, as well as Donald J. Trump, Donald J. Trump, Jr., and Rudolph Giuliani.  *See generally* Compl., ECF No. 1.  Swalwell seeks damages for emotional distress and other injuries arising out of his presence inside the Capitol on January 6, 2021, when an attack disrupted the Joint Session of Congress, which was in the process of considering and counting the Electoral College votes for President and Vice President.  *Id.* ¶¶ 199, 206, 224–26, 234, 243, 259.

The first two counts of the Complaint advance claims under civil rights laws, specifically 42 U.S.C. § 1985(1) (alleged interference with official duties) and 42 U.S.C. § 1986 (conspiracy/aiding and abetting a Civil Rights Act violation).  For these counts, Swalwell seeks damages and injunctive relief.

The Complaint also advances seven tort claims under District of Columbia law.  Compl.

¶¶ 192–261.  Three are negligence *per se* claims based on District of Columbia civil, criminal,

and anti-bias statutes.  *Id.* ¶¶ 192–220.  The remainder of the counts are common-law tort claims

for negligent infliction of emotional distress, intentional infliction of emotional distress, aiding

and abetting assault, and negligence.  *Id.* ¶¶ 221–261.  Swalwell seeks compensatory and

punitive damages for these claims.

With respect to Brooks, the counts of the Complaint are based primarily on a speech he

gave at a rally on the Ellipse south of the White House on January 6.  Compl. ¶¶ 20-21, 78-85,

105-09, 179.  The Complaint asserts that "Brooks—acting in his personal capacity—conspired

with the other Defendants to undermine the election results by alleging, without evidence, that

the election had been rigged and by pressuring elected officials, courts, and ultimately Congress

to reject the results."  *Id.* ¶ 20.  Brooks allegedly engaged in these activities "in an effort to

overturn the 2020 Presidential election results and to aid the other Defendants' efforts to do the

same."  *Id.* ¶ 83.  The Complaint then alleges that, at the January 6 rally, Brooks "directly incited

the violence at the Capitol that followed."  *Id.* ¶ 21.

On June 7, 2021, Brooks informed the Department of this suit, requesting that the

Department certify that he was acting within the scope of his office or employment with respect

to Swalwell's claims.  *See* June 7, 2021 Letter from Rep. Brooks to U.S. Attorney Phillips (ECF

No. 20, at 43).  On June 11, consistent with its usual practice of requesting the views of the

employing agency, the Department requested that the House of Representatives provide its views

on whether Brooks had been acting within scope.  28 C.F.R. § 15.3.

On July 2, 2021, before the Department had responded to his request, Brooks petitioned

this Court to certify that he had been acting within the scope of his office or employment during

the incidents alleged in the Complaint.  Pet. (ECF No. 20, at 1).  On July 5, the Court ordered

that the United States and Swalwell each respond to the petition no later than July 27.  On July 7,

the Court ordered the House of Representatives to respond by that same deadline.

The House of Representatives and its General Counsel did not submit a report in response

to the Department's request to the House for its views on the scope question.  But the

Chairperson of the Committee on House Administration, to whom the Department's request was

referred by the General Counsel, responded to the Department's request for views on Brooks's

scope of employment.  *See* July 23, 2021 Letter from Chairperson Lofgren to Acting Assistant

Attorney General Boynton ("Lofgren Letter").  She reviewed in detail Brooks's speech, as well

as the assertions in his petition to the Court that he was focusing on the 2022 and 2024 elections,

rather than making a call for violence.  *See id.* at 3-4.  Chairperson Lofgren noted that Brooks

had denied inciting violence at the Capitol, *id.* at 3, and that he had sworn under oath to the court

that his conduct was instead in furtherance of political campaigns, *id.* at 4. Assessing the issue

based on "a range of restrictions imposed by federal law, House Rules, and regulations of

various House committees and entities," *id.* at 1, the letter concluded that it is "clear that

campaign activity is outside the scope of official duties."  *Id.* at 4.

The Department has declined Brooks's request for a certification that he was acting

within the scope of his office or employment at the time of the incident giving rise to this suit.

As a result, the United States has not been substituted as the defendant and the Court should now

consider Brooks's petition to certify that he was acting within scope of his office or employment.

