# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Representative ERIC SWALWELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:21-cv-00586-APM |
| ) | |
| DONALD J. TRUMP, et al., ) | |
| ) | |
| Defendants. ) | |

## OPPOSITION TO PETITION TO CERTIFY DEFENDANT MO BROOKS WAS ACTING WITHIN THE SCOPE OF HIS OFFICE OR EMPLOYMENT

Through his Petition, Congressman Mo Brooks asks to make the United States vicariously liable for his attack on it.  Undoubtedly recognizing that disconnect, he makes two desperate pivots that ultimately prove fatal to his Petition.  First, he suggests that he is an employee not of the government he attacked but of his *constituents*, *see* Petition ("Pet.") at 4-5 (arguing that he is "controlled" by his constituents), and was merely serving their interests on January 6.  And, second, he claims that in his speech on January 6 he mainly was just whipping up support for the 2022 and 2024 elections—that his speech wasn't primarily about what the crowd whose members had traveled so far to be there that day should do *that day*, but what they should do in the next two elections.  *See, e.g.*, *id.* at 14, 16, 19.

In claiming the first, though, Congressman Brooks has doubly removed himself from the protections of the Westfall Act.  The Act manifestly protects "employee[s] of the Government." 28 U.S.C. 2679(b)(1).  Worse still, in alleging that he is essentially an employee of his constituents, Congressman Brooks has identified a "master" who exercises *no control* over his day-to-day activities, as required by the District's "scope of employment" law, the body of law

that determines whether the government can be substituted in his place under the Act. Restatement (Second) of Agency §§ 2, 228, 228 cmt. (c); *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009) (explaining that Restatement governs scope of employment analysis under D.C. law).

And, in claiming the latter, Brooks has admitted to engaging in the kind of campaign and political activity that courts routinely identify as falling outside the scope of elected officials' duties and which the House itself says may not be done with official resources.  In other words, by expressly framing his conduct as having been conducted within his campaign capacity, Brooks effectively concedes that that conduct was not within the scope of his employment.

For these reasons and more, Brooks cannot show that his actions in inciting a deadly riot were somehow within the scope of his federal employment.  His Petition should be denied.[1]

## FACTUAL BACKGROUND

The underlying facts of this case are alleged in detail in the Complaint, and summarized in other pleadings as well.  *See* Pl.'s Combined Opp'n to the Mtns. to Dismiss by Defs. Donald J. Trump, Donald Trump Jr., & Rudolph Giuliani (July 8, 2021) (ECF No. 23).  For months Brooks and his co-Defendants told the American people that the 2020 election had been literally stolen from them in an unprecedented act of fraud—allegations that, if true, might indeed justify political violence.  Political violence is precisely how a subset of then-President Donald Trump's supporters repeatedly responded to the co-Defendants' actions in the lead-up to January 6. Brooks and his co-Defendants nevertheless continued to level such accusations right up to January 6, when thousands of Trump's supporters had been called to the District for the express

---

[1] The Petition manifestly must be denied as to Counts 1 and 2 (for violation of 42 U.S.C. §§ 1985 and 1986) because substitution under the Westfall Act is never available for "a violation of a statute of the United States."  28 U.S.C. § 2679(b)(2)(B).

purpose of marching on the Capitol.  Brooks and the others addressed perhaps their most incendiary rhetoric yet to that crowd, and, predictably, yet more political violence followed.  It was the culmination of a chain of events that Trump had set in motion almost immediately after the election.

        **A.**       **Allegations of Fraud and Political Violence**

When it started to become clear in the days after November 3 that the vote would not go his way, Trump made up a story of election fraud.  He began by alleging that votes were illegally being cast after polls were closed.  Compl. ¶¶29-32.  His supporters, sometimes armed, responded by attempting to interfere with vote counts, a fact that was widely reported.  *Id.* ¶34.  Trump then began leveling accusations against individual states and state officials, particularly in Michigan, Pennsylvania, and Georgia.  *Id.* ¶¶35, 41.  Armed supporters of Trump responded by "surround[ing] the home of the Michigan Secretary of State," "demand[ing] a 'citizen tribunal' at the Georgia capitol," *id.*, and threatening the life of Georgia's Secretary of State, Brad Raffensperger.  By November 19, they had told Mr. Raffensperger that his "life depend[ed] on" a recount and that he "should be put on trial for treason and face execution."  *Id.* ¶50.  They also told his wife that he "deserve[d] to face a firing squad."  *Id.*

As Trump was leveling these accusations, and accounts of his supporters' violent responses were being widely reported, Brooks issued tweets supporting Trump's narrative, even by directing them at the same states that Trump was singling out.  Compl. ¶¶81-82.

As early as December 19, it was publicly known that Trump's followers were being called to Washington D.C. on January 6 in response to the alleged unprecedented fraud in the states Trump had been criticizing.  Compl. ¶86.  Trump tweeted again on December 26 that nothing was being done by the Federal Bureau of Investigation or the Department of Justice

about "the 2020 Presidential Election Voter Fraud" and that he would "[s]ee everyone in D.C. on January 6th." *Id.* ¶56.  He and Rudolph Giuliani tweeted multiple times on January 5 about the following day's rally intended to stop the "stolen" election.  *Id.* ¶¶ 57-58, 65-66.  Giuliani tweeted links advocating that Vice President Mike Pence could unilaterally reject the electoral college tally, knowing the crowd would be directed to march to the Capitol precisely at the time of that tallying.  *Id.* ¶¶65-66.  In between those tweets, Brooks tweeted that he himself would be speaking at the rally at Trump's "personal[]" invitation.  *Id.* ¶84.

