UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ERIC SWALWELL,

  **Plaintiff,**

**v.**         Civil Case Number:  1:21-CV-586 APM

DONALD J. TRUMP, DONALD J.
TRUMP, JR., REPRESENTATIVE
MO BROOKS (Pro Se) & RUDOLPH
GIULIANI,

  **Defendants.**

**VERIFIED REPLY TO BRIEFS OPPOSING PETITION TO CERTIFY CONDUCT
WITHIN SCOPE OF EMPLOYMENT**

  Defendant Mo Brooks ("Brooks") offers this <u>verified</u> reply to "The United States'
Response to Defendant Mo Brooks's Petition to Certify He Was Acting Within the Scope
of His Office Of Employment" ("DoJ Brief") and Swalwell's "Opposition to Petition to
Certify Defendant Mo Brooks Was Acting Withing the Scope of His Office or
Employment" ("Swalwell Brief") (collectively "Opposition Briefs").

**VERIFIED FACTS**

  The Opposition Briefs offer zero <u>evidence</u> other than House Ethics Rules found
at  https://ethics.house.gov/campaign/general-prohibition-against-using-official-
resources-campaign-or-political-purposes[1], the "Rodgers Report"[2], a reference to a C-

---

[1] The <u>full</u> House Ethics Rules are found at
https://ethics.house.gov/sites/ethics.house.gov/files/documents/2008_House_Ethics_M
anual.pdf.  The rules relating to impermissible "Campaign Activity" are found at Chapter
4, Pages 121 through 183.

[2] DoJ Brief, p. 11.  Citing but not offering *In the matter of Allegations Relating to
Representative Cathy McMorris Rodgers 28-29 (December 19, 2019)*

Span video that does not involve Brooks,[3] and a letter by a political adversary of Brooks (Democrat Congresswoman Zoe Lofgren).

The Briefs improperly rely on pleading <u>allegations</u> that are both unsupported by evidence[4] and rebutted by evidence.

*Brooks has also made a Motion to Strike various "facts" asserted in the Opposition Briefs.*

The Opposition Briefs are fictional.  This Court must resolve whether it will render a decision based on fiction or fact supported by evidence.

**Verified Brooks Facts.**

1.  Brooks is 67 years.

2.  Brooks has never smoked tobacco.  Brooks does not consume alcohol. Brooks has never experimented with or taken illegal drugs.

3.  Brooks has never been arrested for or convicted of any felonies or misdemeanors.

4.  Brooks has never had a money judgment rendered against him in any civil court for anything.  Similarly, Brooks has never settled any litigation against him by payment of any funds to any plaintiff.

5.  Brooks has never had a DUI, a reckless driving ticket, or even a speeding ticket.

6.  Brooks has never had a motor vehicle wreck in which anyone claimed Brooks was at fault.

---

[3] DoJ Brief, p. 14.

[4] As the word "evidence" is used in the Federal Rules of Evidence.

7.   Brooks has been married 45 years.  Brooks has always been faithful to his wife. Together they have raised four children, all of whom are married, none of whom have been divorced, all of whom are law-abiding, none of whom have ever been arrested for anything, all of whom have college degrees and jobs.  Brooks' children have blessed him with ten grandchildren, with two twins and another granddaughter on the way.

8.   Brooks has served the public for 4 decades as a Tuscaloosa assistant district attorney, an Alabama legislator, the Madison County District Attorney, a county commissioner, and U.S. Congressman.

9.   In 4 decades of public service, Brooks has a perfect ethics record, having never been found to have violated any ethics laws, large or small (despite Democrats, over the years, having harassed Brooks with at least 38 ethics complaints, none of which have been found to be substantive or warranted).

**Brooks' Pre-Rally Speech Activity.**

10.   Brooks was asked on January 5, 2021 by a person who identified himself as a White House employee to give a speech at the Ellipse Rally.

11.   Brooks was not going to go to the Ellipse Speech (prior to being asked to speak at it) for a variety of reasons.  In no particular order, Brooks intended to not go to the Ellipse Rally because of all the speech writing and research work Brooks had to do to be properly prepared for the January 6, 2021 debate on whether to accept or reject various state's electoral college vote submissions, because being one person in a throng of thousands when there was so much other work to do did not merit attendance, because of the peaking threats of violence against Brooks (coupled with having been

3

targeted for assassination by a Socialist Democrat at the Alexandria baseball shooting), etc., etc.  After the White House invitation to speak, Brooks weighed the pros and cons of going and gave the Ellipse Speech.

12.   No person involved in any way with Brooks' Ellipse Speech ever identified himself to Brooks as being a part of President Donald Trump's re-election campaign.

13.   President Donald Trump and Brooks never talked or communicated about Brooks giving a speech at the Ellipse Rally.

14.   Brooks does not recall observing anything at the Ellipse Rally suggesting it was paid for by the President Donald Trump presidential election campaign.

15.   When there was a misunderstanding about how much time Brooks had in which to give his remarks, Brooks called White House Chief of Staff Mark Meadows to resolve the matter, which Meadows did.

16.   Based on the little information Brooks discerned, Brooks believed the Ellipse Rally was, generally speaking, about the January 6, 2021 issues before the U.S. Congress, to-wit:  Congress's duty to vote on January 6, 2021 on whether to accept or reject electoral college vote submittals from states whose elections systems appeared to have such systemic flaws as to render their reported results unreliable, as mandated by the U.S. Constitution and 3 U.S.C. 1 through 21 and educating the American people about and stopping voter fraud, election theft and the upcoming vote on electoral college vote submittals.

17.   Inasmuch as the presidential election date was November 3, 2020, the

Ellipse Rally was not a "campaign rally" to garner citizen votes for candidates for President of the United States, or to garner citizen votes for any other election by United States citizens for any other office.

18.   The "campaign" for president of the United States ended on November 3, 2020, the federal election day set by 2 U.S.C. 7.

19.   Brooks' expenses to attend the Ellipse Rally were not paid for by the Donald Trump for President campaign (or any related campaign entity).  Generally speaking, consistent with Brooks having nothing to do with the planning and execution of the Ellipse Rally (other than attending and giving a speech, when asked), Brooks has no personal knowledge about who or what entity paid for the Ellipse Rally.

20.   There were various factors that caused Brooks to speak at the Ellipse Rally. One such purpose was to express that Brooks intended to fulfill his duties under the 12th Amendment to the Constitution and under 3 U.S.C. 1 through 21 by voting against electoral college vote submittals from states who election systems appeared to be unreliable.

21.   Complaint paragraph 84 alleges there was a tweet by Brooks dated January 5, 2021 at 9:57 PM that states, "BIG DAY:  I speak at tomorrow's #StoptheSteal rally @ 7:50 am CT. @realDonaldTrump asked me personally to speak & tell the American people about the election system weaknesses that the Socialist Democrats exploited to steal this election.  Watch:" Brooks did not send out this tweet. Brooks has no personal knowledge about who sent out this tweet (but suspects a Congressional staffer did it).  Brooks had no prior knowledge of this tweet before it was sent out.  Brooks did not learn about this tweet until after he spoke at the Ellipse Rally.

This tweet is false in various respects.  First, this tweet describes the Ellipse Rally as the "#StoptheSteal rally".  Brooks understands it was the "Save America" Rally.  Brooks was not involved in the planning, invitations concerning, or operation of the Ellipse Rally so Brooks has no personal knowledge of its true name.  Second, this tweet states Brooks' Ellipse Speech started at 7:50 AM CT.  As Brooks recalls it, Brooks' Ellipse Speech started sometime after 8 AM CT.  Third, the tweet falsely states "@realDonaldTrump asked me personally to speak & tell the American people about the election system weaknesses that the Socialist Democrats exploited to steal this election."  Donald Trump did not personally ask Brooks to speak so none of the words attributed to Donald Trump are true.  A White House staffer asked Brooks to speak.