## II.   Legal background.

### A.   The Westfall Act.

The Federal Tort Claims Act ("FTCA") creates a federal tort cause of action against the

United States for injuries resulting from the negligent or wrongful acts or omissions of federal

officials acting within the scope of their employment.  28 U.S.C. §§ 1346(b)(1), 2672, 2674. The Westfall Act provides that when a tort action is brought against a federal employee in his individual capacity, the Department may certify that the defendant employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose." *Id.* § 2679(d)(1).  If the Department certifies that the official was acting within the scope of employment, the suit "shall be deemed an action against the United States" under the FTCA, "and the United States shall be substituted as the party defendant."  *Id.*  The Westfall Act does not apply to claims based on the violation of a federal statute.  *Id.* § 2679(b)(2)(B).

If the Department "has refused to certify scope of office or employment," the federal employee may "petition the court to find and certify that the employee was acting within the scope of his office or employment."  *Id.* § 2679(d)(3).  The Department's decision regarding scope-of-employment certification "is conclusive unless challenged.  Accordingly, the party seeking review bears the burden of presenting evidence and disproving the [Department's] decision to grant or deny scope of employment certification by a preponderance of the evidence."  *Saleh v. Bush*, 848 F.3d 880, 889 (9th Cir. 2017) (quoting *Green v. Hall*, 8 F.3d 695, 698 (9th Cir. 1993)); *see also Wilson v. Libby*, 535 F.3d 697, 711 (D.C. Cir. 2008); *Lyons v. Brown*, 158 F.3d 605, 610 (1st Cir. 1998); *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990), *amended*, 924 F.2d 1555 (11th Cir. 1991).

### B.     District of Columbia scope-of-employment law.

In considering scope-of-employment issues under the Westfall Act, the D.C. Circuit applies the *respondeat superior* principles of the jurisdiction "where the employment relationship exists."  *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1330 (D.C. Cir. 2014) (quoting *Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006)).  Here, Brooks's employment relationship with the United States exists in the District of Columbia (which is also where the alleged tortious

conduct occurred, *see* Compl. ¶¶ 105-09).  The District of Columbia follows § 228 of the

Restatement (Second) of Agency, which provides:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
>> (a) it is of the kind he is employed to perform;
>>
>> (b) it occurs substantially within the authorized time and space limits;
>>
>> (c) it is actuated, at least in part, by a purpose to serve the master, and
>>
>> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228 (1958) ("Restatement"); *see Wilson*, 535 F.3d at 711;

*Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006).

The District of Columbia scope test is an "an objective one, based on all the facts and

circumstances."  *Wilson*, 535 F.3d at 711 (quotation omitted).  Because the test under § 228(1) is

framed in the conjunctive, all four elements of § 228(1) must be satisfied for a court to conclude

that an employee acted within the scope of his office or employment.  *See Ballenger*, 444 F.3d at

663.

## ARGUMENT

The Department of Justice has declined certification under the Westfall Act.  Brooks thus

has the burden to show that he was acting within the scope of his office or employment as a

Member of the U.S. House of Representatives at the time of the incident out of which the

Complaint arose.  Brooks has not carried that burden.

First, the record indicates that Brooks's conduct was undertaken as part of a campaign-

type rally, and campaign activity is not "of the kind he is employed to perform," or "within the

authorized time and space limits" for a Member of Congress.  Restatement §§ 228(1)(a), (b).

Second, the Complaint alleges that Brooks engaged in a conspiracy and incited the attack on the

Capitol on January 6.  That alleged conduct plainly would not qualify as within the scope of

employment for an officer or employee of the United States, because attacking one's employer is

different in kind from any authorized conduct and not "actuated . . . by a purpose to serve" the

employer.  *Id.* § 228(1)(c).  Brooks does not argue otherwise.  Instead, he denies the Complaint's

allegations of conspiracy and incitement.  The Department does not address that issue here

because the campaign-related nature of the rally independently warrants denial of certification,

and because the Department is engaged in ongoing investigations into the events of January 6

more generally.  But if the Court were to reject our argument that the campaign nature of the

January 6 rally resolves the certification question, the Court should not certify that Brooks was

acting within the scope of his office or employment unless it concludes that Brooks did not

engage in the sort of conduct alleged in the Complaint.

Finally, the Court should deny Brooks's petition as to Counts 1 and 2 of the Complaint

because those counts assert federal statutory claims that would not be covered by the Westfall

Act even if Brooks had been acting within the scope of his office or employment.

## I.    Brooks's participation at a campaign event was not within the scope of the office or employment of a Member of Congress.

Members of Congress are subject to extensive restrictions that carefully distinguish

between official functions and unofficial activity, including electioneering and campaign efforts.

It is undisputed that Brooks addressed the crowd at the January 6 rally.  *See* Brooks Aff. 18–21.