### B.    Congressman Brooks' Speech at the Rally

The January 6 rally was organized and run by a political campaign, Donald J. Trump for President.  Compl. ¶97.  Brooks himself swears that he had no plans to even *attend* the rally until Trump invited him to speak at it on January 5.  Pet. at 11, 32.  He accepted the invitation and coordinated with the Trump campaign about the speech's "parameters."  *Id.* at 11.  He then delivered his speech at the Ellipse, "more than a mile away" from the Capitol.  *Id.* at 26.

As detailed in the Complaint, the assembled crowd had been told for months that their country was literally being taken from them in an unprecedented act of fraud, especially in a few key states.  And it had been widely known that some of Trump's supporters had responded to such allegations with political violence.  Brooks, who had joined Trump in targeting those states before the rally in the midst of such responses, told the assembled crowd on January 6 that America was "at risk unlike it has been in decades, and perhaps centuries."  Compl. ¶106.  He then said the following particularly incendiary things to the crowd, among others:

- Socialist Democrats were "steal[ing] from us our God-given right to control our nation's destiny."  *Id.* ¶107.

- "Today is the day American patriots start taking down names and kicking ass!"  *Id.* ¶108.

- "Are you willing to [sacrifice your blood, sweat, tears, fortunes, and maybe your lives]? My answer is yes.  Louder!  Are you willing to do what it takes to fight for America? Louder!!"  *Id.* ¶109.

The crowd responded accordingly.

### C.   Congressman Brooks' Petition and Affidavit in This Court

On June 24, Brooks submitted a petition and affidavit in this Court, seeking to claim that his actions in alleging massive voter fraud and in addressing the crowd on January 6 were within the scope of his employment as a member of Congress.  He claims he is "controlled (in varying degrees) by the House and the citizens of" his district, "both of which have the power to affect the hiring and firing of Brooks and both of which control one or more aspects of" his employment.  Pet. at 4-5.  He also claims the House controls various procedural aspects of Brooks' work there.  *Id.* at 5.  The Petition says nothing more about either group's control over Brooks.  It identifies no ways in which Brooks' constituents controlled his day-to-day activities, let alone controlled his particular actions on January 6.

As to those actions, Congressman Brooks claims that what he was really doing on January 6 was campaigning for the 2022 and 2024 elections.  The Petition states, among other things:

- That "Brooks sought to encourage Ellipse Rally attendees to put the 2020 elections behind them (and, in particular, the preceding day's two Georgia GOP Senate losses) and to inspire listeners to start focusing on the 2022 and 2024 elections, which had already begun."  Pet. at 16.

- That "Brooks sought to inspire and reinvigorate Ellipse Rally citizens who had just suffered horrible defeats in the November 3, 2020 elections followed by two horrible losses of U.S. Senate seats in Georgia, the day before (on January 5, 2021)."  *Id*. at 19.

- That his statement about "kicking ass" referred to "the '2022 and 2024 elections that are right around the corner.'"  *Id.* at 16 n. 28; *see also id.* at 14 nn. 21, 22 (similar).

- That "I am talking about 'kicking ass' in the 2022 and 2024 **_ELECTIONS!_**
  . . . .   My intent in uttering these words was to encourage Ellipse Rally
  attendees to put the 2020 elections behind them (and, in particular, the
  preceding day's two GOP Senator losses in Georgia) and to start focusing
  on the 2022 and 2024 elections. . . ."   Brooks Aff. ¶46 (emphasis in
  original); *see also id.* ¶¶47, 50 (similar).

Consistent with all of that, Brooks dramatically removed his camouflage hat mid-speech and

replaced it with a red "FIRE PELOSI" hat.[2]

The bulk of Brooks' Petition consists of a methodical march through the allegations in

the Complaint, rejecting most of them and qualifying others.  It accepts as true only one:  that

"Congress controls who becomes President."  Pet. at 20.  Its careful march through the

Complaint serves to highlight what Brooks does *not* deny.  Despite claiming, for example, that

Brooks did not personally post all of the tweets identified in the Complaint, *see* Brooks Aff.

¶¶29-35, the Petition never disavows their contents or claims they were unauthorized.  Despite

claiming at the rally that America was at risk as it hadn't been in "perhaps centuries," the

Petition says nothing about the evidence that supposedly led Brooks to believe in good faith that

the 2020 election had been stolen from Trump in an unprecedented act of fraud.  And, most

importantly of all, despite very narrowly claiming that Brooks has "never seen or heard of any

Donald Trump *rally* being followed by *the kind of violence*" that occurred on January 6, *id.* ¶ 20

(emphases added), the Petition does not deny that Brooks was aware that Trump's followers

repeatedly had responded to Trump's election fraud claims with political violence, as specifically

detailed in the Complaint.