22.   Prior to January 6, 2021, Brooks had seen significant parts of various Trump rallies on TV.  Not once did Brooks ever see any violence erupt after any Trump rally.  On most days, Brooks reads dozens of news articles that relate to politics and political events.  Brooks cannot recall reading a single article, or seeing a single TV news cast, that describes significant violence erupting after any Trump rally.

23.   Similarly, prior to January 6, 2021, Brooks had never seen or heard any proof that "Trump's followers repeatedly had responded to Trump's election fraud claims with political violence" (as alleged, without proof, in Swalwell Brief, p. 6).

### House Ethics Rules & Precedence

DoJ and Swalwell rely heavily on the House Ethics Rules so the rules are exhaustively quoted herein.  January 6 votes since 2000 are also detailed.

24.   Per the <u>Congressional Record</u> dated January 6, 2001, Democrat

Congresswoman Maxine Waters objected to receipt of Florida's electoral college vote submittals and sought to have Florida's electoral college votes rejected and not counted, thereby making Al Gore President of the United States.  Maxine Waters stated:

> I am voicing my objections to the electoral votes submitted by Florida. Mr. Speaker, I believe these electoral votes to be <u>illegitimate</u> and unrepresentative of the true popular vote in Florida. Vice President GORE is leading in popular votes in excess of 500,000 votes in this country, and all of Florida's vote recounts are not yet tabulated. The recounts will document that GORE won Florida, despite <u>voter fraud</u>, despite <u>voter intimidation</u>, despite the butterfly ballots, despite the <u>criminal</u> recording of ID numbers on absentee ballots. (Emphasis added)

Democrat Congresswoman Carrie Meek joined in, stating:

> I am here to express the outrage and exasperation of my constituents in Miami, Florida, over the failure of our government and our electoral system in the 2000 Presidential election; 20,000 votes or more were not counted in Miami, Dade County, Florida.
>
> African American voters in Florida did everything they were supposed to do, studied the issues. We did our civic duty. We lined up at the polls and we voted; and yet massive numbers of our votes were not counted.  We exercised what we thought was our legal right, only to have it nullified by faulty and defective voting machines distributed discriminatorily, targeted in our neighborhoods, nullified by purge of voting lists, and on and on. Mr. Speaker, I

want America to understand that African Americans were not given process in this election.

Democrat Congresswoman Sheila Jackson-Lee joined in, stating:

> Today is a solemn day, a day to affirm the votes of the American people; yet thousands of Americans' votes were not counted. I went to Florida and saw thousands of Floridian votes thrown out.

<u>All</u> of these Democrat Congresswomen publicly, explicitly or implicitly, asserted the presidential election was stolen from Al Gore by voter fraud, criminal activity, or other misfeasance or malfeasance.  None of these Democrat Congresswoman were found to have violated the House Ethics Rules.

25.   Per the <u>Congressional Record</u> dated January 6, 2005, Democrat Congresswoman Stephanie Tubbs Jones and Senator Barbara Boxer objected to receipt of Ohio's electoral college vote submittals and sought to have Ohio's electoral college votes rejected and not counted.  Thirty-one Democrat Members of Congress voted to reject Ohio's electoral college votes submittals.

Had these objectors prevailed, George Bush would have lost 20 electoral college votes, putting him at 266 electoral college votes (below the 270-vote majority number normally required to win).

None of these Democrat Congresswoman were found to have violated the House Ethics Rules because of their speeches or their votes.

26.   Per the <u>Congressional Record</u> dated January 6, 2017, Democrat Members of Congress *en masse* sought to overturn the election of Donald Trump as President of the United States.

<u>Democrat</u> Congressman Jim McGovern objected to receipt of Alabama's <u>nine</u> electoral college votes and sought to have Alabama's electoral college votes rejected and not counted, claiming there were "widespread violations of the Voting Rights Act that unlawfully suppressed thousands of votes in the State of Alabama."

<u>Democrat</u> Congressman Jamie Raskin objected to receipt of Florida's <u>twenty-nine</u> electoral college votes and sought to have Florida's electoral college votes rejected and not counted, claiming ten of the electors who cast votes illegally did so.

<u>Democrat</u> Congresswoman Pramila Jayapal objected to receipt of Georgia's <u>sixteen</u> electoral college votes and sought to have Georgia's electoral college votes rejected and not counted.

<u>Democrat</u> Congresswoman Sheila Jackson Lee objected to receipt of Michigan's <u>sixteen</u> electoral college votes and sought to have Michigan's electoral college votes rejected and not counted.

<u>Democrat</u> Congresswoman Sheila Jackson Lee objected to receipt of Mississippi's <u>six</u> electoral college votes and sought to have Mississippi's electoral college votes rejected and not counted.

<u>Democrat</u> Congressman Raul Grijalva and <u>Democrat</u> Congresswoman Sheila Jackson Lee objected to receipt of North Carolina's <u>fifteen</u> electoral college votes and sought to have North Carolina's electoral college votes rejected and not counted.

<u>Democrat</u> Congresswoman Sheila Jackson Lee objected to receipt of South Carolina's <u>nine</u> electoral college votes and sought to have South Carolina's electoral college votes rejected and not counted.

<u>Democrat</u> Congresswoman Sheila Jackson Lee objected to receipt of West Virginia's <u>five</u> electoral college votes and sought to have West Virginia's electoral college votes rejected and not counted.

<u>Democrat</u> Congresswoman Sheila Jackson Lee objected to receipt of Wisconsin's <u>ten</u> electoral college votes and sought to have Wisconsin's electoral college votes rejected and not counted.

<u>Democrat</u> Congresswoman Sheila Jackson Lee objected to receipt of Wyoming's <u>three</u> electoral college votes and sought to have Wyoming's electoral college votes rejected and not counted.

Donald Trump was declared President by a margin of 304 to 227 over Hillary Clinton.  Had the above objections to state electoral college vote submittals succeeded, Hillary Clinton would have won the majority of the electoral college votes counted and been elected President of the United States.

None of these <u>Democrat</u> Members of Congress were found to have violated the House Ethics Rules because of their speeches or their votes.

27.   Per the Congressional Record on January 6, 2021, six <u>Republican</u> Senators and 121 <u>Republican</u> Congressmen voted to reject the electoral college vote submittal by Arizona and seven <u>Republican</u> senators and 138 <u>Republican</u> Congressmen voted to reject the electoral college vote submitted by Pennsylvania.

None of these Members of Congress have been found to have violated any House Ethics Rules based on their votes to reject state electoral college vote submittals.

28.   As best Brooks can ascertain, the <u>Campaign</u> Activity portion of the House

Ethics Rules frequently use the phrase "campaign or political" but never define what the words "campaign" or "political" mean.

29.   The House Ethics Rules have a 63-page section entitled "<u>Campaign</u> Activity".  It describes prohibited "<u>Campaign</u> Activity" by stating, in pertinent part (emphasis added):[5]

> As detailed below, official resources of the House must, as a general rule, be used for the performance of official business of the House, and hence those resources may not be used for <u>campaign or political purposes</u>. The laws and rules referenced in this section reflect —the basic principle that government funds should not be spent to help <u>incumbents gain reelection</u>.[6]

> Among the specific activities that clearly may not be undertaken in a congressional office or using House resources (including official staff time) are the <u>solicitation of contributions</u>; the drafting of <u>campaign</u> speeches, statements, press releases or literature; the <u>completion of FEC reports</u>; the creation or issuance of a <u>campaign</u> mailing; and the holding of a meeting on <u>campaign</u> business.[7]

> [T]he prohibition applies to, for example, <u>campaigns</u> for the Presidency, the U.S. Senate, or a state or local office, and it applies to such <u>campaigns</u>

---

[5] Ibid.  The quoted language comes from the rules portrayed at https://ethics.house.gov/sites/ethics.house.gov/files/documents/2008_House_Ethics_Manual.pdf.