And Brooks does not dispute Plaintiff's allegations that the rally "was funded and organized by

[the Trump] campaign and groups supporting [then-President Trump's] candidacy."  Compl.

¶ 14.  Nor does he dispute Plaintiff's allegations that the purpose of the rally was to advocate that

Donald Trump should be declared the winner of the 2020 election.  Indeed, Brooks states in his petition that his conduct was "primarily motivated by" his "desire to represent the will of" his constituents "who overwhelmingly preferred that Donald J. Trump serve as President."  Pet. 7. And he further describes his actions as intended to influence the 2022 and 2024 elections.  *See, e.g.*, Brooks Aff. 13 ("I am talking about 'kicking ass' in the 2022 and 2024 ***ELECTIONS***!"). Brooks thus has not met his burden to show that his activities at the January 6 rally were within a Representative's scope of employment related to his official duties.

> **A.      Brooks's participation at the January 6 rally was presumptively outside the scope of his official employment.**

The record indicates that the January 6 rally was an electioneering or campaign activity that Brooks would ordinarily be presumed to have undertaken in an unofficial capacity. Activities specifically directed toward the success of a candidate for a partisan political office in a campaign context—electioneering or campaign activities—are not within the scope of the office or employment of a Member of the House of Representatives.  Like other elected officials, Members run for reelection themselves and routinely campaign for other political candidates. But they do so in their private, rather than official, capacities.

This understanding that the scope of federal office excludes campaign activity is broadly reflected in numerous authorities.  This Court, for example, emphasized "the basic principle that government funds should not be spent to help incumbents gain reelection" in holding that House or Senate mailings aimed at that purpose are "unofficial communication[s]."  *Common Cause v. Bolger*, 574 F. Supp. 672, 683 (D.D.C. 1982) (upholding statute that provided franking privileges for official communications but not unofficial communications).

The current House Ethics Manual confirms that the official business of Members of the House does not include seeking election or reelection for themselves or others.  House resources

generally cannot be used for campaign purposes, and Members' staff may engage in campaign work only "on their own time and outside the congressional office." *House Ethics Manual*, Committee on Standards of Official Conduct, 110th Cong., 2d Sess., at 121 (2008). For instance, Representatives cannot conduct campaign activities from House buildings or offices or use official letterhead or insignia, and congressional staff on official time should terminate interviews that focus on campaign issues. *See id.* at 127–29, 133. Of direct relevance here, a Member of Congress also cannot use official resources to engage in presidential campaigns: "[T]he general prohibition against campaign or political use of official resources applies not only to any Member campaign for re-election, but rather to any campaign or political undertaking," and this "prohibition applies to, for example, campaigns for the Presidency." *Id.* at 124; *see* Lofgren Letter 2.

Chairperson Lofgren states that the House adheres to this distinction in setting forth ethics rules that distinguish between a Member's official duties and conduct that must instead be deemed unofficial. Thus, she explains, "standards of conduct that apply to Members and precedents of the House are clear that campaign activity is outside the scope of official duties and not a permissible use of official resources." Lofgren Letter 4; *id.* at 2 (campaign activity is "not permissible official activity" for Members). And "[o]fficial resources of the House must, as a general rule, be used for the performance of official business of the House, and hence those resources may not be used for campaign or political purposes." *Id.* at 2 (quoting H. Comm. on Ethics, *General Prohibition Against Using Official Resources for Campaign or Political Purposes*, https://ethics.house.gov/campaign/general-prohibition-against-using-official-resources-campaign-or-political-purposes).

The House requires Members to determine whether their activities are official or campaign-related.  In using House funds, Members must distinguish their functions:  "Is the primary purpose for the expenditure official and representational?  Or is it primarily related to personal, campaign-related political party, campaign or committee activities?"  Members' Congressional Handbook, 116th Cong. (Nov. 6, 2020).  Members have in the past been admonished that political campaign speeches were not within their official duties.  For instance, when a Member delivered two speeches regarding winning over women voters for the benefit of Republican candidates in future elections, the House Committee on Ethics found those speeches to be unofficial "campaign and political activities" notwithstanding the Member's view that the speeches were "official."  House Comm. on Ethics, *In the Matter of Allegations Relating To Representative Cathy McMorris Rodgers* 28–29, 43 (Dec. 19, 2019) (Rodgers Report).  The Committee reached that conclusion even though those two speeches were not delivered at campaign events favoring a particular candidate.[1]