---

[2] *See* https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification, at
44:10-44:25.

## LEGAL STANDARD

The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley,* 549 U.S. 225, 229 (2007). "[W]hen a federal employee is named in a tort suit, the Attorney General or his designee may certify that the employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose." *Wuterich v. Murtha,* 562 F.3d 375, 380 (D.C. Cir. 2009) (quotation marks omitted). When the Attorney General grants certification, "his certification only serves as prima facie evidence that can be rebutted by 'specific facts that, taken as true, would establish that the defendant's actions exceeded the scope of his employment.'" *Allaithi v. Rumsfeld,* 753 F.3d 1327, 1329–30 (D.C. Cir. 2014) (quoting *Jacobs v. Vrobel,* 724 F.3d 217, 220 (D.C. Cir. 2013)). When a plaintiff rebuts that prima facie evidence, courts deny requests for substitution. *See, e.g.,* *Bowles v. United States,* 685 F. App'x 21, 26 (2d Cir. 2017) (denying substitution after Attorney General's certification); *Garcia v. United States,* 88 F.3d 318, 320 (5th Cir. 1996) (same); *Carroll v. Trump,* 498 F. Supp. 3d 422, 428 (S.D.N.Y. 2020) (same), *appeal docketed,* *Carroll v. Trump,* No. 20-3977 (2d Cir. Nov. 25, 2020).[3] Just as on a motion to dismiss, "'the complaint is construed liberally in the plaintiffs' favor'" in analyzing the certification question, "'and we grant plaintiffs the benefit of all inferences that can be derived from the facts alleged.'" *Stokes v. Cross,* 327 F.3d 1210, 1215

---

[3] *See also Stokes v. Cross,* 327 F.3d 1210, 1216 (D.C. Cir. 2003) (reversing district court's affirmance of Westfall Act certification and remanding for discovery on scope-of-employment issue); *Smith v. United States,* No. 1:09CV1120, 2009 WL 10730945, at *2 (E.D. Va. Nov. 20, 2009) (ordering evidentiary hearing on scope of employment question despite Attorney General's certification that acts were within scope); *Jamison v. Wiley,* 14 F.3d 222, 225 (4th Cir. 1994) (affirming denial of substitution after certification initially given but withdrawn).

(D.C. Cir. 2003) (quoting *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citations omitted)).

## ARGUMENT

For a host of reasons, Congressman Brooks does not qualify to have the United States substituted in his place in this suit.  "Under the Westfall Act, courts apply the *respondeat superior* law in the state in which the alleged tort occurred."  *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (citing *Stokes*, 327 F.3d at 1214).  "District of Columbia law . . . defines the scope of employment in accordance with the RESTATEMENT (SECOND) OF AGENCY (1958)," specifically section 228.  *Murtha*, 562 F.3d at 383 (citations omitted).  As explained below, that test applies only to the "[c]onduct of a *servant*," Restatement § 228(1), which the Restatement defines as one "whose physical conduct *in the performance of the service* is controlled or is subject to the right to control by the master," *id.* § 2 (emphases added).  The test then identifies three additional factors that must be satisfied for a servant's conduct to be deemed within the scope of a party's employment.  *Id.* § 228(1).

Brooks' actions with respect to the January 6 insurrection fail that test at every turn.  He was not a "servant" whose actions that day were controlled by anyone, let alone his constituents.  *See infra*, Part I.  And even if he had been, his actions still fell outside the scope of his duties as a Member of Congress for several additional reasons, not the least of which being that he engaged in that conduct in his campaign capacity rather than his official capacity.  *See infra*, Part II.

## I.      Congressman Brooks Is Not a "Servant" Whose Conduct Was Even Arguably Controlled by Anyone on January 6, Let Alone His Constituents.

Section 228(1) of the Restatement (Second) of Agency provides as follows:

> (1) Conduct of a servant is within the scope of employment if, but only if:
> - o   it is of the kind he is employed to perform;

- o  it occurs substantially within the authorized time and space limits;
- o  it is actuated, at least in part, by a purpose to serve the master, and
- o  if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

By its terms, agency is possible only as to the "[c]onduct of a servant."  The Restatement defines "servant" as "'an agent . . . whose *physical conduct* in *the performance of the service* is controlled or is subject to the right to control by the master.'"  *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 n.9 (D.C. 1982) (emphasis added, quoting Restatement (Second) of Agency § 2). Accordingly, under the Restatement, the scope of employment question is determined in large part by the existence and extent of a principal's control.  In elaborating on Section 228's test, Comment c to that section thus emphasizes that "there is no liability for the conduct of one who, although a servant in performing other service, is doing work *as to which there is no control or right to control* by the master."  (Emphasis added.). As is true in some other jurisdictions as well, "control" is part of the scope-of-employment test in the District.  *See, e.g.*, *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 461 (Ind. 2018) ("The scope-of-employment rule emanates from the concept of control."); *Iandiorio v. Kriss & Senko Enterprises, Inc.*, 517 A.2d 530, 534 (Pa. 1986) (finding "sufficient control over the employees' conduct to bring these activities within the scope of employment").