[6] Ibid. P. 123.

[7] Ibid. P. 124.

whether the Member is a <u>candidate</u> or is merely seeking to support or assist (or oppose) a <u>candidate</u> in such a campaign.[8]

**Example 1.** A Member wishes to issue a press release announcing that he is endorsing a <u>candidate</u> for President. The Member may not issue the release out of his House office or use any House resources (including his official press release letterhead) in making the announcement.[9]

The rules on proper use of official House funds and resources were implicated in a case handled by the Standards Committee in the 104th Congress. That case, which was initiated by a complaint filed with the Committee, concerned a Member's use of his office fax machine and official letterhead to send out a press release that severely criticized the record of a prospective <u>campaign</u> opponent on Medicare issues.[10]

[A] Member may not film a <u>campaign</u> commercial or have <u>campaign</u> photos taken in a congressional office.[11]

House rooms and offices are not to be used for events that are campaign or political in nature, such as a meeting on <u>campaign</u> strategy, or a reception for <u>campaign</u> contributors.[12]

---

[8] Ibid. p. 124.

[9] Ibid. p. 125.

[10] Ibid. p. 126.

[11] Ibid. p. 127.

[12] Ibid. p. 128.

**Example 2**. A Member's <u>campaign</u> wishes to make commercials featuring testimonials by individuals whom the office has assisted on casework matters.[13]

The Members' Handbook issued by the Committee on House Administration provides that official funds may be used to purchase and produce mailing lists, provided that, among other things, —the list does not contain any <u>campaign</u>, <u>campaign</u> related, or <u>political party</u> information.[14]

[A] Member may not use official funds to purchase mailing lists from the Member's <u>campaign</u>.[15]

The Members' Handbook also provides that, —[o]fficial mailing lists may not be shared with a Member's <u>campaign</u> committee, any other <u>campaign</u> entity, or otherwise be used for <u>campaign</u> purposes.[16]

Member and Committee websites – … May not be directly linked or refer to websites created or operated by a <u>campaign</u> or any <u>campaign</u>-related entity, including political parties and <u>campaign</u> committees.[17]

**Example 5.** In the past year the Member has been very active on the gun issue. The <u>campaign</u> wishes to issue a brochure on the issue, and a <u>campaign</u> worker asks the congressional office for a copy of all the

---

[13] Ibid. p. 128

[14] Ibid. P. 128.

[15] Ibid. P. 128.

[16] Ibid. P. 128.

[17] Ibid. P. 131.

statements and releases the Member issued on guns. The congressional office may provide one copy of the requested material to the campaign.[18]

Other materials in the congressional office files – including, for example, back-up memoranda on issues – are not to be shared with the campaign or otherwise used for campaign purposes.  Congressional staff members should not do research on behalf of the campaign or write campaign speeches or other materials while on official time or using official resources.[19]

30.   In every example Brooks could find, the phrase "campaign or political purposes" in the House Ethics Rules is in the context of an existing election campaign for a public office that has one or more actual persons ("candidates") seeking that public office that citizens will vote on (the essence of a "campaign"), or, perhaps, in the context of generally helping a particular political party (Democratic Party, Republican Party, etc.

31.   Per a word search of the 456-page House Ethics Rules, the word "electioneering" is never used.

32.   "Political" Definition.

Merriam-Webster's Dictionary[20] defines the word "political" to mean:

1.    a.  : of or relating to government, a government, or the conduct of government

---

[18] Ibid. P. 134.

[19] Ibid. P. 134.

[20] https://www.merriam-webster.com/dictionary/political

b **:** of, relating to, or concerned with the making as distinguished from the administration of governmental <u>policy</u>

2 **:** of, relating to, involving, or involved in <u>politics</u> and especially party politics

3 **:** organized in governmental terms political units

4 **:** involving or charged or concerned with acts against a government or a political system

33.   The House Ethics Rules do not define the word "political".  The Merriam-Webster definition of the word "political" encompasses all or almost all of a Congressman's entire job (voting, House Floor and other speeches, committee hearings and briefings, constituent interactions, etc., etc.).

34.   As best Brooks can ascertain, every single "campaign" activity or purpose example cited in the House Ethics Rules <u>all</u> occurred in the context of a "<u>campaign</u>" for election to public office setting, wherein there were actual candidates seeking to procure votes of citizens in an ongoing election.  Conversely, <u>none</u> of the prohibited activity examples appear to occur outside the foregoing.

**Brooks Campaign Expertise**

35.   As best Brooks can ascertain, no person in the history of Alabama has won more general elections carrying the Republican banner than Brooks (14 successful elections as the GOP nominee).  Further, Brooks has both managed and chaired campaigns on behalf of other candidates.

36.   "Campaign Activities" include a lot of things.  By way of example but not limitation, "campaigning" is an effort to encourage citizens to:

- Vote for a candidate.

- Contribute money or any other thing of value to a candidate.

- Take or put up a yard sign for a candidate.

- Hand out campaign materials for a candidate.

- Stuff envelopes and do "mailer" work for a candidate.

- Take or put on car stickers for a candidate.

- Do telephone polling for a candidate.

- Go door-to-door (for canvassing or literature distribution) for a candidate.

- Work the voting locations for a candidate.

- Undertake "get-out-the-vote" activities for a candidate.

- Recruit volunteers for a candidate.

- Put up or distribute campaign posters for a candidate.

- Try to persuade other citizens to vote for a candidate.

- Drafting, producing or purchasing advertising for a candidate.

- Endorsing a candidate.

- Drafting of campaign speeches, news releases, literature, or statements for a candidate.

- Recruit or run as a candidate.

- Do any number of ancillary or other things that advance the chances of a particular candidate's prevailing in an election.

**Brooks' Rally Speech.**

37.   In the Ellipse Speech, Brooks generically encouraged American citizens to exercise their civic responsibility and participate in America's Republic and election processes and to vote based on agreement or disagreement with those candidates.

16

38.   Brooks' Ellipse Speech did not violate any express House Ethics Rules provisions.

39.   Brooks did not, in his Ellipse Speech, identify any specific, existing candidates that citizens should vote for or against, nor did Brooks identify any specific, existing campaigns for election that citizens should support or oppose, nor did Brooks advocate the election of candidates of any political party.

40.   In his Ellipse Speech, Brooks did not campaign for, or ask voters to support, any candidate for any public office concerning any existing or future election.

41.   In his Ellipse Speech, Brooks did not campaign for, or ask voters to support, any political party concerning any existing or future election.

42.   Brooks did not give a "campaign speech" at the Ellipse Rally (as the word "campaign"[21] is defined and understood).

43.   Brooks said <u>nothing</u> in his Ellipse Speech concerning any candidate's or political party's election campaign for a public office.

44.   Brooks said <u>nothing</u> in his Ellipse Speech concerning any candidates seeking public office via an election.

45.   Brooks said <u>nothing</u> in his Ellipse Speech promoting either political party, Republican or Democrat.

---

[21] Brooks' understanding of the word "campaign", as used in the House Ethics Rules and the pleadings herein, is that it means exactly what it seems to mean:  an effort to win a public election to public office in an existing (not hypothetical) race that involves one or more persons ("candidates") seeking to persuade voters to vote for a candidate for that public office.  As far as Brooks can ascertain, every single example of prohibited conduct given in the House Ethics Rules is consistent with the above definition of "campaign" and, for that matter, consistent with how the word "political" is used (except that the word "political" may be slightly different insofar as it relates to advancements of a "political party").

46.    Brooks said <u>nothing</u> in his Ellipse Speech advocating the election of any political party's candidates, whether they be Republicans or Democrats.

47.    Brooks never advocated in his Ellipse Speech the election of one or more Republican, Democrat, or any other party's candidates, generally; or any Republican, Democrat or other party candidates, specifically; or the advancement of any political party, in the 2022 or 2024 elections.