These distinctions "are based largely on a common sense understanding of the political and official activities" of federal officials, grounded in longstanding democratic norms.  *Payment of Expenses Associated with Travel by the President and Vice President*, 6 Op. O.L.C. 4 (1984) ("*Payment of Travel Expenses*").  Thus, "[a]ppearing at party functions, fundraising, and

---

[1] In relying on these authorities, we do not suggest that any conduct that violates the House's rules or policies would necessarily be outside the scope of a Member's office or employment. The D.C. Circuit has made clear that "alleging a federal employee violated policy or even laws in the course of her employment" does not, by itself, "take that conduct outside the scope of employment."  *Smith v. Clinton*, 886 F.3d 122, 126 (D.C. Cir. 2018).  Here, however, the House's rules and policies—and the broader principles they reflect—are directly relevant to the dispositive question:  "[W]hether the underlying activity itself was part of the employee's duties."  *Id.* at 127.  The House's rules, and the extensive guidance from the Ethics Committee, make clear that campaigning and electioneering activities are neither part of nor incidental to a Member's office or employment.

campaigning for specific candidates are the principal examples . . . which should be considered political," and not part of "official duties."  *Id.* at 4; *see Gallant v. NLRB*, 26 F.3d 168, 172 (D.C. Cir. 1994) (holding that creating letters for purpose of "retaining [official's] job" rested on "purely personal objective" and were personal, not agency, records).

The same fundamental distinction between official duties and electioneering activity is also reflected in decisions applying state *respondeat superior* law.  In cases involving state and local officials, courts around the country have repeatedly rejected claims that campaign activities fall within the scope of employment.  The Supreme Court of Hawaii, for example, held that a city employee was not acting within the scope of his office or employment when he "delivered [a] speech as a political candidate" because "[h]is candidacy was not part of his job" and he was required "to conduct his campaign separate from his [official] duties."  *Mehau v. Reed*, 869 P.2d 1320, 1332–33 (Haw. 1994); *see Williams v. Gorton*, 529 F.2d 668, 672 (9th Cir. 1976) (holding in absolute-immunity context that even speech relating to "official activity" could be "shown to be purely electioneering in a private capacity" due to the campaign context).  Other decisions likewise recognize that the scope of an elected official's employment does not extend to "personal ventures such as electioneering, campaigning or fund raising meetings to pay off campaign debts," because "[t]hose activities are undertaken for the sole benefit of the elected official."  *Ennis v. Crenca*, 587 A.2d 485, 490 (Md. 1991) (concluding that local legislator's actions were "similar to electioneering activities and not to those activities of a legislator furthering the county's business"); *see, e.g.*, *Glacken v. Incorporated Vill. of Freeport*, 2014 WL 1836143, at *6 (E.D.N.Y. May 8, 2014) (finding incumbent mayor's conduct outside scope as to "speech [that] occurred while he was campaigning for re-election at a Candidates Forum"); *Dean v. American Fed'n of Gov't Emps., Loc. 476*, 509 F. Supp. 2d 39, 58–59 (D.D.C. 2007) (applying

12

D.C. *respondeat superior* law and finding incumbent union president acted outside scope because his "allegedly defamatory e-mail in response to an email from a Local member specifically opposing his re-election in the upcoming Local election" was sent "in his capacity as an individual candidate for re-election" to a union office); *Anderson v. City of Inkster*, 2014 WL 3747545, at *2 (Mich Ct. App. July 29, 2014) (holding that "the campaign activities of an incumbent judge" running for reelection are "not within the scope of employment" because the effort "to further her reelection campaign" had to be characterized as "an individual interest, not an interest of the court").

To be sure, the rally on January 6 differed from a typical campaign rally because it occurred two months after Election Day.  But participating at a post-election rally that is paid for by a political campaign or its supporters, and that is concededly directed toward affecting the electoral outcome of a presidential election on behalf of a specific candidate or garnering support for the next election, is no less an electioneering or campaign activity.  *See* Rodgers Report 28–29.  Just like pre-Election Day efforts to affect the voting outcome of an election in favor of a particular candidate, post-Election Day efforts on behalf of a candidate to affect the outcome of an election in favor of that candidate are electioneering or campaign activities and thus not within the scope of a Member's office or employment.

It is, of course, sometimes "simply not possible to divide many of the actions" of an elected official into campaign and official activities.  *Payment of Travel Expenses,* 6 Op. O.L.C. at 2.  Members of Congress may properly "engage in many activities other than the[ir] purely legislative activities," even where those activities "are a means of developing continuing support for future elections."  *United States v. Brewster*, 408 U.S. 501, 512 (1972).  And Members of Congress may engage in activities within the scope of the office to which they were elected, even

where "one motive" is to garner "enhanced popularity [to] facilitate fundraising for [their]

reelection campaign and ultimately help generate the votes [they] need[] to remain in office."

*Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 108 (D. Mass. 1997), *aff'd*, 147 F.3d

68 (1st Cir. 1998).  That includes making speeches to encourage public support for proposals or

actions by the House that the Member supports, often in order to induce other Members to vote

in the same way.

Brooks has not, however, met his burden of demonstrating that the January 6 rally was

the type of event that falls within the scope of the office or employment of a Member of

Congress, as opposed to an electioneering or campaign activity specifically directed toward the

success of a presidential candidate or the success of future candidates.  He thus has not shown

that his conduct was "of the kind he is employed to perform," or "substantially within the

authorized time and space limits," as required by District of Columbia *respondeat superior* law.

Restatement §§ 228(1)(a), (b); *see also id.* § 228(2).

Indeed, Brooks does not dispute the allegation that the rally was a campaign event that

"was funded and organized by [the Trump] campaign and groups supporting [Trump's]

candidacy."  Compl. ¶ 14; *see* Brooks Aff. ¶ 20 (indicating that Brooks appeared to understand

the January 6 rally to be a "Donald Trump rally").  Candidate Trump, who spoke later that day,

put it bluntly on January 6:  the rally was about whether "we win the election."  C-SPAN, Rally

on Electoral College Vote Certification, https://www.c-span.org/video/?507744-1/rally-electoral-

college-vote-certification.  And Brooks in effect concedes that his participation at the rally was

directed toward affecting the election outcome in support of candidate Trump in the 2020

presidential election and gaining partisan political support for the 2022 and 2024 federal

elections, which is not the business of the United States.  Pet. 19, 41.  Brooks's own account of

his actions at the rally attests that they were intended to affect the outcome of both the election that had just occurred and future elections.  *Id.*

With respect to the 2020 presidential election, Brooks announced ahead of the January 6 rally that he was participating to support candidate Trump's electioneering efforts.  *See* Compl. ¶ 84.[2]  At the rally, Brooks exhorted that "we are not going to let [the Democrats] . . . steal from us our God-given right to control our nation's destiny."  Brooks Aff. 19.  Brooks's petition also indicates his central goal was to secure a particular electoral outcome.  The petition asserts that he participated "to reject the electoral college vote submittals of various states" at least in substantial part because his constituents supported candidate Trump.  Pet. 41.  In short, it appears that the fundamental purpose of the rally was to advance the electoral success of a presidential candidate, and Brooks has not carried his burden of showing that he was engaging in official activities at the January 6 rally that were distinct from that basic purpose.  Under our Constitution and the representative democracy it establishes, the United States has no institutional interest in which political candidate ascends to the presidency.

With respect to future elections, moreover, Brooks highlighted that "the 2022 and 2024 elections are right around the corner," and has asserted in his petition that his statements expressed his "desire to beat offending Republicans in those elections."  Pet. 16 & n.28.  He thus concedes that another basic feature of his participation in the rally was to influence the 2022 and 2024 elections.  *See, e.g.*, Brooks Aff. ¶ 13 ("I am talking about 'kicking ass' in the 2022 and

---

[2] The Complaint alleges that Brooks attended the January 6 rally at the personal request of a presidential candidate, pointing to a January 5, 2021 tweet by Brooks that stated that he would be speaking at the "#StoptheSteal rally" and that "@realDonaldTrump asked me personally to speak."  Compl. ¶ 84 (ECF No. 1).  Brooks denies this claim and asserts that he was invited by a White House employee.  *See* Brooks Aff. ¶ 37.  The Court need not resolve this factual dispute, as Brooks's tweet is, at a minimum, probative that his participation at the rally was in support of the electoral success of a particular presidential candidate.

2024 ***ELECTIONS***!").  But garnering partisan support for future elections is no less an electioneering or campaign activity, and the United States has no institutional interest in which candidates are elected then either.  *See* Rodgers Report 28–29, 43.