A long line of cases illustrate that the kind of control required to qualify one as a "servant" is the right to control both *what* should be done and *how* the servant should do it. "'The decisive test . . . is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done.'"  *Tulo v. Ayodeji*, 945 A.2d 596, 602 (D.C. 2008) (quoting *Kelly*, 448 A.2d at 860); *see also Chicago, Rock Island*

*& Pac. Ry. Co. v. Bond*, 240 U.S. 449, 456 (1916) (no vicarious liability because employer "did not retain the right to direct the manner in which the business should be done, as well as the results to be accomplished, or, in other words, did not retain control not only of what should be done, but how it should be done"); *Construction, Bldg. Material, Ice & Coal Drivers, Helpers & Inside Employees Union, Local No. 221 v. NLRB*, 899 F.2d 1238, 1242 (D.C. Cir. 1990) (R.B. Ginsburg, J.) ("[t]he right to control the '*means and manner*' of job performance . . . is . . . recurrent in the cases in point" addressing employee versus independent-contractor status) (emphasis added); *Browning-Ferris Indus. of California, Inc. v. Nat'l Lab. Rels. Bd.*, 911 F.3d 1195, 1212 (D.C. Cir. 2018) ("'The vital element which negatives such independence, in the relation between employer and employee, is the right to control the employee, not only as to the final result, *but in the performance of the task itself*.'") (emphasis added; quoting *Grace v. Magruder*, 148 F.2d 679, 681 (D.C. Cir. 1945)).  The importance of the control requirement cannot be overstated.

Brooks' Petition says nothing suggesting that his decision to give his January 6 speech, or its contents, or any of the statements he made about the integrity of the election before January 6 were sufficiently controlled by his constituents.[4]  The arguments Brooks does make suggest the exact opposite: (1) that Brooks, who originally had no intention of even *attending* the rally, quickly accepted the offer and prepared a speech just a day before the rally; and (2) that the only entity to exercise any control over the speech was the Trump Campaign that organized the rally, which set the time of his speech and with whom Brooks negotiated its "parameters."  Pet. at 11, 32.  The Petition likewise offers nothing that suggests that Brooks' pre-January 6 tweets were

---

[4] Brooks' actual actions certainly were not directed by the House, the only other potential "master" the Petition identifies.

controlled in any way by his constituents or anyone else.  His only defense as to those is that he did not personally post all of them, *see* Brooks Aff. ¶¶ 29-35, which has no bearing on the "control" analysis—especially since Brooks is careful not to actually *disavow* their contents.  He never, in any event, suggests they were controlled in any way by someone else.

The only "control" Brooks might argue is that his constituents can vote him out of office.  But that doesn't cut it.  The fact that constituents can remove him from office does not give them the right to control his day-to-day conduct once in office.  Nor does it do so as a practical matter given that he is not an at-will employee but is subject to removal only every two years.  As the D.C. Court of Appeals has noted:  "'[N]o single fact is more conclusive of a master and servant relationship than the unrestricted right of the employer to terminate the employment *whenever he cho[o]se[s]*.'"  *Giles v. Shell Oil Corp.*, 487 A.2d 610, 612 (D.C. 1985) (emphasis added; quoting *Kelly*, 448 A.2d at 861).  If one has the ability to fire another at will, then as a practical matter one arguably has the ability to control their day-to-day conduct.  That manifestly does not apply to someone who can be fired only every two years.  Brooks' job security was at its zenith when he incited the riot, as he had just been re-elected to office weeks earlier.  D.C. courts have found no *respondeat superior* liability in cases where purported servants were subject to far more control, precisely because control did not extend to day-to-day activities.  *See, e.g.*, *District of Columbia v. Hampton*, 666 A.2d 30, 38-39 (D.C. 1995) ("plethora" of "comprehensive" "rules and regulations governing foster homes and care for foster children" did not create *respondeat superior* liability because District "did not have the right to control the *daily activities* of caring for the foster child") (emphasis added); *Moorehead v. D.C.*, 747 A.2d 138, 144 (D.C. 2000) ("There is no indication, either in this case or in general, that the Chief of Police exercises any control whatever over the *day-to-day activities* of special police officers, . . . or that he otherwise

11

has the right to control [an SPO] in the performance of a task and in its result[.]") (emphasis added; quotation omitted); *contrast with Kelly*, 448 A.2d at 861 (imposing *respondeat superior* liability because "Safeway enjoyed the right to control the guards' conduct" and "had operational control over the guards" through its store manager).

Brooks' actions and current arguments both demonstrate that he was subject to no one's control, in the sense required for *respondeat superior* liability, when he decided to speak on January 6, or when he tweeted about purported election fraud in the weeks after the election. That is fatal to his Petition, even if in other circumstances the analysis could somehow be different. *See* Restatement (Second) of Agency § 228 cmt. (c) ("there is no liability for the conduct of one who, although a servant in performing other service, is doing work as to which there is no control or right to control by the master"). Because no one controlled that conduct, it could not have been within the scope of his employment under the Restatement and D.C. law. Brooks' Petition should be denied on that basis alone.