48.    As of January 6, 2021, Brooks was unaware of any declared or undeclared candidate for any elected public office in the 2022 or 2024 elections.

49.    Brooks' Ellipse Speech was roughly 1,089 words long.  The DoJ Brief focuses on a small, less than 8% of the Speech, two-sentence paragraph that is roughly 85 words long.[22]  The Brooks' Ellipse Speech segments are:

Introduction and message to take to your heart.  Roughly 48 words long.

History: America is great, and why.  Roughly 260 words long.

Socialism is evil and on the attack.  Roughly 108 words long.

America will beat Socialism.  Roughly 70 words long.

The 2020 elections are over with.  Roughly 19 words long.

January 6 is a critical day for Congressional votes.  Roughly 161 words long.

The 2022 & 2024 elections are upcoming.  Roughly 85 words long.

History: sacrifices of our ancestors.  Roughly 68 words long.

---

[22] But let's be clear, regardless of today's outcome the 2022 and the 2024 elections are right around the corner, and America does not need and cannot stand, cannot tolerate any more weakling, cowering, wimpy Republican Congressmen and Senators who covet the power and the prestige the swamp has to offer, while groveling at the feet and the knees of the special interest group masters. As such, today is important in another way, today is the day American patriots start taking down names and kicking ass.

History: Thomas Payne quote.  Roughly 90 words long.

Call to chant "USA".  Roughly 180 words long.

**Swalwell Conspiracy Theories.**

50.   Brooks did not conspire with anyone to incite any violence at the U.S. Capitol on January 6, 2021.

51.   To the best of Brooks' recollection, he has communicated with <u>defendant Rudy Giuliani</u> one time in his life:  in December 2020, in the White House, with a bunch of other Congressmen (a dozen or two) in which Giuliani, in very general terms, outlined his opinions about 2020 voter fraud, election theft, and the like.  At no time during this meeting with Brooks and other Congressmen did anyone mention any plan to incite a riot or attack the Capitol or, as best Brooks recalls it, even mention any kind of outdoor speeches or protests at the Ellipse or Capitol on January 6, 2021.

52.   Brooks did not conspire with defendant Rudy Giuliani to incite any violence at the U.S. Capitol on January 6, 2021.

53.   To the best of Brooks' recollection, between November 3, 2020 and January 6, 2021, Brooks never communicated, directly or indirectly, with <u>defendant Donald Trump, Jr.</u>  For that matter, Brooks has no recollection of ever communicating with defendant Donald Trump, Jr. before January 6, 2021.

54.   Brooks did not conspire with defendant Donald Trump, Jr., to incite any violence at the U.S. Capitol on January 6, 2021.

55.   To the best of Brooks' recollection, between November 3, 2020 and January 6, 2021, Brooks met with <u>defendant President Donald Trump</u> one, on the same day as the White House meeting with defendant Rudy Giuliani.  This meeting included other

Congressmen (a dozen or two).  At no time during this meeting with Brooks and a bunch of other Congressmen did anyone mention any plan to incite a riot or attack the Capitol nor, as best Brooks recalls it, even mention any kind of outdoor speeches or protests at the Ellipse or Capitol on January 6, 2021.

56.   Brooks has a very vague recollection that, between November 3, 2020 and January 6, 2021, Brooks may have received one or two telephone calls from President Donald Trump.  If so, it is Brooks' very vague recollection that these phone calls were limited to voter fraud and election theft concerns of defendant President Donald Trump and/or President Donald Trump calling to thank Brooks for Brooks' fight for honest and accurate elections.  Brooks is fairly certain none of these phone calls, if they occurred, related to any kind of outdoor speeches or protests at the Ellipse or Capitol on January 6, 2021 because that kind of communication would have stood out and Brooks is confident he would recall it with greater clarity.

57.   Brooks did not conspire with defendant Donald Trump, to incite any violence at the U.S. Capitol on January 6, 2021.

### Congressional Duties vis-à-vis the White House.

58.   Brooks represents Alabama's 5th Congressional District.

59.   Alabama's 5th Congressional District is the home of NASA's Marshall Space Flight Center and the U.S. Department of Defense's Redstone Arsenal.

60.   On information and belief, gleaned from any number of governmental publications, and based on personal knowledge and observation from having lived in Alabama's 5th Congressional District for roughly 60 years, including more than a decade as Alabama's 5th Congressional District Congressman, well over 30,000 (perhaps over

40,000) direct federal and private sector space, defense and other jobs originate from Redstone Arsenal, the Marshall Space Flight Center, and other federal government activities in Alabama's Fifth Congressional District.

61.   The President of the United States, as America's Commander-in-Chief and as the Chief Executive Officer of the Executive Branch of the United States Government, has significant authority and control over the location and nature of federal government jobs in Alabama's 5th Congressional District.

62.   It is absolutely a part of the job and duties of the U.S. Congressman from Alabama's 5th Congressional District that the Congressman cooperate with the White House whenever possible and appropriate to protect and promote the direct and indirect jobs tied to federal activities in Alabama's 5th Congressional District.

63.   Cooperating, or not cooperating, with the White House affects a Congressman's effectiveness.  Certainly rejecting the request of the White House to give a speech at the Ellipse could hurt a Congressman's effectiveness.  This is particularly true given the importance of the White House to space, defense and other jobs in a Congressman's district.

64.   The foregoing Alabama 5th Congressional District jobs were a significant factor and motivator, among other factors and motivators, that caused Brooks to give the Ellipse Speech when the White House asked that Brooks do so.

**Brooks Did Not Instigate an Attack on the Capitol.**

65.   Brooks did not instigate an attack on the U.S. Capitol on January 6, 2021.

66.   Brooks spoke at the Ellipse Rally roughly between 9:00 AM ET to 9:30 AM ET.  Thereafter, music played at the Ellipse for some period of time.

67.   While Brooks remained in the Ellipse area for only five to ten minutes after concluding the Ellipse Speech, Brooks neither saw nor heard of anyone who, after Brooks Ellipse Speech concluded, left the Ellipse to go and attack the Capitol.

68.   The Ellipse Rally was an entirely separate event from the Capitol attack, inasmuch as the Ellipse is more than a mile away from the Capitol.

69.   Brooks is unaware of any evidence that anyone, after hearing Brooks' Ellipse Speech, left the Ellipse to attack the Capitol.   To the contrary, even Swalwell concedes that the attack on the Capitol began roughly <u>four</u> <u>hours</u> <u>after</u> Brooks' Ellipse Speech.[23]

70.   To the best of Brooks' knowledge and belief, there is no evidence of any kind that Brooks instigated an attack on the Capitol on January 6, 2021.

71.   To the best of Brooks' knowledge and belief, based on briefings, public statements by law enforcement, investigative reports, and the like, the attack on the Capitol was planned, led and inspired by militants days or weeks in advance of Brooks' Ellipse Speech.  For example, and per law enforcement and other federal government information disclosed to the public and/or Brooks, the militant elements planted pipe bombs away from the Capitol complex on or before January 5, 2021 and reported those pipe bombs to Capitol Police on January 6, 2021, thereby causing Capitol Police to divert personnel away from the Capitol to the pipe bomb locations, at which time the militants attacked a weakened protective Capitol Police force at the Capitol.  Ergo, it is impossible that Brooks' Ellipse Speech on January 6, 2021 caused these militant

---

[23] Swalwell Complaint, Paragraph 121.

elements to attack the Capitol because their attack planning began days or weeks before Brooks' Ellipse Speech.

**Brooks & 2020 Voter Fraud and Election Theft**

72.   Brooks believes that, if only lawful votes cast by eligible American citizens were counted, Donald Trump won the electoral college and won re-election.