Accordingly, Brooks's activities at the rally were not part of his official functions as a Member of the House of Representatives, and both Plaintiff's allegations and Brooks's own statements indicate that his participation at the rally was an electioneering or campaign activity that was outside the scope of his office or employment as a Member of Congress.[3]

### B.   Brooks has not shown how his participation at the rally would otherwise be within scope.

Brooks has not overcome the ordinary understanding that electioneering or campaign activities are outside the scope of a Representative's employment.  Brooks offers only one reason why his participation at the January 6 rally would fall within scope.  In his view, his conduct occurred "in the context of and in preparation for Congressional votes on January 6, 2021," which concerned the certification of the Electoral College votes cast for the presidential candidates.  Pet. 41.  Brooks asserts that his conduct during the incidents alleged in the Complaint was related to his duty to vote on "whether to accept or reject the electoral college vote submittals of various states."  Pet. 41; *see, e.g.*, Brooks Aff. ¶¶ 9, 11–12, 16–17, 21, 24–26, 28, 34–35, 37, 39–45, 47–49, 53-55.  That is, Brooks argues that he participated in the January 6 rally in connection with his duty to participate in the certification of the presidential election.

---

[3] Brooks notes that he drafted his remarks for the rally on his congressional computer, practiced the speech in his congressional office, and relied on assistance from his congressional staff.  Pet. 10-11.  But the scope-of-employment question turns on the character of the conduct out of which the complaint arises—here, Brooks's participation at the rally itself.  And Brooks's use of official resources to prepare for the rally does not alter the character of what Brooks himself acknowledges was essentially a campaign event.  *Cf.* Rodgers Report 28-29 (concluding that political speeches were outside a Member's official duties even though they were prepared in her congressional office with assistance from her congressional staff).

But Brooks has not established that he was acting within the scope of his office or employment relating to participation in the certification of the electoral votes when participating in the January 6 rally.  The Constitution requires the counting of votes for presidential candidates before the Senate and the House of Representatives, U.S. Const. amend. XII, and a federal statute prescribes a procedure for those bodies to assemble in the House Chamber to certify the votes (and to lodge objections), 3 U.S.C. § 15.  This is no doubt a solemn duty of a member of Congress.

Brooks's contentions, however, do not establish that his electioneering or campaign activities were within the scope of his office or employment relating to that role.  Political campaigns and electioneering activity routinely address actions that candidates have taken or will take in their official capacities, such as voting on legislation.  But the fact that such partisan campaign activities *discuss* a candidate's official duties does not mean that those activities themselves *are* official duties or are within the scope of his office or employment that are properly regarded as incidental to those duties.  *See, e.g.*, *Mehau*, 869 P.2d at 1333 (observing that city employee's "speech pertained to organized crime," but concluding that it fell outside the scope of his employment in the prosecutor's office because he "delivered the speech as a political candidate"); *Glacken*, 2014 WL 1836143, at *6 (holding that incumbent's speech in response to question about pending legal action against the Village where he was mayor was outside the scope of his employment because it occurred while he was "campaigning for re-election").  So too here.

Brooks asserts that his conduct was within the scope of his office or employment because his vote was based on the fact that his "constituents overwhelmingly supported Donald Trump in the 2020 General Election."  Pet. 4; *see also* Brooks Aff. ¶ 9.  It may be presumed that Members

are representing their constituents when they vote.  But Brooks's logic goes too far.  Under his view, it is not clear what limit there would be to his legislative functions; so long as he could point to some desire on some part of his constituency, any purely electioneering or campaign activity would fall within the scope of his office or employment and require the United States to bear responsibility for any alleged tortious conduct.  Activities incidental to the duty to vote, such as garnering support from colleagues or the public, do not include expressive activity at a campaign rally in support of a particular candidate, "however deeply [the legislator] felt that his vote was the right thing to do," and however deeply the legislator felt that his constituents supported the vote.  *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011).  And addressing an electioneering rally is not a "direct outgrowth" or "an integral part" of the certification process established in 3 U.S.C. § 15.  *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 32 (D.C. 1979).[4]

Brooks also cites a number of decisions of the D.C. Circuit and other courts that have found defamatory comments by Members of Congress to be within the scope of those Members' employment.  *See* Pet. 35-41.  But none of those decisions involved a Member's direct involvement in electioneering or campaign activity at a campaign event organized to affect an electoral outcome.  Instead, each case involved some incidental political purpose that arose out of the kind of conduct the Member was employed to perform.  *See, e.g.*, *Ballenger*, 444 F.3d at 664 (finding within scope remarks about personal life during press interview); *Does 1-10 v.*

---

[4] Brooks also contends that his posts on Twitter in the weeks and months leading up to the January 6 rally were within scope.  *See* Pet. 41. Plaintiff's Complaint does not appear to allege that those tweets are an independent basis for any tort claims, or anything other than context to understand Brooks's actions on January 6.  *See* Compl. ¶¶ 45-63.  This Court does not need to address whether claims based on Brooks's tweets alone would be within the scope of his office or employment.