Neither of the D.C. Circuit cases that have held that certain members of Congress acted within the scope of their employment for Westfall Act purposes counsels a different result. Those cases (*Murtha* and *Ballenger*) never considered whether Members of Congress were "servants" adequately "controlled" by someone as required by the Restatement's scope-of-employment test, apparently because the plaintiffs in those cases never argued the "control" question. *See, e.g.*, *Murtha*, 562 F.3d at 383 (plaintiff "argues that Congressman Murtha's statements to the media fell outside the scope of his employment"); *Ballenger*, 444 F.3d at 664 (noting plaintiff's argument that defamatory statements are not the type of statements members

are employed to perform).[5]  That is not uncommon.  In *Kelly*, the D.C. Court of Appeals

analyzed whether Safeway security guards were "servants" who were sufficiently controlled by

Safeway such that Safeway could be vicariously liable when they assault customers, even though

that Court previously had held that Safeway's security guards "act[] within the scope of

employment" when they commit such assaults.  *Kelly*, 448 A.2d at 861 (discussing *Safeway*

*Stores, Inc. v. Gibson*, D.C. Mun. App., 118 A.2d 386, 388 (1955), *aff'd*, 99 U.S. App. D.C. 111,

237 F.2d 592 (1956)).  The Court explained that in that prior case, "this Court did not discuss the

distinction between an independent contractor and a servant since Safeway only challenged

whether the guard was acting within the scope of his employment" on other grounds, and went

on to hold that Safeway sufficiently controlled its security guards as to make it vicariously liable.

*Kelly*, 448 A.2d at 861.  *Murtha* and *Ballenger* likewise do not decide the question whether

Brooks qualifies as a "servant" under D.C. *respondeat superior* law by virtue of being

adequately controlled by someone, as required by the Restatement's scope-of-employment test.

For all of the reasons given above, he manifestly does not.

## II.  Even if Congressman Brooks Were A Servant Whose Relevant Conduct Was Controlled By His Constituents, His Actions Were Not Within the Scope of Any Such Employment.

As noted above, it is not enough to establish that one is a "servant" of some other to

qualify for substitution under the Westfall Act.  Not all "[c]onduct of a servant" is "within the

scope of employment"; instead, "[c]onduct of a servant is within the scope of employment *if, but*

*only if*," three things are true:

---

[5] The *Ballenger* Court, moreover, explicitly limited its holding to the particular facts before it. *Ballenger*, 444 F.3d at 666 ("This case, like every judicial decision, cannot be divorced from its facts. . . .  [O]ur *ratio decidendi* necessarily depends on the context in which the statement was made.").

- "'[I]t is of the kind he is employed to perform;'"

- "'[I]t occurs substantially within the authorized time and space limits;'" *and*

- "'[I]t is actuated, at least in part, by a purpose to serve the master.'"

*Wilson v. Libby*, 535 F.3d 697, 711 (D.C. Cir. 2008) (emphases added; quoting Restatement

(Second) of Agency § 228(1)).[6]  Brooks' conduct satisfies none of—much less all three of—

those factors.

### A.     Congressman Brooks' Conduct Was Not "Of The Kind He Is Employed To Perform."

The first factor weighs heavily against a finding that Brooks' conduct was within the

scope of his employment.  In his haste to make his comments on January 6 about anything other

than the violent march on the Capitol that they incited, Brooks now claims that his speech was

primarily a campaign speech for the 2022 and 2024 elections.  *See, e.g.*, Pet. at 14, 16, 19.  But

that manifestly places his conduct outside the scope of his employment, because House rules bar

Members from using official time and resources on campaign and political activity.  Indeed, the

House itself has so determined.  In a letter attached to House Counsel's filing today,

Congresswoman Zoe Lofgren, Chair of the Committee on House Administration, explains that

Brooks' sworn testimony "that his conduct was . . . in furtherance of political campaigns" means

that activity necessarily was "*outside the scope of official duties*," ECF No. 32-1 at 4 (emphasis

added), and thus was not "within the scope" for Westfall Act certification purposes.

---

[6] As noted above, in cases where the servant directly used physical force, a fourth factor is added:  whether "the use of force is not unexpectable by the master."  *Libby*, 535 F.3d at 711 (quoting Restatement (Second) of Agency § 228(2) (1958)).

Brooks' final, half-hearted effort to salvage part of his conduct for certification purposes—i.e., his argument that his campaign speech was somehow in furtherance of his duties under the Electoral Count Act, *see* Pet. at 19-20, 41—likewise fails, as also explained below.

        **1.**      **Campaign and Political Activity Is Outside the Scope of Congressman Brooks' Official Duties.**

In an effort to avoid the consequences of his speech on January 6, Brooks has painted himself into a corner for purposes of this Petition.  As explained above, he claims that what he was really doing on January 6 was campaigning for the 2022 and 2024 elections.  As he tells it, he sought "to inspire listeners to start focusing on the 2022 and 2024 elections," Pet. at 16, and to "inspire and reinvigorate Ellipse Rally citizens," *id.* at 19, who quite obviously came from the Republican Party base.  He even claimed that his phrase about "kicking ass!" was in reference to the 2022 and 2024 elections. *Id.* at 16 n. 28; *see also id.* at 14 nn. 21, 22; Brooks Aff. ¶46.  And, as noted above, he dramatically removed his camouflage hat mid-speech and replaced it with a red "FIRE PELOSI" hat.[7]  In other words, Brooks himself amply supports the Complaint's allegation that he engaged in the conduct at issue in furtherance of his and his political party's "partisan aims," not because of his official duties.  Compl. ¶¶85, 109; *see also id.* ¶97 (alleging that January 6 rally was organized and run by a political campaign, Donald J. Trump for President).