73.   Brooks' belief is based on various reports, studies, articles, personal experience, the U.S. Constitution, the U.S. Code, and the like.  In accord with Brooks' belief, Brooks gave numerous 5-minute speeches on the House of Representatives floor that explained some of the reasons for his belief.  By way of example but not limitation:

- In 1982, a post-election investigation revealed that Democrats rigged 25% (11 out of 45) of the voting machines in Brooks' election to the Alabama House of Representatives.  Brooks won despite Democrats' election theft efforts (the first Republican to prevail in that legislative seat in over a century).  In one strong Republican precinct with five voting machines, none of the voting machines worked, prompting poll workers to periodically announce that, if you wanted to vote for Mo Brooks, you had to sign your name on a sheet on the wall.  Voters lost their secret ballot right but, at some point on election day, at least they could vote for the candidate of their choice.

- Brooks studied the bipartisan Commission on Federal Election Reform report, circa 2005, co-chaired and co-authored by Democrat President Jimmy Carter and Republican former Reagan White House Chief of Staff James Baker.  Among other things, this report identified significant systemic election fraud

weaknesses in America's election system, to-wit: that mailed out ballots were one of the worst, if not the worst, fraud-prone areas in America's election system; that lack of photo identification requirements in all 50 states was another major weakness; and that non-citizen voting in American elections was a growing problem that should be corrected.  The Commission warned that, if these system weaknesses were not corrected, there would come a day when the winning candidate is declared the loser and the losing candidate is declared the winner.  As best Brooks could ascertain, instead of addressing systemic weaknesses and fixing them, the 2020 election process magnified those weaknesses and made voter fraud and election theft much easier.

- Brooks studied a report by House Judiciary staffers that detailed 2020 election violations of Constitution Article 1, Section 4 (the "Elections Clause"), and other things.

- Brooks examined the 1993 National Voter Registration Act and, in particular, Section 5 of that Act that makes it <u>illegal</u> for voter registrars to require proof of citizenship when non-citizens demanded to be registered to vote.  In that vein, Brooks also examined a 2020 U.S. 10th Circuit Court of Appeals decision which confirmed a lower court decision striking down a Kansas law that empowered voter registrars to require proof of citizenship when a person sought to register to vote.

- Brooks examined a 2000 to 2005 era study by the General Accounting Office which revealed that as much as 3% of registered voters in some parts of America were not American citizens.

- Brooks examined various reports and communications out of Arizona, Georgia, Nevada, Pennsylvania, etc., that revealed significant voting system issues.

- Brooks read various court decisions and portions of the U.S. Constitution and federal election contest statutes that persuaded Brooks it is the duty of Congress, *not the Courts*, to resolve <u>all</u> election contests involving elections for the House of Representatives, the Senate, and the Presidency.

- The list of things Brooks read, and people Brooks talked with, concerning 2020 voter fraud and election theft activities goes on and on.

### AFFIRMATION

*Pursuant to 28 U.S.C. 1746, I declare or certify, under penalty of perjury that the foregoing stated facts are true and correct to the best of my knowledge and belief.*

*Executed on August 3, 2021.*

*Mo Brooks*

*Mo Brooks*
*Electronic Signature*

### ARGUMENT OVERVIEW

Congressmen are employees of the federal government who are subject to Westfall Act provisions.

The underlying facts are that Brooks (or his Congressional staff) issued tweets and Brooks gave an Ellipse Speech in the context of whether Congress should accept or reject states electoral college vote submittals, a matter before Congress pursuant to

the U.S. Constitution, generally, the U.S. Code, generally, and 3 U.S.C. 1 through 21, in particular.

The Complaint alleges small parts of those tweets and Ellipse Speech somehow incited an attack on the Capitol, and that Brooks and the other defendants conspired to attack the Capitol.  Brooks has issued sworn statements refuting these Complaint allegations.  Neither the DoJ nor Swalwell have presented any evidence conflicting with Brooks' sworn statements.

Brooks seeks certification that the tweets he issued and Ellipse Speech he gave were done in the scope of his employment pursuant to the terms of the Westfall Act.

Brooks concurs with the DoJ's admission that "the party seeking review bears the burden of presenting evidence and disproving the [Department's] decision to grant or deny scope of employment certification by a preponderance of the evidence."[24]

A key question is whether the Court should render a decision based on fictional Complaint allegations or facts supported by evidence.

**ARGUMENT**

1. **Congressmen are employees of the federal government and subject to the Westfall Act.**

Per 28 U.S.C. 2671, the term "employee" includes Congressmen.  "The plain meaning of this language is that members of Congress, federal judges, and the staffs of both all are included in the term "federal agency.""  Carroll v. Trump, U.S.D.C. District of Columbia, 20-CV-7311 (2020).

---

[24] DoJ Brief, p. 6.

Every single case cited in the DoJ and Swalwell briefs have consistently held that Congressmen and Senators are subject to the Westfall Act.[25]

2. **Speeches and Other Public Communications By Congressmen Generally Meet the Westfall Act's "Scope of Employment" Requirement And, If Part of the Speech or other Public Communication is Within "Scope of Employment", Then All of the Speech or other Public Communication is Within "Scope of Employment".**

Precedent establishes that if part of a Congressman's speech, tweet, or other public communication relates to public policy or public events (or even sometime purely private, personal matters of the sort Congressmen are expected to talk about), then the entire speech, tweet or other public communication is within a Congressman's scope of employment even though parts of the speech, tweet or other public communication may not, standing alone, be normally considered within scope of employment.

Brooks' Ellipse Speech was roughly 1,089 words long.  Swalwell and DoJ focus on less than 8% of the Speech: a two-sentence paragraph roughly 85 words (or, smaller yet, 13 words and 1% of the Ellipse Speech).[26]

---

[25] Swalwell argues Brooks is not a servant whose conduct was even arguably controlled by anyone on January 6, let alone his constituents.  Notably, Swalwell cites not one case holding that Congressman and Senators are not covered by the Westfall Act. Further, and not to be too cynical, Brooks submits it is reasonable for this Court to infer that it is highly  improbable that Congress  intended for the Westfall Act to give benefit to all federal government employees . . . except themselves.

[26] But let's be clear, regardless of today's outcome the 2022 and the 2024 elections are right around the corner, and America does not need and cannot stand, cannot tolerate any more weakling, cowering, wimpy Republican Congressmen and Senators who covet the power and the prestige the swamp has to offer, while groveling at the feet and the knees of the special interest group masters. As such, today is important in another way, today is the day American patriots start taking down names and kicking ass.

The Brooks' Ellipse Speech introduction was roughly 48 words (4%).  Focus on American history (greatness, sacrifices, Thomas Payne, etc.) was roughly 418 words (38%).  Urging citizens to lawfully exercise their First Amendment rights at the Capitol by chanting "USA" was roughly 180 words (17%).  Emphasizing the evils of Socialism (another major public policy issue before Congress) and that America, over the long haul, must and will beat Socialism was roughly 178 words (16%).  January 6 is a critical day for Congressional votes on the electoral college submittals was roughly 161 words (15%).  Remarking that the 2020 elections are over and done was roughly 19 words (2%).

Hence, 92% (and, arguably, 99%) of the Ellipse Speech was clearly within the boundaries of the House Ethics Rules.

In Wuterich v. Murtha, 562 F.3d 375 (DC Court Appeals, 2009), Congressman John Murtha, while in his campaign office, allegedly made false, defamatory statements to the news media about who killed Iraqi civilians.  Wuterich's Complaint alleged Murtha's "comments were made outside of the scope of his employment as a U.S. Congressman and [were] intended to serve his own private purposes and interests."  Just as the Murtha Court held it Complaint allegations not dispositive, neither should this Court concerning unsubstantiated Swalwell allegations.