*Haaland*, 973 F.3d 591, 602 (6th Cir. 2020) (finding within scope social-media posts that sought to "oppose the President and his legislative goals by putting on record their opposition"); *Wuterich v. Murtha*, 562 F.3d 375, 379 (D.C. Cir. 2009) (finding within scope congressman's allegedly defamatory comments made in media interviews, and noting that a declaration had been provided by the defendant's office confirming that the "interviews were not campaign related"); *Williams v. United States*, 71 F.3d 502 (5th Cir. 1995) (finding in scope remarks about another individual's lobbying fees during press interview regarding naval warship).

Indeed, Brooks's reliance on *Operation Rescue* underscores the relevant distinctions. In that case, the district court held that Senator Ted Kennedy had acted within the scope of his office or employment when he made comments to the media about a bill he was supporting in the Senate. 975 F. Supp. at 108. Although the plaintiff had argued that the comments fell outside the scope of employment of a Senator because they were made during a fundraising event, the court found as a matter of undisputed fact that the comments "were *not* made gratuitously in Senator Kennedy's speech *at* the fundraising event" but rather occurred only after that event. *Id.* (emphasis added). Brooks's conduct at candidate Trump's political rally bears no similarity to the facts at issue in the cases Brooks cites.

## II.    Instigating an attack on the United States Capitol would not be within the scope of a Member of Congress's employment.

The Complaint alleges that Brooks conspired with others to instigate a violent attack on the U.S. Capitol and incited a riot there. Compl. ¶¶ 21, 171, 179. Instigating such an attack plainly could not be within the scope of federal employment. Under District of Columbia law, an employee who "maliciously act[s] contrary to [his] employer's interest" acts "outside the scope of [his] employment." *Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003). This is because "[c]onduct of a servant is not within the scope of employment if it is . . . too little

actuated by a purpose to serve the master."  Restatement (Second) of Agency § 228(2).  As courts have explained, conduct directed toward "thwarting" the business of the employer is plainly outside the scope of employment, because it would be "conceptually incoherent" to think that undermining the employer's business is attributable to the employer itself.  *Mailhiot v. Liberty Bank & Tr. Co.*, 510 N.E.2d 773, 777 (Mass. App. Ct. 1987); *see, e.g.*, *Stokes*, 327 F.3d at 1216.

Conduct that affirmatively seeks to thwart the employer's interests is thus categorically different from conduct that is merely prohibited or otherwise wrongful.  The Westfall Act, and the common law tort principles it incorporates, recognize that in some instances employees will commit torts for which the employer bears responsibility, even when the employer disapproves of or expressly forbids the tortious conduct.  Courts have held, for example, that a variety of allegedly defamatory comments fell within the scope of elected officials' employment because they were incidental to the officials' duties.  *See* pp. 18-19, *supra*.  Indeed, the D.C. Circuit has held even "allegations of serious criminality" will not take conduct outside the scope of employment if "the alleged tortious conduct was incidental to the defendants' legitimate employment duties."  *Rasul v. Myers*, 512 F.3d 644, 659-660 (D.C. Cir. 2008); *see Wilson*, 535 F.3d at 711-712.  But that logic applies only to torts that arise out of activities "originally undertaken on the employer's behalf."  *Smith v. Clinton*, 886 F.3d 122, 127 (D.C. Cir. 2018) (quoting *Ballenger*, 444 F.3d at 664).  In contrast, violent conduct deliberately undertaken to *thwart* the employer's interests cannot be within the scope of employment.  Such "malicious" actions instead only serve the "independent" and "selfish purposes" of the employee.  *Weinberg v. Johnson*, 518 A.2d 985, 989 (D.C. 1986).

Here, the Complaint alleges that Brooks conspired with the other Defendants and the "rioters who breached the Capitol on January 6" to prevent Congress from certifying the Electoral College votes.  Compl. ¶ 12.  To serve that end, the Complaint alleges that, among other things, the Defendants conspired amongst themselves and with others to "injure members of Congress . . . and Vice President Pence" in an effort to disrupt the peaceful transfer of power. Compl. ¶¶ 1, 12, 171, 179.  Such a conspiracy would clearly be outside the scope of the office of a Member of Congress:  Inciting or conspiring to foment a violent attack on the United States Congress is not within the scope of employment of a Representative—or any federal employee— and thus is not the sort of conduct for which the United States is properly substituted as a defendant under the Westfall Act.