In all of that, Brooks acted outside the clear scope of his Congressional duties.  It is well-settled that the scope of a Member's federal employment does *not* encompass campaign activity.  The House Ethics Manual, for example, contains a more than sixty-page chapter on "Campaign Activity," which emphasizes the necessity of Members segregating campaign

---

[7] *See* https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification, at 44:10-44:25.

activity from official activity, and which expressly proscribes the use of congressional buildings and congressional resources—including particularly congressional staff time—for campaign activity.[8]  The House Ethics Committee also has published guidance elaborating on these aspects of the Ethics Manual.[9]  As explained in Chairwoman Lofgren's letter, "Official resources of the House must, as a general rule, be used for the performance of official business of the House, and hence those resources may not be used for campaign or political purposes." ECF No. 32-1 at 2.  That includes a prohibition on the use of "House rooms and offices" and "congressional staff time" for "campaign or political purposes," including the re-election campaigns of others.  *Id.*  Yet that is precisely what Brooks now claims he did:  use his offices, his staff, and his supplies to write and prepare the speech he delivered on January 6.  *See* Pet. at 11; Brooks Aff. ¶¶ 37-38.  He did so despite having been a Member since 2011, *see* Pet. at 4, and despite being "required to complete annual ethics training" on these very topics.  ECF No. 32-1 at 1; *see United States v. Beusch*, 596 F.2d 871, 878 (9th Cir. 1979) (violation of employee policies "may be considered in determining whether employee in fact acted to benefit the corporation," particularly where such policies are "diligently enforc[ed]").  Accordingly, Brooks' actions fall outside the scope of his official duties, by his own admission.[10]

---

[8] *See* House Ethics Manual, Ch. 4 ("Campaign Activity"), https://ethics.house.gov/sites/ethics.house.gov/files/documents/2008_House_Ethics_Manual.pdf.

[9] *See See* Guidance, House Ethics Committee, https://ethics.house.gov/campaign/general-prohibition-against-using-official-resources-campaign-or-political-purposes.

[10] *See also, e.g.*, *S.V. v. Kratz*, No. 10-C-0919, 2012 WL 5833185, at *4 (E.D. Wis. Nov. 16, 2012) (knowing violation of "express employer policies . . . may be a powerful indication that the employee was acting outside the scope of employment"); *Hamilton v. Cty. of Onondaga, New York*, No. 515-cv-01333, 2018 WL 4554496, at *18 (N.D.N.Y. Sept. 21, 2018) (defendants' actions "were not within the scope of their employment" given "County's own policies against harassment and discrimination").

None of the cases identified by Brooks, and no other cases of which we are aware, hold otherwise.  To be sure, courts routinely hold that elected officials act within the scope of employment when performing functions commonly required by their position, and particularly functions related to their legislative responsibilities.[11]  But when confronted with the question whether *campaign* activity is within the scope of an elected official's employment, they hold the opposite.  *See, e.g.*, *Glacken*, 2014 WL 1836143, at *6 (mayor engaged in campaign activity was acting outside state law protection); *Greaney v. Ferrer*, 278 A.D.2d 154, 155 (1st Dep't 2000) (defendant's statements were not entitled to an absolute privilege because they "were made in the context of a political campaign, rather than during [the] defendant's performance of his public duties"); *Burdge v. Excelsior Ins. Co.*, 194 N.J. Super. 320, 325 (N.J. Super. Ct. App. Div. 1984) (finding that the "political activity of a candidate does not constitute a business pursuit related to the performance of [official] duties"); *cf. Boehner v. McDermott*, 484 F.3d 573 (D.C. Cir. 2007) (no argument regarding certification, in Member versus Member litigation, where defendant Member's conduct apparently taken for political advantage).

To the extent that Brooks' speech was in furtherance of a scheme to violently disrupt the electoral vote certification or to encourage its unconstitutional rejection by Vice President Pence, his speech clearly was outside the scope of his official duties.  To the extent it instead

---

[11] *See Does 1-10 v. Haaland*, 973 F.3d 591, 601-02 (6th Cir. 2020) (Kentucky law; comments on topic of public interest and legislative import—i.e., border wall); *Wuterich v. Murtha*, 562 F.3d 375, 384-85 (D.C. Cir. 2009) (media interviews about Iraq War); *Council on American Islamic Relations, Inc. v. Ballenger*, 444 F.3d 659, 661 (D.C. Cir. 2006) (discussion with reporter primarily about "legislative issues"); *Williams v. United States*, 71 F.3d 502, 506 (5th Cir. 1995) (Texas law; comments from press interview about Congressional appropriations); *Operation Rescue Nat. v. U.S.*, 975 F. Supp. 92 (D. Mass. 1997) (Massachusetts law; statements to media regarding pending legislation); *Chapman v. Rahall*, 399 F. Supp. 2d 711 (W.D. Va. 2005) (West Virginia law; statements to media stemming from foreign affairs discussion); *Scott v. Janklow*, 2004 WL 2212048 (D. Minn. Oct. 1, 2004) (South Dakota law; official travel).

was a campaign speech for the 2022 and 2024 elections, as Brooks now claims, it also was outside the scope of his official duties.  Either way, substitution must be denied.