Brooks emphasizes that Murtha's comments were "in his campaign office" to rebut DoJ's & Swalwell's suggestion that whether or not the Ellipse Rally was a "campaign event" is somehow dispositive.  It is the content of Brooks' Ellipse Speech that is dispositive and relevant, not its physical location.  See also Operation Rescue

28

Nat'l v. United States, 975 F. Supp. 92, 106 (D. Mass. 1997) (remarks made at a campaign fundraising event held within scope of employment).

Murtha submitted a declaration (evidence) rebutting Complaint allegation.  While the defamatory statements by Murtha, taken in isolation, may have been outside his scope of employment, the Court held that since the overall comments by Murtha, the "underlying conduct — interviews with the media about the pressures on American troops in the ongoing Iraq war — is unquestionably of the kind that Congressman Murtha was employed to perform as a Member of Congress", the entire public statement was uttered within scope of employment.  The Court stated, "even a partial desire to serve the master is sufficient" to make the entire public statement in the "scope of his employment." Emphasis added.

The United States was then substituted as a defendant.

Williams v. U.S., 71 F.3d 502 (5th Cir. 1995) similarly holds that an entire public statement is within the scope of employment even if part of the public statement was defamatory and arguably outside the scope of employment. This is in large part because the job requirements and duties of Congressmen are so broad and so unlike normal employees.

 After noting "the legislative duties of Members of Congress are not confined to those directly mentioned by statute or the Constitution. Besides participating in debates and voting on the Congressional floor, a primary obligation of a Member of Congress in a representative democracy is to serve and respond to his or her constituents. Such service necessarily includes informing constituents and the public at large of issues being considered by Congress", the Court held that "we are not hesitant to find that as a

matter of law Brooks's statements, including the alleged defamatory remarks and even assuming such remarks are defamatory, were made in the context of an interview addressing Congress' appropriation of money including Williams's lobbying fees for the restoration of the Battleship Texas, clearly fell within the course and scope of his position as a Member of Congress." (Emphasis added)

In John Does 1-10 v. Debra Haaland; Elizabeth Warren (U.S. Court of Appeals, 6th Cir. 2020, File Name 20a0293p.06, No. 19-6347), the Complaint alleged that Congressman Haaland & Senator Warren issued tweets defaming Covington Catholic High School students.

The district court "concluded that regardless of whether one agrees with Warren's and Haaland's communications, they were "intended to convey the politicians' views on matters of public interest to their constituents." R. 80, Dist. Ct. Order, PageID # 1081. Therefore, "the statements were made within the scope of defendants' employment as elected representatives" and they were entitled to the benefit of sovereign immunity pursuant to 28 U.S.C. § 2679(b)(1). Id. This meant that the United States was substituted as Defendant in their place."   Emphasis added.

The phrase "regardless of whether one agrees with Warren's and Haaland's communications" underscores that, while Swalwell and others may intensely agree or disagree with Brooks' Ellipse Speech content, that is not a suit basis.  America cherishes free speech, even speech some find offensive.  It makes no difference if the speech content is right or wrong.

On appeal, the 6th Circuit affirmed and found in favor of Warren and Haaland, stating, "out-of-circuit precedent involving situations closely aligned to the facts of this

case strongly supports finding that these tweets were within the scope of Defendants' employment as <u>officers</u> of the United States."  Emphasis added.

In particular, the <u>John Does</u> 6th Circuit relied on <u>Operation Rescue Nat'l v. United States</u>, 975 F. Supp. 92, 106 (D. Mass. 1997), wherein Senator Ted Kennedy publicly stated "that anti-abortion organizations like the plaintiff had a 'national policy [of] firebombing and even murder. … The district court found, in relevant part, that because "Senator Kennedy was providing political leadership and a basis for voters to judge his performance in office—two activities that public officials are expected, and should be encouraged, to perform," his comments were within the scope of employment. Id. at 108. <u>In this sense, the Senator's employer was his constituents and he served them by fully informing them of his views and working to pass legislation he believed would benefit them.</u>" Emphasis added, to underscore that "constituents" are also one of a Congressman's and Senator's multiple employers.

The 6th Circuit cited certain very important facts and reasoning in finding the Haaland and Warren tweets were protected by the Westfall Act, to-wit:

- The comments "constituted a condemnation of a political adversary's public acts"

- "Senator Warren and Representative Haaland were criticizing supporters of President Trump"

- The tweets related to "a topical and polarizing issue (i.e., the border wall)"

- "In each case, <u>the allegedly defamatory statements were made in the context of informing constituents of the Congressmembers' views and as part of their advocacy—whether for or against—current legislation</u>"

- "If anything, Senator Kennedy's allegations of domestic terrorism and murder were closer to the outer bounds of his scope of employment than Senator Warren's and Representative Haaland's less inflammatory tweets."

- "Defendants were reasonably connecting Plaintiffs' rhetoric and clothing to President Trump in order to comment on an event that had received widespread press attention and that resonated with the pressing issue of funding for the border wall."

- "[I]t is the act of communicating one's views to constituents and not the manner of communication that justifies application of the Westfall Act.

- "[T]hese tweets fit within the "wide range of legitimate 'errands' performed for constituents," which includes "preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress.""

- "Senator Warren and Representative Haaland sought to oppose the President and his legislative goals by putting on record their opposition to Plaintiffs' actions."

- "[T]he tweets were made in furtherance of the interests of Defendants' employers."

- "[The tweets] were calculated to serve the interests of Defendants' constituents (i.e., employers) by informing them of Defendants' views regarding a topical issue and related legislation."

Emphasis added to highlight the "campaign" or "political" nature of the Haaland and Warren public statements that were still found to be within scope of employment.

Haaland and Warren made numerous statements that are "political", and arguably even "campaign" in nature (by attacking 2020 re-election candidate Trump)" yet they were <u>still</u> held to be within scope of employment, thus showing how broad the phrase scope of employment is when applied to Congressmen and Senators.

The 6th Circuit concluded, "Plaintiffs were "engaging in behavior appropriate to the <u>normal scope of [their] employment</u>." . . . <u>Congressmembers</u> <u>routinely</u> <u>broadcast</u> <u>their</u> <u>views</u> <u>on</u> <u>pending</u> <u>legislation</u> <u>and</u> <u>related</u> <u>current</u> <u>events</u> <u>through</u> press releases, televised <u>speeches</u>, interviews, and, as in the present case, through <u>social</u> <u>media</u> <u>postings</u>. Defendants' statements were made within the scope of their employment." Emphasis added.

In <u>Council on American Islamic Relations v. Ballenger</u>, 444 F.3d 659 (D.C. Cir. 2006), the Court relied on <u>evidence</u> to hold that Ballenger's interview with a reporter about his personal marital status (something highly personal, perhaps a future campaign issue, but definitely not normally considered a work duty of a normal American employee) was *within* the Congressman's scope of employment.  <u>Ballenger</u> helps establish how broadly scope of employment is interpreted concerning Members of Congress, who, in the course of their Congressional duties, are expected to do most anything, and talk about most everything.

CAIR tried to distinguish defamatory words from the rest of the interview, arguing that "Ballenger's allegedly defamatory statement *itself* was not conduct of the kind he is employed to perform."  The Court of Appeals disagreed, finding, "To qualify as conduct of the kind he was employed to perform, the [defendant's] actions must have either

been of the same general nature as that authorized or *incidental* to the conduct authorized." Quoting <u>Haddon v. United States</u>, 68 F.3d 1420, 1424 (D.C. Cir. 1995).

<u>Ballenger</u> continued, "The proper inquiry in this case 'focuses on the underlying dispute or controversy, not on the nature of the tort, and is <u>broad enough to embrace any *intentional* tort arising out of a dispute that was originally undertaken on the employer's behalf.</u>  Here, the "underlying dispute or controversy" was the phone call between Ballenger and [the reporter] discussing the marital separation.  <u>The appropriate question, then, is whether that telephone conversation – not the allegedly defamatory sentence – was the kind of conduct Ballenger was employed to perform.</u>"

Paraphrasing <u>Ballenger</u>, "The appropriate question, then, is whether (an Ellipse speech at the request of the White House) – not the allegedly (the 13 words[27] - a mere 1% of the Ellipse Speech) – was the kind of conduct (Brooks) was employed to perform.