Brooks does not argue otherwise.  Instead, he denies the Complaint's allegations that he conspired to incite the attack on the Capitol.  *See* Brooks Aff. 17–18.[5]  The Department of Justice does not address that issue here.  The campaign or electioneering nature of Brooks's participation in the January 6 rally independently warrants denial of certification, and the Department is engaged in ongoing investigations into the events of January 6 more broadly.[6]  But if the Court were to reject our argument that the campaign nature of the January 6 rally resolves

---

[5] The parties' dispute on this question does not undermine the ultimate conclusion that Brooks was not acting within the scope of his office or employment.  For the reasons set forth above, *see* Part I, *supra*, Brooks's statements denying that he sought to incite the violent attack on the Capitol only confirm that he was engaging in campaign-related activity in support of a candidate and therefore acting outside the scope of his office or employment on that independent basis.

[6] As this Court is aware, the U.S. Attorney's Office for the District of Columbia and the Federal Bureau of Investigation have for several months continued their investigation and prosecution of those responsible for the attack.  This investigation is ongoing.  More than 535 defendants have been arrested across the country and at least 165 defendants have been charged on counts ranging from destruction of government property to conspiracy to obstruct a congressional proceeding.  *See* Department of Justice Statement, https://www.justice.gov/usao-dc/six-months-january-6th-attack-capitol.

the certification question, the Court should not certify that Brooks was acting within the scope of his employment unless it concludes that Brooks did not engage in the sort of conduct alleged in the Complaint.  *Cf. Osborn v. Haley*, 549 U.S. 225, 252 (2007) (recognizing that scope-of-employment questions may overlap substantially with the merits of a tort claim).

### III.   The Court should deny the petition as to Counts 1 and 2 because those claims are not covered by the Westfall Act.

Plaintiff alleges nine claims for relief, two of which are federal statutory claims.  *See* Compl. ¶¶ 166–191 (Counts 1 and 2).  The Westfall Act does not apply to federal statutory claims, 28 U.S.C. § 2679(b)(2)(B), and Brooks thus must remain a defendant in his individual capacity as to the two counts alleging federal statutory violations.  To the extent Brooks's Petition seeks certification as to these counts, *see* Pet. at 1 (seeking certification only "with respect to all applicable . . . Counts"), that request should be denied.

### CONCLUSION

The United States respectfully requests that Brooks's petition for a Westfall Act certification be denied.

Respectfully submitted,

**BRIAN M. BOYNTON**
Acting Assistant Attorney General
Civil Division

**JAMES G. TOUHEY, JR.**
Director, Torts Branch
Civil Division

*/s/ Taheerah K. El-Amin*
**TAHEERAH K. EL-AMIN**
Trial Attorney, Torts Branch
Civil Division

Attorneys for the United States

22

## CERTIFICATE OF SERVICE

I certify that, on July 27, 2021, I uploaded the attached document to the Court's CM/ECF system, which will cause service on all counsel of record registered with ECF in this matter:

Matthew G. Kaiser
Sarah Fink
KAISER DILLON PLLC
*Mkaiser@kaiserdillon.com*
*Sfink@kaiserdillon.com*

Philip C. Andonian
Joseph P. Caleb
CALEB ANDONIAN PLLC
*Phil@calebandonian.com*
*Joe@calebandonian.com*

Barry Coburn
COBURN & GREENBAUM, PLLC
*Barry@coburngreenbaum.com*

*Counsel for Plaintiff*

Jesse R. Binnall
BINNALL LAW GROUP
*Jesse@binnall.com*

*Counsel for Defendants Donald J. Trump and Donald J. Trump, Jr.*

Joseph D. Sibley, IV
CAMARA & SIBLEY, LLP
*sibley@camarasibley.com*

*Counsel for Defendant Rudolph W. Giuliani*

Nicholas D. Marias
KEKER, VAN NEST & PETERS, LLP
Adav Noti
Mark P. Gaber
Paul March Smith
CAMPAIGN LEGAL CENTER
Brianne Jenna Gorod
CONSTITUTIONAL ACCOUNTABILITY CENTER

*nmarais@keker.com*
*anoti@campaignlegalcenter.org*
*mgaber@campaignlegalcenter.org*
*psmith@campaignlegalcenter.org*
*brianne@theusconstitution.org*

*Counsel for Amici*

I further certify that, on July 27, 2021, I served the attached document by U.S. Mail to the

following non-ECF participant (with e-mail courtesy copy):

Hon. Mo Brooks
2185 Rayburn HOB
Washington, D.C.  20515

*Defendant*

        */s/ Taheerah K. El-Amin*
        TAHEERAH K. EL-AMIN
        Attorney for the United States