> ### 2.     The Electoral Count Act Did Not Authorize Congressman Brooks to Object to the Vote Count as He Did.

Brooks also provides a glancing argument that some part of his campaign speech can be labelled as made pursuant to "presidential dispute resolution obligations imposed on Congress" by "3 U.S.C. § 15 in particular," Pet. at 19-20, which statutory provision Brooks suggests gave him the right to "challenge[] the electoral college vote submittals of states whose election processes were less than reliable in the judgment of Brooks," *id.* at 41.  That supposed right, Brooks apparently contends, advances his "within the scope" argument, notwithstanding that he engaged in that conduct in his campaign capacity.

The relevant statute, part of the Electoral Count Act (ECA), however, gave Brooks no such right.  It primarily gives members of Congress the limited right to determine whether the electors presented to it are the ones that the lawful authority of each state intended to so designate, in the wake of the 1876 presidential election where several states submitted multiple slates of electors and Congress was deadlocked on how to proceed.  *See Bush v. Gore*, 531 U.S. 98, 155 (2000) (Breyer, J., dissenting).  It therefore provides logistical procedures by which a submitted slate of electors is deemed legitimate, involving such things as sealed transmittal of their names to the Archivist of the United States.  *See, e.g.*, 3 U.S.C. § 6.  It requires that votes "regularly given by electors" so submitted be accepted when "but one return has been received" from that State.  3 U.S.C. § 15.[12]  It even provides a safe harbor provision which renders the

---

[12] The Act's legislative history indicates that votes not "regularly given" refers to improper votes made by valid electors, *not* to electors who themselves are invalid because of defects in a state's election process.  *See* 18 Cong. Rec. 52 (1886) (statement of Rep. Adams) (explaining that the

selection of electors "conclusive," 3 U.S.C. § 5, and which every state but Wisconsin had satisfied by December 8 of last year, weeks before the rally.[13]  *See also Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732, 735, 209 L. Ed. 2d 164 (2021) (Thomas, J., dissenting from denial of cert.) (noting that Section 5's safe-harbor provision gives states "about five weeks to address all disputes and make a 'final determination' of electors if it wants that decision to 'be conclusive'" (quoting 3 U.S.C. § 5)).  In other words, Congressman Brooks was not authorized by the ECA to reject votes based on his purported belief that certain states' results were unreliable or fraudulent.  That statute, then, cannot salvage any of Brooks' relevant conduct as the type he is employed to perform.

> ### B.   Congressman Brooks' Conduct Was Not "Substantially Within the Authorized Time and Space Limits."

Because Brooks' January 6 speech was given at a campaign rally to advance particular political aims, it necessarily was not "substantially within the authorized time and space limits," and therefore fails the second of these three additional factors as well.  As explained above, campaign and political activity is outside the scope of a Member's official duties and may not permissibly be done through the use of official resources.  Brooks' speech that day was outside the scope of his employment for this reason as well.

---

phrase "regularly given" as it appears in another section means "[t]he title of the electors may be valid, and yet their votes may be invalid, and the words 'regularly given' referred not to the title of the electors themselves, but to the validity of their votes after they have been regularly elected").

[13] See Mark Sherman, Tuesday's Safe Harbor Deadline Is Boost for Biden, Associated Press (Dec. 8, 2020), https://apnews.com/article/safe-harbor-law-locks-congress-joe-biden-119b6e1570f33af0baee1493cbbe012b; 2020 Electoral College Results, Electoral College, National Archives and Records Administration, https://www.archives.gov/electoral-college/2020 (last visited July 27, 2021).

### C.      Congressman Brooks' Conduct Was "Too Little Actuated" by a Purpose to Serve Any Master.

The third factor in the analysis weighs against a within-the-scope finding as well. Though phrased as requiring that conduct be motivated "at least in part" by an intent to serve the master, that factor is not satisfied by just any amount of acceptable intent. Instead, "'[c]onduct of a servant is not within the scope of employment if it is . . . *too little* actuated by a purpose to serve the master.'" *Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003) (emphasis added; quoting Restatement (Second) of Agency § 228(2)); *see also D.C. v. Bamidele*, 103 A.3d 516, 524 (D.C. 2014) (District not vicariously liable for police misconduct motivated in part by officers' official duty because it was "'too little actuated by a purpose to serve the master'") (quoting Restatement (Second) of Agency § 228(2)).[14]