The <u>Ballenger</u> Court said "Yes".  This Court should follow <u>Ballenger</u> and hold likewise.

Finally, "CAIR claims that Ballenger's (defamatory) statement was not "actuated, even in part, to serve the master." … *The Restatement's text reveals that <u>even a partial desire</u> to serve the master is sufficient" for "scope of employment" purposes."*  Emphasis added.  Yet, the <u>Ballenger</u> Court still held that a conversation with a reporter about a Congressman's marital status was within the Congressman's employment scope.

<u>Ballenger</u> also cited <u>United States v. Brewster</u>, 408 U.S. 501, 512, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972) as consistent with this view, "describing as "entirely legitimate" a "wide range" of "activities other than purely legislative activities, "including "news letters

---

[27] "…today is the day American patriots start taking down names and kicking ass."

to constituents, news releases, and <u>speeches delivered outside the Congress</u>"" as well within the scope of employment of a Congressman." Emphasis added.

DoJ concurs with <u>Ballenger</u>, stating: "And Members of Congress may engage in activities within the scope of the office to which they were elected, <u>even where "one motive" is to garner "enhanced popularity [to] facilitate fundraising for [their] reelection campaign and ultimately help generate the votes [they] need[] to remain in office</u>*."* <u>Operation Rescue Nat'l v. United States</u>, 975 F. Supp. 92, 108 (D. Mass. 1997), aff'd, 147 F.3d 68 (1st Cir. 1998). <u>That includes making speeches to encourage public support for proposals or actions by the House that the Member supports, often in order to induce other Members to vote in the same way</u>."  DoJ Brief, p. 14.  Emphasis added.

### REBUTTAL OF SPECIFIC DOJ & SWALWELL ARGUMENTS

1. **This Court Should Reject the Swalwell & DoJ Arguments that Brooks Did Not Act Within the Scope of Employment Because Brooks' Remarks Were Prohibited Campaign or Political Activity.**

DoJ and Swalwell argue that <u>all</u> of Brooks' conduct is outside the scope of employment because <u>part</u> of Brooks' conduct was arguably prohibited by House Ethics Rules.

This argument should be rejected by this Court for two, independent reasons.

First, as stated above, "even a *partial desire to serve the master is sufficient*" to make the <u>entire</u> public statement in the "scope of his employment." <u>Wuterich v. Murtha</u>, above.  Similarly, if the gist of Brooks' conduct was within the scope of employment, the all of Brooks' sub-part conduct is within scope of employment.  Regardless of whether Brooks' motivation or actual conduct was, in whole or in part, due to House Floor votes later in the day on electoral college vote issues; or to protect Brooks' White House

relationship to preserve and promote space and defense jobs in Alabama's 5th Congressional District; or to address the recurrent public policy fight between dictatorial Socialism versus liberty, freedom and free enterprise; or to encourage American citizens to exercise First Amendment freedom of speech rights; or to generically encourage American citizens to exercise their civic duty to participate in unnamed future elections; or to discuss American history and greatness, or a combination thereof, the "partial desire to serve the master" requirement was met by Brooks' Ellipse Speech and, as such, all of Brooks' Ellipse Speech was within his scope of employment.

Second, DoJ and Swalwell rely heavily on the House Ethics Rules to claim Brooks somehow operated outside the scope of employment.  DoJ and Swalwell err.

Words have meaning.  And different words have different meanings.   The House Ethics Rules use "campaign activity", "campaign purpose", "political activity" and "political purpose" to describe what is, and what is not, prohibited conduct (herein "campaign activity" or "political activity", because House Ethics Rules offer no distinction between "activity" and "purpose").

## A. Brooks' Ellipse Speech is <u>Not</u> a <u>Campaign</u> Activity Prohibited by the House Ethics Rules.

While House Ethics Rules bar "campaign or political activity", the House Ethics Rules no not define either "campaign" or "political," leaving the terms vague and open to guesswork.

The essence of "Campaign Activity" is helping a campaign and candidate garner votes from the public that will result in victory.  <u>Every</u> <u>single</u> House Ethics Rules <u>example</u> of a "campaign activity" is in the context of (i) an effort to win an election to public office, (ii) in an existing (not hypothetical future) race that involves one or more

persons ("candidates"), (iv) who are seeking to persuade voters to vote for a candidate for that public office.

The House Ethics Rules give numerous, specific examples of prohibited "campaign activity".  Brooks' Ellipse Speech does not violate a single one.

Similarly, the DoJ Brief cites <u>six</u> cases concerning "campaign activity".  In each there is an election for public office, an existing (not hypothetical future) race, that involves one or more candidates, seeking to persuade voters to vote for a candidate for that public office.[28]  <u>Not a single case</u> in the DoJ Brief holds that an elected official speaking at a rally <u>after</u> all citizens have voted, <u>after</u> the election date has passed, and <u>after</u> the citizens' votes have been counted, constitutes "campaign activity" with respect to that campaign that ended months earlier on election day.

Taken as a whole, Brooks' Ellipse Speech does not ask or urge anyone to contribute to, volunteer for, vote for or otherwise in any way help or support any particular candidate or political party.

---

[28] DoJ Brief, p. 12 – <u>Glacken v. Incorporated Village of Freeport</u>, 2014 WL 1836143 (E.D.N.Y.):  a mayor gave a speech "while campaigning for *re-election* at a Candidates Forum"; DoJ Brief, p. 12 – <u>Williams v. Gorton</u>, 529 F.2d 668 (1976):  "Gorton, *while campaigning for re-election* in the Fall of 1972, made many uncomplimentary statements about Williams and the car dealership"; DoJ Brief, p. 12 – <u>Ennis v. Crenca</u>, 587 A.2d 485 (Md. 1991):  although not material to this action, this case pertained to a bribe to pay off a former candidate's/now office-holder's *campaign* debt; DoJ Brief p. 12 – <u>Dean v. American Federation of Government Employees, Local 476</u>, 509 F.Supp.2d 39 (D.D.C. 2007):  "Eitches sent the allegedly defamatory e-mail in response to an e-mail from a Local member specifically opposing his *re-election* in the upcoming Local election." DoJ Brief p. 13 - <u>Anderson v. City of Inkster</u>, 2014 WL 3747545 (Mich. Ct. App. July 29, 2014):  the person in question was "running for *reelection*"; DoJ Brief p. 17 - <u>Mehau v. Reed</u>, 869 P.2d 1320 (1994): "Reed delivered the speech as a political *candidate* and announced a disclaimer before he began."

In any event, as of January 6, 2021, there did not exist a presidential campaign citizens could vote in.  The presidential campaign ended on November 3, 2020, the election day for president set by 2 U.S.C. 7, by which time all citizen votes had been cast.  Hence, Brooks' Ellipse Speech was not a "Campaign Activity" concerning the 2020 presidential election.

What about future elections?

Brooks' generic encouragement to citizens to exercise their civic duty to generically participate in future elections helped no political party in any election and helped no specific candidate win any election.

There is nothing in the House Ethics Rules that state that Brooks' encouraging citizens to generically participate in America's Republic in the 2022 and 2024 elections is unethical "Campaign Activity". To the contrary, it is arguably the civic responsibility and part of every Congressman's job (and every elected official's job) to do exactly that.

While a line would have been crossed if Brooks had advocated supporting a particular candidate or a particular political party in the 2022 or 2024 elections, Brooks Ellipse Speech did not do that.  While it is true Brooks mentioned "Republicans" and "Democrats" in his Ellipse Speech, an honest and fair reading of Brooks' entire Ellipse Speech establishes that Brooks abided by House Ethics Rules by not advocating or favoring one political party over any other political party.