Brooks naturally asserts that his actions on January 6 were in furtherance of his employment. But his subjective say-so about his motivation is not relevant: "When evaluating scope of employment, 'the test . . . is an objective one, based on all the facts and circumstances.'" *Doe v. Sipper*, 821 F. Supp. 2d 384, 388 (D.D.C. 2011) (quoting *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986)). And the objective evidence, including Brooks' own statements about his speech, demonstrates that it fell outside the scope of his employment as a Member of Congress. As Brooks admits in his affidavit, he viewed the rally as so unrelated to the duties he would perform that day that he had no intention of even attending it until he was invited to speak at it the day prior. Pet. at 11, 32. And the speech he then gave at the rally bore no resemblance to the speech he would actually give on the House floor in furtherance of his

---

[14] *See also Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 428 (D.C. 2006) ("The theft by Mr. Young and Mr. Brown was not 'actuated at least in part, by a purpose to serve the master.'  RESTATEMENT § 228(1)(c).  Indeed, it was not merely 'too little activated [sic] by a purpose to serve the master,' *id.* § 228(2), it was not so actuated at all.").

purported duty that day.  He told the crowd, as Trump and the co-Defendants had been saying for weeks, that what was happening was a unique act of unprecedented fraud in particular states, one that put America at risk like it hadn't been in "decades, and perhaps centuries."  But he would then say on the House floor that the problem was *nationwide* voting by non-citizens dating back to *1993*.[15]  His rally speech was "too little actuated by" even Brooks' mistaken notion of his duties under the ECA.

Finally, and to state the obvious, Brooks' actual conduct as plausibly alleged that day failed to serve any "master" at all.  *Stokes*, 327 F.3d at 1215 (allegations regarding scope of employment must be liberally construed in plaintiff's favor).  The Complaint plausibly alleges that Trump's followers had been told for weeks that their country was being stolen from them in an unprecedented act of fraud.  The Complaint further plausibly alleges that a subset of those supporters repeatedly had responded to those claims with political violence.  And Brooks, though he denies many things in his affidavit, does not deny knowing that Trump's followers had been told such things and had responded in that way.  Despite that, he told a crowd of some of Trump's most ardent supporters that their country faced a potential existential threat, unlike anything it had experienced in "decades, and perhaps centuries."  And he told them in inflammatory language that *today* they had to act, that the vote *today* could turn their country into an amoral dictatorship, and that *today* they had to start "kicking ass!," knowing they were marching to the Capitol where Trump already had pressured Pence to engage in an illegal act.  Conduct that outrageous had nothing to do with his actual employment.  *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 31 (D.C. 1979) ("[t]he outrageous quality of an employee's act may

---

[15] *See* https://brooks.house.gov/media-center/news-releases/congressman-mo-brooks-house-floor-calls-honest-accurate-elections (last visited. July 27, 2021).

well be persuasive" in analyzing scope of employment question); Restatement (Second) Agency § 245 cmt. f. ("the fact that the servant acts in an outrageous manner . . . is evidence indicating that the servant has departed from the scope of employment in performing the act"). The Complaint, buttressed by Brooks' petition and affidavit, plausibly alleges that he knowingly, or at a minimum recklessly, incited the crowd to violence that day. That conduct was not within the scope of any employment.

*     *     *

Brooks engaged in conduct not authorized by his office. He gave a purported campaign speech at a political rally using official resources. The Committee on House Administration confirms that in doing so he acted outside the scope of his official duties. He further acted pursuant to a purported understanding of his duties under the ECA that the ECA does not support. He did so outside the Capitol grounds. He did so at an event that for weeks he had no intention of attending. He did so with ideas that would bear no resemblance to his official Floor statement. And he did so in language he knew, or should have known, would incite individuals to respond to his apocalyptic claims with political violence, as had happened more than once. For all of those reasons, his conduct was outside the scope of his employment.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Congressman Brooks' Petition be denied.

Dated: July 27, 2021                                    Respectfully submitted,

_____/s/ Philip Andonian_____          _____/s/ Sarah Fink_____
CALEBANDONIAN PLLC                              KAISERDILLON PLLC
Philip Andonian (D.C. Bar No. 490792)       Matthew Kaiser (D.C. Bar No. 486272)
Joseph Caleb (D.C. Bar No. 495383)          Sarah Fink (D.C. Bar No. 166663)
1100 H Street, N.W., Ste. 315                     1099 Fourteenth Street, N.W., 8th Fl.
Washington, D.C. 20005                            Washington, D.C. 20005
Tel: (202) 953-9850                                   Tel: (202) 640-2850
Email: phil@calebandonian.com               Email: mkaiser@kaiserdillon.com
            joe@calebandonian.com                          sfink@kaiserdillon.com


_____/s/ Barry Coburn_____
COBURN & GREENBAUM PLLC
Barry Coburn (D.C. Bar No. 358020)
Marc Eisenstein (D.C. Bar No. 1007208)
1710 Rhode Island Avenue, N.W., 2nd Fl.
Washington, D.C. 20036
Tel: (202) 643-9472
Email: barry@coburngreenbaum.com
            marc@coburngreenbaum.com

*Attorneys for Plaintiff Eric Swalwell*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of July, 2021, I caused the foregoing Opposition to Petition to Certify Defendant Mo Brooks Was Acting Within the Scope of His Office or Employment to be filed via the Court's CM/ECF system, which I understand caused a copy to be served on all registered parties.

_____/s/ Sarah Fink_____
Sarah Fink