Brooks challenges Swalwell and the DoJ to prove a single instance in which Brooks' Ellipse Speech conflicts with a single House Ethics Rule "campaign activity" example.  They cannot because it did not happen.

**B.  Brooks' Ellipse Speech Was Not a "Political Activity" as that Term is Used in the House Ethics Rules.**

The House Ethics Rules phrase "political activity" is so broad as to be meaningless.  By and large, the House Ethics Rules appear to make the phrase "political activity" synonymous with "campaign activity".  To that extent, the above "campaign activity" analysis is incorporated herein by reference.

How all-encompassing and overly broad is the normal meaning of "political activity"? Merriam-Webster's Dictionary[29] defines "political" as "of or relating to government, a government, or the conduct of government", "of, relating to, or concerned with the making as distinguished from the administration of governmental policy", "of, relating to, involving, or involved in politics and especially party politics", "organized in governmental terms political units" and "involving or charged or concerned with acts against a government or a political system."

Per Webster's, everything a Congressman does, from voting, to giving floor speeches, to drafting legislation, to meeting with constituents, to participating in committee hearings, is "political" and, hence, a "political activity".  But this can't be the meaning of the House Ethics Rules because, if it is, every single Member of Congress regularly violates ethics laws and even this Court is caught in that "political activity" trap merely by handling this litigation.

Surely the meaning of "political", as used in the House Ethics Rules, should not be, and is not, construed as broadly as the word "political" is normally defined.

Hence, in the House Ethics Rules, the phrase "political activity" must mean something less than its normal meaning for its use to make any sense.  In that vein,

---

[29] https://www.merriam-webster.com/dictionary/political

Brooks suggests the most sensical explanation is that the phrase "political activity" refers to "partisan" activity that advances the interest of a political party.

The DoJ Brief refers to the House Committee on Ethics, *In the Matter of Allegations Relating to Representative Cathy McMorris Rodgers* 28-29, 43 (December 19, 2019) (herein "Rodgers Report") for the proposition that Brooks' Ellipse Speech does not have to reference an existing political campaign for election by voters to violate the House Ethics Rules.  In Rodgers Report, Congresswoman Rodgers gave two speeches "regarding winning over women voters for the benefit of <u>Republican</u> candidates in future elections."  DoJ Brief, p. 11.  The Committee deemed these speeches were "campaign and political activities" "even though those two speeches were not delivered at campaign events favoring a particular candidate." DoJ Brief, p. 11.

Rodgers' speeches were <u>not</u> "campaign activity" because they were not directed at an existing political campaign for election by voters.  Hence, they must violate the "political activity" prong because they sought to "(win) over women voters for the benefit of <u>Republican</u> candidates in future elections."  Stated differently, Rodger's speeches advanced a specific political party in future elections, to-wit: the <u>Republican</u> Party, thus making the Rodgers speeches partisan and "political activities".

Just as Brooks' Ellipse Speech was not a "campaign activity" (for reasons stated above), Brooks' Ellipse Speech was not a "political activity" because, on balance, it did not promote or advance any political party's interest in any future election because it, in accord with the House Ethics Rules, was bipartisan and expressed dissatisfaction with <u>both</u> political parties, while expressing <u>no</u> <u>preference</u> <u>or</u> <u>favoritism</u> toward either political party.

Stated differently, while Brooks generically complained about <u>both</u> Republicans and Democrats, Brooks never advocated, assisted or advanced the election of <u>any</u> Republican, Democrat, or other party candidate, generally or specifically; nor did Brooks advance any other interests of any political party, Republican, Democrat or other, in the 2022 or 2024 elections.  Hence, the Rogers Report does not apply to the Brooks' Ellipse Speech and the Brooks' Ellipse Speech was not a "political activity".

2. **Brooks Did Not Instigate or Incite an Attack on the Capitol as the Complaint Alleges.**

Swalwell's Complaint alleges, and the DoJ parrots, that Brooks instigated or incited an attack on the Capitol and, hence, did not engage in conduct within the scope of employment

This Court should reject this argument for two reasons.

First, "even a *partial desire to serve the master is sufficient*" to make the <u>entire</u> public statement in the "scope of his employment." <u>Wuterich v. Murtha</u>, Brooks has established, at a minimum, "partial desire".

Second, the evidence before this Court is that Brooks did not illegally instigate or incite the Capitol attack.  As such, this Court should reject the Swalwell and DoJ argument because it has no evidentiary support and has no Complaint allegation support that has not been rebutted by Brooks.

3. **Brooks' Conduct Was, In Whole or In Part, Related to His Duties Under the U.S. Constitution, Generally, and 3 U.S.C. Sections 1 Through 21**.

Swalwell advances the novel and creative argument that Brooks had no right to contest various state electoral college vote submittals because the U.S. Code allegedly does not empower Brooks to do that.  Swalwell Brief, pp. 18-19.

The House of Representatives disagrees.

In 2001 one or more Democrat Congressmen objected to receipt of Florida's electoral college vote submittal for George Bush.  In 2017, numerous Democrat Congressmen combined to object to receipt of the electoral college vote submittals of ten states:  Alabama, Florida, Georgia, Michigan, Mississippi, North Carolina, South Carolina, West Virginia, Wisconsin and Wyoming.

In 2005, a Democrat Congressman and a Democrat Senator objected to receipt of the electoral college vote submittal of Ohio.  Thirty-one Democrat Congressmen later voted to reject Ohio's electoral college vote submittal.

In 2021, Republican Congressmen and Republican Senators objected to the electoral college vote submittals of Arizona and Pennsylvania.  Six Republican Senators and 121 Republican Congressmen voted to reject the electoral college vote submittals of Arizona.  Seven Republican Senators and 138 Republican Congressmen voted to reject the electoral college vote submittals of Pennsylvania.

Congress (directly or indirectly via the Constitution and federal statutes), not Swalwell, determines what votes Congress will face on any given day.  Congress decided that, on January 6, 2021, Congressmen and Senators will vote on whether to accept or reject state electoral college vote submittals.

As such, Brooks' Ellipse Speech quite clearly related to, and was in the context of, votes in Congress later on January 6, 2021 concerning whether Congress should accept or reject state electoral college vote submittals.

**CONCLUSION**

The Brooks' tweets and Ellipse Speech, given at the request of the White House, regardless of whether they were right or wrong, are clearly in the context of House Floor votes later in the day on electoral college vote issues; protecting Brooks' White House relationship to preserve and promote space and defense jobs in Alabama's 5th Congressional District; addressing the recurrent public policy fight between dictatorial Socialism versus liberty, freedom and free enterprise; encouraging American citizens to exercise First Amendment freedom of speech rights; generically encouraging American citizens to exercise their civic duty to participate in unnamed future elections; Brooks' desire to reflect the views of his constituents, and/or discussing American history and greatness constitute a whole or "partial desire to serve the master" scope of work requirement, and, as such, were within Brooks' scope of employment as a United States Congressman.

It makes no difference whether others agree or disagree with Brooks' views.

Swalwell and DoJ having offered no material evidence rebutting any of Brooks' sworn statements, Brooks must be dismissed as a defendant in this matter concerning all applicable Complaint Counts and the United States of America should be substituted as a defendant in his stead pursuant to the Westfall Act.

*Mo Brooks*

Morris Jackson "Mo" Brooks, Jr.
1000 New Jersey S.E., Unit 1208
Washington, DC  20003

### CERTIFICATE OF SERVICE

I certify that on August 3, a copy of the foregoing was filed with the Clerk via email to DCDml_Intake@dcd.uscourts.gov and/or the Clerk's Pacer System which, as Brooks understands it, causes send a copy to all counsel of record.

43

*Mo Brooks*

Morris Jackson "Mo" Brooks, Jr.
1000 New Jersey S.E., Unit 1208
Washington, DC  20003